WILLIAM W. HUCKINS (BAR NO. 201098)
MATTHEW D. PHAM (BAR NO. 287704)
MIKAYLA O'NEAL (BAR NO. 334357)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, California  94111-4074
Phone:  (415) 837-1515
Fax:  (415) 837-1516
E-Mail:  whuckins@allenmatkins.com
        mpham@allenmatkins.com
        moneal@allenmatkins.com

Attorneys for Defendant
DAVID MICHAEL WHELCHEL

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>GROWTH CAPITAL SERVICES, INC.,<br>a Delaware corporation,<br><br>      Debtor. | Bankruptcy Case No. 23-30218-HLB<br><br>Adversary No. 23-03019<br><br>**DEFENDANT DAVID MICHAEL WHELCHEL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT** |
| JANINA M. HOSKINS, in her capacity as Chapter 7 Trustee of Growth Capital Services, Inc.,<br><br>      Plaintiff,<br><br>      v.<br><br>DAVID MICHAEL WHELCHEL, an individual, and FINALIS SECURITIES, LLC, a Delaware Limited Liability Company,<br><br>      Defendants. | Date:    Thursday, August 17, 2023<br>Time:   2:00 p.m.<br>Dept:   19<br><br>Complaint Filed:    May 9, 2023 |

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

Bankruptcy Case No.  23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:05:30   Page 1 of 62
4856-7020-2734.1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     MATERIAL FACTS ALLEGED IN THE COMPLAINT ............................. 3

    A.     The Parties ........................................................................................ 3

    B.     The Engagement Letters with Clients to Raise Capital .................... 4

    C.     Debtor's Financial Condition on November 24, 2021 ...................... 5

    D.     Debtor's Payments to Whelchel ....................................................... 6

    E.     The FINRA Arbitration Award in Early January 2022 and Debtor's
Resulting Decision to Terminate Its Employees and Shut Down Its
Operations ......................................................................................... 6

    F.     Debtor's Assignment of the Engagement Letters to Finalis and Other
Broker Dealers After Debtor Shut Down Its Operations ................. 7

    G.     Debtor Files for Bankruptcy and the Trustee Files this Adversary
Proceeding a Year Later ................................................................... 8

III.    FACTS AND DOCUMENTS REFERRED TO AND INCORPORATED
IN THE COMPLAINT, BUT NOT ATTACHED TO THE COMPLAINT ..... 8

IV.     ARGUMENT ............................................................................................... 12

    A.     The Standard for Dismissal Under FRCP 12(b)(6) ......................... 12

    B.     The First Claim for Relief Against Whelchel for Avoidance of
Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) Should Be
Dismissed ........................................................................................ 13

    C.     The Second Claim for Relief Against Whelchel for Avoidance of
Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B) Should Be
Dismissed ........................................................................................ 17

    D.     The Third Claim for Relief Against Whelchel for Avoidance of
Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) Should Be
Dismissed ........................................................................................ 18

    E.     The Fourth Claim for Relief Against Whelchel for Avoidance of
Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B) Should Be
Dismissed ........................................................................................ 22

    F.     The Fifth Claim for Relief Against Whelchel For Recovery of
Avoided Transfers Should Be Dismissed Because There Are No
Avoidable Transfers ........................................................................ 23

V.      CONCLUSION ............................................................................................ 23

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

(i)

Case 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 2 of 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................. 12

*Barron v. Reich*,
    13 F.3d 1370 (9th Cir. 1994) ...................................................................... 8

*Bass v. Facebook, Inc.*,
    394 F. Supp. 3d 1024 (N.D. Cal. 2019) ..................................................... 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................. 12

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994) ...................................................................... 8

*Cooper v. Centar Investments (Asia) Ltd. et al. (In re Trigem America Corp.)*,
    431 B.R. 855 (Bankr. C.D. Cal. 2010) ...................................................... 21

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ............................................................... 12, 14

*Estate of Fitness Holdings International, Inc. v. Hancock Park Capital II, L.P.*,
    714 F.3d 1141 (9th Cir. 2013) ............................................................ 18, 22

*Galbraith v. County of Santa Clara*,
    307 F.3d 1119 (9th Cir. 2002) .................................................................... 8

*Harris v. County of Orange*,
    682 F.3d 1126 (9th Cir. 2012) .................................................................... 9

*In re Acequia, Inc.*,
    34 F.3d 800 (9th Cir. 1994) ...................................................................... 14

*In re Cushman Bakery*,
    526 F.2d 23 (1st Cir. 1975) ....................................................................... 14

*In re ECS Refining, Inc.*,
    625 B.R. 425 (Bankr. E.D. Cal. 2020) ........................................... 12, 14, 17

*In re Google Assistant Priv. Litig.*,
    457 F. Supp. 3d 797 (N.D. Cal. 2020) ...................................................... 10

*In re McCafferty*,
    96 F.3d 192 (6th Cir. 1996) ...................................................................... 20

*In re Omegas Group, Inc.*,
    16 F.3d 1443 (6th Cir. 1994) .................................................................... 20

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

Case 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:05:30   Page 3 of 62

| | Page(s) |
|---|---|

*In re Tung Thanh Nguyen,*
783 F.3d 769 (10th Cir. 2015) .......................................................................... 20

*Johnson v. Riverside Healthcare Sys., LP,*
534 F.3d 1116 (9th Cir. 2008) ........................................................................... 12

*Khoja v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) .......................................................................... 8, 9

*Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.,*
926 F.2d 1248 (1st Cir. 1991) ........................................................................... 14

*Neilson v. Union Bank of Cal., N.A.,*
290 F.Supp.2d 1101 (C.D. Cal. 2003) ................................................................ 9

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC,*
709 F.3d 109 (2nd Cir. 2013) ...................................................................... 12, 14

*Screen Capital Int'l Corp. v. Library Asset Acquistion Co., Ltd.,*
510 B.R. 248 (C.D. Cal. 2014) .......................................................................... 14

*Senior Transeastern Lenders v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.),*
680 F.3d 1298 (11th Cir. 2012) ......................................................................... 18

*Tolz v. Miller (In re Todd),*
391 B.R. 504 (Bankr. S.D. Fla. 2008) ............................................................... 18

*United States ex rel. Harper v. Muskingum Watershed Conservancy District,*
842 F.3d 430 (6th Cir. 2016) ............................................................................. 12

*United States v. Ritchie,*
342 F.3d 903 (9th Cir. 2003) ............................................................................... 8

*Van Buskirk v. CNN,*
284 F.3d 977 (9th Cir. 2002) ............................................................................... 8

*Venture Assoc. Corp. v. Zenith Data Systems Corp.,*
987 F.2d 429 (7th Cir. 1993) ............................................................................... 8

*Yip v. Connedx Corp. (In re Gomez),*
560 B.R. 866 (Bankr. S.D. Fla. 2016) ............................................................... 15

**Statutes**

11 U.S.C. § 541(d) .............................................................................................. 20

11 U.S.C. § 548(a)(1) .......................................................................................... 13

11 U.S.C. § 548(a)(1)(A) ............................................................................... 13, 19

11 U.S.C. § 548(a)(1)(B) ........................................................................... 17, 18, 22

11 U.S.C. § 548(a)(1)(B)(i) ................................................................................. 18

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 4 of 64

4856-7020-2734.1

(iii)

|  | Page(s) |
|---|---|
| 11 U.S.C. § 548(c) | 20 |
| 11 U.S.C. § 548(d)(2) | 20 |
| 11 U.S.C. § 550 | 23 |
| 11 U.S.C. § 551 | 23 |

**Other Authorities**

| 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed.1999) | 8 |

**Rules**

| Fed. R. Bankr. P. 7009 | 14 |
| Fed. R. Bankr. P. 7012(b) | 12 |
| Fed. R. Civ. P. 12(b)(6) | 12 |
| Fed. R. Civ. P. 9 | 13 |
| FINRA Rule 4110 | 15 |
| SEC Exchange Act Rule 15c3-1 | 15 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4856-7020-2734.1

(iv)

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 5 of 62

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The Complaint for Avoidance and Recovery of Actual and Constructive Avoidable Transfers ("Complaint") filed by Janina M. Hoskins ("Trustee") in her capacity as Chapter 7 Trustee of Growth Capital Services, Inc. ("Debtor") against David Michael Whelchel ("Whelchel") must be dismissed.

As discussed in more detail below, Debtor was an independent broker dealer registered with the Securities and Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"), whose primary business was providing broker dealer services in connection with the private placement offerings of securities. Private placement offerings of securities are required to be consummated by an SEC-registered broker dealer, and Debtor provided the required supervisory, compliance and investigative activities in connection with the private placement offerings. As a SEC-registered broker dealer, Debtor was required to meet certain specified net capital requirements as a condition of conducting its broker dealer services.

Whelchel is the co-founder and managing partner of Big Path Capital, LLC ("Big Path"), a boutique investment bank focused on helping companies and funds raise capital through the private placement offerings. Whelchel was a registered representative with Debtor pursuant to an independent contractor agreement between the parties, which was referred to as a subscription agreement.

Finalis Securities, LLC ("Finalis"), the other named defendant in the Trustee's Complaint, also is an independent SEC-registered broker dealer and member of FINRA that provides broker dealer services like Debtor provided before it terminated its employees and shut down its operations in January 2022. Whelchel became a registered representative with Finalis after Debtor shut down its operations in January 2022.

Before Debtor shut down its operations, Whelchel, Big Path and Debtor worked together in facilitating the private placement offerings by clients looking to raise capital. Whelchel and Big Path provided advisory and investment banking services, and Debtor provided the required broker dealer services mandated by the SEC, FINRA and other regulatory bodies. In connection with

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-1-

Case 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:06:50   Page 6 of 62

proposed private placement offering by clients, Whelchel, Big Path, Debtor and the clients would enter into Engagement Letters, which described the relationship between the parties, the services to be provided, and the fees (also referred to as commissions) to be paid to Debtor (typically 2% of the capital raised) upon the successful private placement of the client's securities. Under the subscription agreement, the client's commission payments, which were required to be paid to Debtor as the SEC-registered broker dealer, were shared between Whelchel and Debtor, with 90-96% paid to Whelchel and 4-10% paid to Debtor for their respective services.[1]

On January 10, 2022, a FINRA arbitration panel issued an adverse arbitration award against Debtor of more than $900,000. According to the Complaint, within 7 days after the adverse award was issued, Debtor terminated all of its employees, shut down its operations, and ceased providing broker dealer services. After shutting down its operations, Debtor entered into amendments to the client Engagement Letters, which assigned Debtor's rights and obligations to provide broker dealer services under the Engagement Letters to Finalis.

The First and Second Claims for Relief of the Complaint against Finalis and Whelchel allege that the client Engagement Letter amendment were fraudulent transfers, both with actual intent to defraud and constructively in fraud of creditors. The First and Second Claims for Relief fail to state claims against Whelchel because he was not a transferee under the amendments. Rather, Whelchel and Big Path were already parties to the Engagement Letters. Moreover, even if Whelchel were a transferee – which is not the case, the Complaint fails to allege facts sufficient to infer any actual intent to defraud and the facts alleged reflect Debtor received reasonably equivalent value when Finalis assumed Debtor's broker dealer obligations under the Engagement Letters after Debtor terminated its employees and shut down its operations. As such, the First and Second Claims for Relief fail to state claims against Whelchel and must be dismissed.

---

[1] As set forth in Exhibit 1 hereto, Whelchel's share and Debtor's share of the commission were based on the gross amount of commissions received by Debtor over the previous 12 months. On the first $500,000 in commissions, Whelchel received 90% of the commissions and Debtor received 10% of the commissions; for the next $500,000 of commissions received, Whelchel received 93% of the commissions and Debtor received 10%, commissions; and once commissions exceeded $1,000,000, Whelchel received 96% of the commissions and Debtor received 4% of the commissions.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:09:30   Page 7 of 62

4856-7020-2734.1

-2-

The Third and Fourth Claims for Relief of the Complaint against Whelchel allege that Debtor's commission payments to Whelchel from successful private placement offerings were fraudulent transfers, both with actual intent to defraud and constructively in fraud of creditors. The Third and Fourth Claims for Relief fail to state fraudulent transfer claims against Whelchel because there are no badges of fraud from which to infer any actual intent to defraud in connection with the commission payments to Whelchel, the commission payments were for services rendered and earned by Whelchel and Big Path, and Debtor's payment in satisfaction of the debt owed to Whelchel constitutes an exchange of value that is not a transfer constructively in fraud of creditors, as matter of law. As such, the Third and Fourth Claims for Relief against Whelchel must be dismissed.

Last, because the avoidable transfer claims against Whelchel fail, the Fifth Claim for Relief against Whelchel for recovery of avoidable transfers likewise fails.

In sum, all of the Claims for Relief against Whelchel fail and the Complaint against Whelchel must be dismissed.

## II.    MATERIAL FACTS ALLEGED IN THE COMPLAINT[2]

### A.    The Parties

Debtor was an independent SEC-registered broker dealer and member of FINRA, whose primary business was providing broker-dealer services in connection with the private placement offerings of securities. Complaint, ¶¶ 2, 16, Ex. A.

Whelchel is the co-founder and managing partner of Big Path, a boutique investment bank focused on providing corporate finance, merger and acquisition, and placement agent services to companies and funds globally. Complaint, ¶ 30.[3] Whelchel was a registered representative of Debtor pursuant to an independent contractor agreement between Whelchel and Debtor. Complaint, Ex. A, § 1.3.[4] As discussed below, Whelchel became a registered representative of Finalis in late

---

[2]    Whlechel disputes many of the factual allegations of the Complaint, notwithstanding references to the factual allegations herein.

[3]    Big Path is not a registered broker dealer. Complaint, ¶ 41.

[4]    The independent contractor agreement, also known as a Registered Representative Subscription Agreement ("Subscription Agreement") is discussed in Section III, *infra*, and is attached as Exhibit 1 hereto.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-3-

Case 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 8 of 62

January 2022, after Debtor terminated all of its employees, shut down its operations, and ceased to provide broker dealer services. Complaint, ¶¶ 4, 12, 27, 41, 44.

Like Debtor before it ceased operations, Finalis is a SEC-registered broker dealer and member of FINRA. Complaint, ¶ 13, Ex. B.

**B.     The Engagement Letters with Clients to Raise Capital**

As discussed above, Big Path, Whelchel and Debtor were engaged in the business of facilitating the private placement offerings of securities by clients. Complaint, ¶¶ 16, 30-32. In connection with these services, Big Path, Whelchel, Debtor, and clients looking to raise capital through private placement offerings would enter into "Engagement Letters," which described the relationships between the parties, the services to be rendered, the fees to be paid, and other rights and obligations of the parties. Complaint, ¶¶ 28, 29, Ex. A.

The Engagement Letters provided that the relationship between Big Path/Whelchel, as advisor, and the client was that of an independent contractor. Complaint, Ex. A, § 1.2. Similarly, the Engagement Letters provided that the relationship between Debtor and the client also was that of an independent contractor. Complaint, Ex. A, § 1.3. With respect to the relationship between Big Path/Whelchel and Debtor, the Engagement Letters provided that:

> "Advisor is a registered representative of GCS pursuant to an independent contractor agreement (the "Independent Contractor Agreement") between Advisor and GCS. This Agreement shall not affect the Independent Contractor Agreement, and if there is a conflict between such Independent Contractor Agreement and this Agreement, then the Independent Contractor Agreement shall control, as between GCS and Advisor." Complaint, Ex. A, § 1.4.

The Engagement Letters described the services to be provided by Big Path/Whelchel, as Advisor, and Debtor, as the registered broker dealer. Specifically, as advisor, Whelchel/Big Path was to use its best efforts to facilitate and effect the client's offering of securities through a private placement. Complaint, Ex. A. § 2.1.2. As the registered broker dealer, the Engagement Letters describe Debtor's services as follows:

> "Certain Offerings are subject to regulation by the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA") and/or other regulatory agencies. Such Offerings may only be marketed and consummated by an SEC-registered broker dealer. Accordingly, GCS shall provide certain supervisory, compliance and investigative activities mandated by the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

Bankruptcy Case No.  23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

4856-7020-2734.1                                    -4-

Case 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:09:30   Page 9 of 62

SEC, FINRA and applicable law in connection with such Offerings, and shall also present the Offering to identified parties (the "Broker Dealer Services"). Complaint, Ex. A, § 2.2.2.

Under the Engagement Letters, on the closing of an Offering, the client was required to pay a broker-dealer fee of 2% of the investment made or committed to be made in the Offering by a prospective investor. Complaint, Ex. A, § 3.2.

In the event of a termination of an Engagement Letter, *other than termination by the client for a material breach by Debtor or Whelchel/Big Path*, the Engagement Letter states Debtor is entitled to the applicable broker dealer fee if the client consummated an Offering with any prospective investor within 24 months after the termination date. Complaint, Ex. A, § 3.2.2 (emphasis added). Conversely, if an Engagement Letter terminated because of a material breach by Debtor, Debtor had no entitlement to a broker dealer fee after the termination.

The Engagement Letters further provided that in consideration of and as a condition precedent to the client's engagement of Debtor and Whelchel/Big Path, the parties agreed to certain indemnity obligations. Complaint, Ex. A, § 6. In that connection, Debtor agreed to indemnify, defend and hold harmless each client indemnified person against all losses arising out of or in connection with a material breach by Debtor. Complaint, Ex. A, Appendix B, § 3.

Finally, if the Engagement Letter was terminated, the indemnity obligations and the obligation to pay fees and expenses owed to Whelchel/Big Path would not be affected. Complaint, Ex. A, § 9.

**C.      Debtor's Financial Condition on November 24, 2021**

The Complaint alleges that according to Debtor's audited financial statement dated November 24, 2021, Debtor had cash and cash equivalents of $4,261,311 and commission receivables of $2,062,127. Complaint, ¶ 2. The Complaint fails to describe Debtor's liabilities as of November 24, 2021 and fails to attach Debtor's audited financial statement as an exhibit to the Complaint. As discussed in footnote 1 above and Exhibit 1 hereto, Debtor likely had commission liabilities as of November 24, 2021 because as much as 96% of the commissions receivable by Debtor in connection with private placement offerings were then owed to Whelchel/Big Path under

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-5-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:20:30    Page 10 of 62

the Subscription Agreement, and likely to Debtor's other registered representatives under their independent contractor/subscription agreements.

**D.    Debtor's Payments to Whelchel**

The Complaint alleges Debtor paid Whelchel $1.7 million on December 30, 2021 and $225,000 between January 14, 2022 and February 7, 2022.  Complaint, ¶ 26.

Notably, while the records and documents are certainly in the possession and control of the Trustee, the Complaint omits copies of Debtor's alleged payments (e.g., wire transfer confirmations) and the related supporting documentation (e.g., remittance advices or other memoranda) explaining the reasons for Debtor's payments.[5]  As discussed in Section III *infra* and attached hereto as Exhibit 2, Debtor's alleged payment of $1.7 million payment to Whelchel on December 30, 2021 related to commissions earned by and owed to Whelchel for successful private placement offerings.

**E.    The FINRA Arbitration Award in Early January 2022 and Debtor's Resulting Decision to Terminate Its Employees and Shut Down Its Operations**

On January 10, 2022, a FINRA arbitration panel issued an award of more than $900,000 in favor of Intellivest Securities, Inc. and against Debtor.  Complaint, ¶¶ 3, 21, 25, 26.  The Complaint did not attach a copy of the FINRA arbitration award as an exhibit.  As discussed in Section III *infra*, a copy of the FINRA arbitration award is attached as Exhibit 3 hereto.[6]

The Complaint alleges that within a week after the adverse arbitration award was issued, GCS terminated its employees and shut down its operations.  Complaint, ¶¶ 4, 27.  As discussed above, Whelchel became a registered representative of Finalis on or about January 18, 2022 after Debtor shut down its operations and ceased providing broker dealer services.  Complaint, ¶ 41.

---

[5]    As a SEC-registered broker dealer in a highly regulated industry, plainly there are documents evidencing Debtor's payments and what they were for.

[6]    The allegations in the Complaint about what Debtor knew or must have known about the arbitration award before it was issued are speculative, conclusory and factually unsupported. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681-82 (2009)(ignoring allegations of a defendant's purported knowledge where there were no specific facts supporting an inference of knowledge).

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4856-7020-2734.1

Bankruptcy Case No.  23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-6-

**F.      Debtor's Assignment of the Engagement Letters to Finalis and Other Broker Dealers After Debtor Shut Down Its Operations**

After shutting down its operations, the Complaint alleges that starting on or about January 24, 2022, Debtor entered into amendments to the Engagement Letters, assigning Debtor's rights and obligations to other broker dealers, including Finalis.  Complaint, ¶¶ 4, 37.  Exhibit C of the Complaint attaches an exhibit from Debtor's Statement of Financial Affairs (Exhibit A, page 27 of 29) describing transfers by Debtor outside of the ordinary course of business within 2 years of the petition date.  Complaint, ¶ 39, Ex. C.  Exhibit C identifies the assignment of Engagement Letters involving Whelchel/Big Path and other registered representatives of Debtor.  *Id.*[7]  Exhibit B of the Complaint includes selective examples of Engagement Letter amendments ("Amendments") involving Debtor, Big Path, Whelchel (as signatory for Big Path and as registered representative), the client or "Company," and Finalis.  Complaint, ¶ 39, Ex. B.

The Amendments make clear that Debtor (described as "Broker Dealer"), Big Path and Company are parties to existing Engagement Letters (referred to in the Amendments as "Letter Agreements").  Complaint, Ex. B.  In describing the assignment by Debtor and the assumption by Finalis, the Amendments state:

> 1.      All of Broker Dealer's rights, title, obligations, duties, and interest in the Letter Agreement (the "**Rights**") shall be assigned by Broker Dealer to Finalis and Finalis assumes the Rights.   All references in the Letter Agreement to (i) "Growth Capital Services, Inc." are hereby replaced with "Finalis Securities LLC" and (ii) "GCS" are hereby replaced with "Finalis".   Notwithstanding anything to the contrary in the Letter Agreement or in the Independent Contractor Agreement (as defined in the Letter Agreement), as of the date hereof, Broker Dealer shall not be entitled to receive any fees, tail fee or compensation pursuant under the Letter Agreement as of the date hereof.  Complaint, Ex. B.

As set forth in the Amendments, Debtor assigned its rights and obligations under the Engagement Letters and Finalis assumed those rights and obligations as of the date of the Amendment, with Big Path, Whelchel and the affected Company agreeing and consenting to the

---

[7]   Of the 50 contracts identified in Exhibit C, 29 appear to involve Big Path/Whelchel and were assigned to Finalis, and 21 appear to involve other registered representatives that were assigned to other broker dealers.  *Id.*  No adversary proceedings have been initiated against broker dealers or registered representatives involving the assignments other than against Whelchel and Finalis.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No.  23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT
-7-

Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 14:08:39   Page 12 of 62

assignment to and assumption by Finalis. The Amendments further clarify that, except for the assignment to and assumption by Finalis, a change in wire transfer instructions to Finalis instead of Debtor, and a revision to the indemnity agreement between Finalis and the affected Company, the Engagement Letters remained unaltered and in full force and effect. Complaint, Ex. B, § 4.

### G. Debtor Files for Bankruptcy and the Trustee Files this Adversary Proceeding a Year Later

On May 3, 2022, Debtor filed for bankruptcy. Complaint, ¶ 45. As of the petition date, Debtor had $43,024.70 in assets and liabilities of $2,472,881.12 (of which $24,517.70 were priority wage claims and $2,448,363.42 were general unsecured claims). *Id.* Of the scheduled general unsecured claims, Intellivest is identified as a creditor holding a contingent, unliquidated and disputed claim of $908,929.50 and Joshua Petersen is identified as a creditor holding a contingent, unliquidated and disputed claim $1,500,000.

On May 9, 2023, the Trustee filed the Complaint against Whelchel and Finalis.

## III. FACTS AND DOCUMENTS REFERRED TO AND INCORPORATED IN THE COMPLAINT, BUT NOT ATTACHED TO THE COMPLAINT

A court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)(citing *Van Buskirk v. CNN*, 284 F.3d 977, 980(9th Cir. 2002); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed. 1999)). A document not attached to a complaint may be incorporated by reference into a complaint if the plaintiff refers to the document or the document forms the basis of the plaintiff's claim. *Id.* (citing *Van Buskirk*, 284 F.3d at 980; *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431(7th Cir. 1993)). A defendant may offer such a document, and the court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6). *Id.*; *see also Khoja*

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-8-

Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 16:50:39   Page 13 of 62

*v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018)(a court "may assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)"); *Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp.2d 1101, 1114 (C.D. Cal. 2003)(reasoning that plaintiffs should not be allowed to survive a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based). A court may also take judicial notice under Federal Rule of Evidence 201 and consider documents not attached to a complaint if their authenticity is not subject to reasonable dispute and the complaint refers to or relies on the documents. *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); *Khoja*, 899 F.3d at 1003.

Here, the Complaint and Exhibit A (i.e., the Letter Agreement example) refer to Whelchel "as a registered representative of GCS pursuant to an independent contractor agreement (the "Independent Contractor Agreement") between Advisor and GCS." Complaint, ¶¶ 13, 41, Ex. A (§ 1.3). Section 1.3 of Exhibit A, describing the "Relationship Between Advisor and GCS," further states: "This Agreement shall not affect the Independent Contractor Agreement, and if there is a conflict between such Independent Contractor Agreement and this Agreement, then the Independent Contractor Agreement shall control, as between GCS and Advisor." Complaint, Ex. A. Further, the Complaint and Exhibit B (i.e., the Amendment to Letter Agreement) state: "Notwithstanding anything to the contrary in the Letter Agreement or in the Independent Contractor Agreement (as defined in the Letter Agreement), as of the date hereof, Broker Dealer shall not be entitled to receive any fees, tail fee or compensation pursuant to the Letter Agreement as of the date hereof." Complaint, ¶ 38, Ex. B.

Notwithstanding the repeated references to Whelchel as a registered representative of Debtor pursuant to an Independent Contractor Agreement, and the centrality of the agreement to the relationship between Whelchel, Big Path, Debtor and the clients under the Engagement Letters, the Complaint fails to include a copy of the Independent Contractor Agreement between Debtor and Whelchel. Accordingly, a copy of the Independent Contractor Agreement, referred to as the Registered Representative Subscription Agreement ("Subscription Agreement"), is attached hereto

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-9-

Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 16:35:39   Page 14 of
62

as Exhibit 1. The Subscription Agreement should be considered by the Court in deciding this motion to dismiss.[8]

As set forth in Exhibit 1, the Subscription Agreement is between Whelchel, as primary registered representative, and Debtor, as broker dealer, and describes the services to be provided by and the relationships between the parties. Ex. 1, pgs. 2, 8, 11. Under the Subscription Agreement, Whelchel was required to be paid 90-96% of the commissions (i.e., any cash compensation) received by Debtor in connection with services and securities transactions conducted by Whelchel on Debtor's platform, supervised and overseen by Debtor. Ex. 1, pgs. 2 (§ 2), 11 (§ 1.a), 12 (§ 1.f), 12 (§ 2.c).[9] Debtor was required to pay the commissions to Whelchel within the 7 days following Debtor's receipt of the commissions from the clients or Debtor's approval of the proposed securities transaction, whichever was later. Ex. 1, pg. 5 (§ 1.f).

The Subscription Agreement described Debtor's services as supervision and oversight of Whelchel's activities involving securities transactions, as required under federal and state securities law and the rules of FINRA. Ex. 1, pg. 12 (§ 2.c). Like the Engagement Letters, the Subscription Agreement provided that Whelchel was an independent contractor of Debtor. Ex. 1, pg. 12 (§ 3). Under the Subscription Agreement, Debtor was required to "remain in good standing and maintain appropriate licensure as required by the applicable regulatory authorities" and to inform Whelchel immediately of any event that precluded Debtor of fulfilling its obligations under the Subscription Agreement. Ex. 1, pg. 15 (§ 6.a).

Further, Whelchel was allowed to terminate the Subscription Agreement for any material breach by Debtor. Ex. 1, pg. 17 (§ 10.a.ii). Termination of the Subscription Agreement would not, however, affect the compensation owed to Whelchel and Debtor (i.e., payment of commissions) for services performed during the term of the Subscription Agreement. Ex. 1, pg. 18 (§ 10.b.iii). The

---

[8] The Subscription Agreement was signed Debtor's CEO, Brian Dunn, is a document in the possession, custody or control of the Trustee, its authenticity is not subject to reasonable dispute, and it should be considered by the Court in deciding this motion to dismiss. *See Bass v. Facebook, Inc*., 394 F. Supp. 3d 1024, 1037 n.1 (N.D. Cal. 2019) (granting Facebook's request to incorporate by reference the Terms of Service because the consolidated complaint relied upon them to allege the breach of contract claims and statutory claims); *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 814 (N.D. Cal. 2020).

[9] Conversely, Debtor was entitled to retain 4-10% of the commissions it received.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

Subscription Agreement also provided that for securities transactions approved in writing by Debtor prior to termination, the commission payments received during the 12-month period following termination would be split between Whelchel and Debtor as set forth in Section 1.a of the Subscription Agreement discussed above (i.e., 90-96% to Whelchel and 4-10% to Debtor). Ex. 1, pg. 19 (§ 11).

Debtor also agreed to indemnify Whelchel and Big Path against any losses incurred or suffered by Whelchel and Big Path resulting from Debtor's failure to perform its obligations as broker dealer under the Subscription Agreement. Ex. 1, pg. 20 (§ 12.b).

Like the Independent Contractor Agreement/Subscription Agreement, the Complaint makes repeated allegations about payments made to Whelchel on December 30, 2021 through early February 2022. The Complaint again omits evidence of the payments and supporting documents related to the payments. As discussed above, the payments related to Whelchel's share of the commissions received by Debtor in connection with successful private placement offerings. Attached as Exhibit 2 hereto is a copy of the spreadsheet Debtor provided to Whelchel in support of the December 30, 2021 commission payment. The spreadsheet describes the successful securities offerings ("Deal" column), the commissions received by Debtor, the shares of the commissions owed to Whelchel, and totals of the commissions received and paid. The identities of the sellers and buyers of the securities and the related transaction values have been redacted from the spreadsheet for confidentiality purposes. Exhibit 2 also includes a screenshot of Whelchel's bank records showing Whelchel's receipt of Debtor's wire transfer payment of the commissions owed to Whelchel. Exhibit 2 should be considered by the Court in deciding this motion to dismiss.

The Complaint also refers repeatedly to the FINRA arbitration award, but fails to attach a copy of the award to the Complaint. *See, e.g.*, Complaint, ¶¶ 3, 4, 21, 51, 60, 65, 71. Accordingly, a copy of which is FINRA arbitration award dated January 10, 2022 is attached hereto as Exhibit 3. Exhibit 3 should be considered by the Court in deciding this motion to dismiss.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT
-11-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:58:30    Page 16 of 62

# IV. ARGUMENT

## A. The Standard for Dismissal Under FRCP 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), made applicable in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012(b), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6), incorporated by Fed. R. Bankr. P. 7012(b). "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *accord Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Courts employ a three-step analysis in deciding Rule 12(b)(6) motions. *In re ECS Ref., Inc.*, 625 B.R. 425, 439 (Bankr. E.D. Cal. 2020). First, the court takes notice of the elements of the claim to be stated. *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Next, the court discards conclusions. *Iqbal*, 556 U.S. at 679; *United States ex rel. Harper v. Muskingum Watershed Conservancy District*, 842 F.3d 430, 438 (6th Cir. 2016) (the complaint failed to include "facts that show how" the defendant would have known alleged facts). Finally, assuming the truth of the remaining well-pleaded facts, and drawing all reasonable inferences therefrom, the court determines whether the allegations in the complaint "plausibly give rise to an entitlement to relief." *In re ECS Refining Inc.*, 625 B.R. at 439 (citations omitted). "Plausibility means that the plaintiff's entitlement to relief is more than possible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) (the facts pled "must cross the line from conceivable to plausible"); *Iqbal*, 556 U.S. at 678 (plausibility requires more than a sheer possibility). Allegations that are "merely consistent" with liability are insufficient. *Iqbal*, 556 U.S. at 662. Moreover, if the facts give rise to two competing inferences, one of which constitutes an obvious alternative explanation, that inference defeats a finding of plausibility and the complaint must be dismissed. *Marcus & Millichap Co.*, 751 F.3d at 996; *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 121 (2nd Cir. 2013) (emphasis added).

Here, as discussed in more detail below, the Complaint against Whelchel must be dismissed.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-12-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:34:53    Page 17 of 62

**B.** **The First Claim for Relief Against Whelchel for Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) Should Be Dismissed**

The First Claim for Relief of the Complaint alleges that Debtor's assignment of the Engagement Letters to Finalis were transfers made with actual intent to hinder, delay and defraud creditors under 11 U.S.C. § 548(a)(1)(A).[10] The First Claim for Relief is alleged "Against All Defendants," including Whelchel. As discussed below, the First Claim for Relief, as it relates to Whelchel, fails and must be dismissed.

Bankruptcy Code § 548(a)(1)(A) provides that the trustee may avoid a transfer of an interest of the debtor in property that was made within 2 years before the petition date if the debtor made the transfer "with **actual intent** to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . ." 11 U.S.C. § 548(a)(1) (emphasis added).

Here, the Complaint inaccurately alleges that the Engagement Letter were transferred to "Finalis and Whelchel in his capacity as Big Path's managing partner and a registered representative of Finalis." Complaint ¶ 52. As discussed above, Whelchel and Big Path were already parties to the Engagement Letters prior to the Amendments. The Amendments assigned Debtor's rights and obligations under the Engagement Letters to Finalis, which assumed the rights and obligations. Whelchel and Big Path were not the recipients of any transfers of the Engagement Letters by Debtor. Accordingly, the First Claim for Relief against Whelchel must be dismissed.

Even if Whelchel or Big Path were a recipient of the Engagement Letters – which is not the case, the First Claim for Relief would nevertheless fail because the Complaint fails to allege facts sufficient to state a claim that the Engagement Letters were transferred with actual intent to hinder delay or defraud Debtor's creditors.

Claims for avoidance of an alleged fraudulent transfer under Bankruptcy Code § 548(a)(1) are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9, incorporated

---

[10] While paragraph 51 of the Complaint refers to a $1.7 million payment to Whelchel on December 30, 2021, the other paragraphs of the First Claim for Relief and the prayer for relief clarify that the First Claim for Relief only seeks to avoid the assignment of the Engagement Letters as alleged fraudulent transfers.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-13-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:56:59    Page 18 of
62

by reference in Federal Rule of Bankruptcy Procedure 7009. *See Screen Capital Int'l Corp. v. Library Asset Acquisition Co., Ltd.*, 510 B.R. 248, 257 (C.D. Cal. 2014)(allegations of fraud must be pleaded with particularity and conclusory allegations of fraud are insufficient). Courts examine the circumstances, or badges of fraud, in evaluating claims of fraudulent transfers with actual intent to hinder, delay or defraud, such as: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer. *In re Acequia, Inc.*, 34 F.3d 800, 805-06 (9th Cir. 1994). Courts also examine whether there was a legitimate supervening purpose for the transfer. *Id.* at 806. Multiple badges of fraud are typically necessary to establish a presumption of fraudulent intent. *See Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254 (1st Cir. 1991); *In re Cushman Bakery*, 526 F.2d 23, 33 (1st Cir. 1975). Further, as discussed above, if the facts give rise to two competing inferences, one of which constitutes an obvious alternative explanation, that inference defeats a finding of plausibility and the complaint must be dismissed. *See Marcus & Millichap Co.*, 751 F.3d at 996; *New Jersey Carpenters Health Fund*, 709 F.3d at 121.

Here, the Complaint's allegations fail to show an actual intent to defraud Debtor's creditors in assigning the Engagement Letters to Finalis, the allegations are conclusory and factually unsupported, and the allegations are subject to alternative, persuasive and plausible explanations.

First, within a week after the adverse arbitration award was entered against Debtor, Debtor's officers terminated all of the employees and shut down its operations, apparently determining Debtor could no longer conduct business in light of the award. Complaint ¶ 4. The decisions by Debtor's officers on behalf of Debtor to terminate its employees and shut down its operations fall under the business judgment rule, which presumes the decisions were made on an informed basis, in good faith, and in the honest belief the action was taken in the best interests of Debtor. *See ECS Refining*, 625 B.R. at 446-47.

Second, under SEC regulations and FINRA rules, a registered broker dealer must satisfy certain net capital requirements to continue operations as a broker dealer, and a broker dealer must

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4856-7020-2734.1

-14-

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 09:50:58   Page 19 of 62

suspend all of its business operations when it fails to meet the net capital requirements. *See* SEC Exchange Act Rule 15c3-1 (requiring registered broker dealers to maintain specified net capital requirements for the protection of their customers); FINRA Rule 4110 (requiring a member to suspend all business operations during any period in which it is not in compliance with applicable net capital requirements set forth in SEC Exchange Act Rule 15c3-1, unless otherwise permitted by FINRA). Here, from the facts alleged in the Complaint, one can reasonably infer that when the adverse arbitration award was entered against Debtor, Debtor could not satisfy its net capital requirements and was forced to shut down its operations. The Complaint fails to allege sufficient facts about the adequacy of Debtor's capitalization and ability to satisfy Debtor's net capital requirements after entry of the arbitration award to defeat the presumption that Debtor was forced to shut down its operations on an informed and good faith basis because of regulatory requirements.

Third, as discussed above, under the Engagement Letters and Subscription Agreement, Debtor was obligated to perform broker dealer services to the clients, Big Path and Whelchel to facilitate the private placement of securities. Debtor was also required to remain in good standing and maintain appropriate regulatory licensure under the Subscription Agreement. Debtor's decision to shut down its broker dealer operations after the arbitration award was entered repudiated Debtor's obligations under the Engagement Letters and Subscription Agreement, thereby breaching the Engagement Letters and Subscription Agreement and excusing further performance thereunder by the clients, Big Path and Whelchel. Moreover, Debtor's repudiation and breach of the Engagement Letters excused the client's obligation to pay any tail fees owed to Debtor. Thus, there was no property interest transferred when the letter agreements were assigned to Finalis and the tail fees were waived. *Yip v. Connedx Corp. (In re Gomez)*, 560 B.R. 866, 873 (Bankr. S.D. Fla. 2016)("The Stock had no value. Neither the Debtor nor his bankruptcy estate are entitled to anything for an asset that has no value. Transfer of a valueless asset cannot hinder, delay or defraud any creditor of value as it is valueless. Further, it is impossible to receive less than reasonably equivalent value for an asset that has no value.")

Fourth, as discussed above, Debtor owed indemnity obligations to the clients under the Engagement Letters, and to Big Path and Whelchel under the Subscription Agreement, for losses

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-15-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:43:50    Page 20 of 62

arising from a material breach by Debtor of its obligation to perform its broker dealer services. Rather than sit idly by, let the breaches continue, and incur more debt from the indemnity obligations, Debtor mitigated the damage that would otherwise be caused by assigning the Engagement Letters to Finalis, another SEC-registered broker dealer and FINRA member, which could perform the broker dealer services for the clients, Big Path and Whelchel after Debtor shut down its operations. Thus, rather than fraudulently transferring away valuable contract rights, as alleged in the Complaint, Debtor actually avoided incurring further debt by assigning the Engagement Letters to Finalis, which assumed Debtor's broker dealer obligations.

Fifth, the existence of several badges of fraud related to Debtor's assignment of the Engagement Letters to Finalis are noticeably absent. There was no special relationship between Debtor and Finalis. Finalis is an independent SEC-registered broker dealer and FINRA member, like Debtor was before it shut down its operations. With respect to Whelchel, the Engagement Letters and Subscription Agreement make clear the relationship between Debtor and Whelchel was that of independent contractors, so there was no special relationship. Finalis assumed Debtor's broker dealer obligations under the Engagement Letters, which avoided Debtor incurring further debt from Debtor's breaches and indemnity obligations. While some of the Engagement Letters were assigned to Finalis, Debtor also assigned Engagement Letters to other broker dealers, again to avoid Debtor incurring further debt from Debtor's breaches and indemnity obligations that would arise but for the assignments. Last, Debtor did not retain any interest in the Engagement Letters after the assignments. In sum, Debtor's assignment of the Engagement Letters reflect Debtor's prudent business decision and arms-length transactions among the involved parties, rather than any fraudulent transfers with the intent to hinder, delay and defraud Debtor's creditors.

Based on the foregoing, the First Claim for Relief against Whelchel must dismissed because Whelchel was not a recipient of the Engagement Letters, which were assigned to Finalis, and the Complaint does not allege sufficient facts to state claim that Debtor transferred the Engagement Letters with actual intent to hinder, delay and defraud Debtor's creditors.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-16-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:16:30    Page 21 of
62

**C.     The Second Claim for Relief Against Whelchel for Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B) Should Be Dismissed**

The Second Claim for Relief of the Complaint alleges that Debtor's assignment of the Engagement Letters to Finalis were transfers made constructively in fraud of creditors under 11 U.S.C. § 548(a)(1)(B).  Like the First Claim for Relief, the Second Claim for Relief is alleged "Against All Defendants," including Whelchel.  As discussed below, the Second Claim for Relief, as it relates to Whelchel, fails and must be dismissed.

Bankruptcy Code § 548(a)(1)(B) provides that the trustee may avoid a transfer of an interest of the debtor in property that was made within 2 years before the petition date if the debtor received less than reasonably equivalent value in exchange for the transfer, and either (1) the debtor was insolvent on the date the transfer was made or became insolvent as a result of the transfer, (2) the debtor was engaged in business or a transaction for which any property remaining with the debtor was an unreasonably small capital, or (3) the debtor made such transfer to or for the benefit or an insider.  *See* 11 U.S.C. § 548(a)(1)(B); *ECS Refining*, 625 B.R. at 460.[11]

Like the First Claim for Relief, the Second Claim for relief against Whelchel fails to state a claim of a transfer constructively in fraud of creditors because Whelchel was not the recipient of the Engagement Letters that were assigned by Debtor to Finalis.  Instead, the Amendments make clear that Big Path and Whelchel were already parties to the Engagement Letters, so there was no transfer of Debtor's property to Whelchel in connection with the Amendments.

The Second Claim for Relief also fails because Debtor's assignment of the Engagement Letters to Finalis involved a concurrent assumption of Debtor's obligations under the Engagement Letters by Finalis in the form of performance of required broker dealer services from the date of the Amendments after Debtor shut down its operations and could no longer perform the broker dealer services.  Finalis' assumption of Debtor's obligations under the Engagement Letters allowed Debtor to avoid incurring further debts under Debtor's indemnity obligations that would otherwise result

---

[11]   Because the assignment of the Engagement Letters alleged in the Complaint did not involve the incurrence of debt by Debtor or a transfer to or for the benefit of an insider under an employment contract outside the ordinary course of business, those elements of 11 U.S.C. § 548(a)(1)(B) are not applicable.

Case: 23-03019     Doc# 15     Filed: 07/10/23     Entered: 07/10/23 16:45:30     Page 22 of 62

from Debtor's repudiations and breaches of the Engagement Letters. Additionally, insofar as Debtor had terminated its employees and shut down its operations by the time the Engagement Letters were assigned, the Engagement Letters had little, if any, value at the time of transfer. Put simply, without the ability to perform the required services under the Engagement Letters, they were of no value to Debtor. *Tolz v. Miller (In re Todd)*, 391 B.R. 504, 509 (Bankr. S.D. Fla. 2008) ("A valueless asset transferred for no consideration neither hurts nor benefits the estate. If no value was lost in the transfer between the Debtor and the Defendant, it is inherently the case that the Debtor did not receive less than equivalent value." (citation omitted)). Indeed, other than conclusory allegations that no consideration was received by Debtor in connection with the assignments – which is plainly inaccurate, the Complaint fails to state any facts showing that reasonably equivalent value was not received by Debtor. *See Estate of Fitness Holdings International, Inc. v. Hancock Park Capital II, L.P.*, 714 F.3d 1141, 1145-46 (9th Cir. 2013)(to the extent a transfer is made in satisfaction of an antecedent or present debt, the transfer is made for reasonably equivalent value under 11 U.S.C. § 548(a)(1)(B)(i), which precludes a determination that it was constructively fraudulent under 11 U.S.C. § 548(a)(1)(B)); *Senior Transeastern Lenders v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012)(the purpose of avoiding transfers unsupported by reasonably equivalent value is to "protect creditors against the depletion of a bankruptcy estate"); *In re Gomez*, 560 B.R. at 874 (a precise dollar-for-dollar exchange is not required for reasonably equivalent value to be present; nor must a direct benefit exist; it is sufficient if the transaction merely conferred indirect benefits). Instead, the Second Claim for Relief merely restates the statutory elements, fails to allege supporting facts, is conclusory, and fails to meet the *Twombly*/*Iqbal* pleading standards.

Based on the foregoing, the Second Claim for Relief against Whelchel must dismissed.

**D.      The Third Claim for Relief Against Whelchel for Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) Should Be Dismissed**

The Third Claim for Relief of the Complaint alleges that Debtor's alleged payment of $1.9 million to Whelchel on or after December 30, 2021 were transfers made with actual intent to hinder,

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

-18-

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:35:30    Page 23 of 62

delay and defraud creditors under 11 U.S.C. § 548(a)(1)(A). For the reasons set forth below, the Third Claim for Relief against Whelchel fails and must be dismissed.

First, as with the First Claim for Relief, the existence of several badges of fraud related to Debtor's alleged $1.9 million in payments to Whelchel are noticeably absent. There was no special relationship between Debtor and Whelchel. The Engagement Letters and Subscription Agreement make clear the relationship between Debtor and Whelchel was that of independent contractors, so there was no special relationship. Debtor's Statement of Financial Affairs (item 4 – payments or other transfers of property to insiders within one year of the petition date) show no payments or property transfers to Whelchel, further confirming there was no special relationship between Debtor and Whelchel.

Second, according to the allegations of the Complaint, Debtor had more than $6.3 million in cash and commissions receivable five weeks before Debtor allegedly made the $1.7 million payment to Whelchel on December 30, 2021. Plainly, Debtor's $1.681 million commission payment to Whelchel on December 30, 2021 was not a transfer of all or substantially all of Debtor's assets, nor do the facts alleged show Debtor was insolvent or had unmanageable debts at the time of the alleged payment. The Complaint also does not allege any facts about Debtor's assets between January 14, 2022 and February 7, 2022, so no inference can be made that Debtor transferred substantially all of its assets in connection with the alleged $225,000 in commission payments to Whelchel between January 14, 2022 and February 7, 2022.

Moreover, as discussed above and set forth in Exhibit 2 hereto, Debtor was obligated under the Subscription Agreement to pay Whelchel between 90-96% of the commissions Debtor received and Exhibit 2 makes clear the payments were Whelchel's 96% share of the commissions received for services rendered and earned by Whelchel in connection with successful private placement securities offerings.

Last, Debtor did not retain any interest in the alleged $1.9 million in payments to Whelchel. Indeed, quite the opposite, Debtor paid Whelchel for services rendered and earned.

In short, there are no badges of fraud related to the alleged $1.9 million in payments to Whelchel, but rather the facts show Whelchel was simply paid for the services he rendered and

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-19-

Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 16:15:30   Page 24 of 62

earned under the Subscription Agreement and Engagement Letters. As such, the Third Claim for Relief against Whelchel fails and must be dismissed.

The Third Claim for Relief fails for three additional reasons.

First, under 11 U.S.C. § 548(c), a transferee that takes for value and in good faith may retain the transferred property to the extent the transferee gave value for the transferred property. 11 U.S.C. § 548(c). Value includes the satisfaction of antecedent debt of a debtor. 11 U.S.C. § 548(d)(2). While the alleged $1.9 million in payments to Whelchel are not fraudulent transfers, as discussed above, Whelchel would nevertheless retain the payments in any event because the facts show the payments for services rendered and earned by Whelchel under the Subscription Agreement and Engagement Letters, which Debtor rightfully paid and Whelchel received in good faith as his share of the commissions received by Debtor in connection with successful private placement offerings.

Second, the $1.9 million in alleged payments did not involve transfers of Debtor's property to Whelchel. Bankruptcy Code § 541(d) provides that "[p]roperty in which the debtor holds ... only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). "Section 541(d) has often been invoked as the basis for excluding from a bankruptcy estate assets held in constructive trust by the debtor in favor of another." *In re McCafferty*, 96 F.3d 192, 196 (6th Cir. 1996) (citing *In re Omegas Group, Inc.*, 16 F.3d 1443, 1448 (6th Cir. 1994). Transfers of bare legal title by the debtor are not fraudulent transfers. *See In re Tung Thanh Nguyen*, 783 F.3d 769, 776 (10th Cir. 2015); *In re Todd*, 391 B.R. at 509 ("An interest that is limited in the hands of the debtor is equally limited in the hands of the estate, and therefore, where the debtor holds bare legal title with any equitable interest, the estate acquires bare legal title without any equitable interest in the property. Since the Debtor held only bare legal title to the Real Property, the value of that interest in the property was essentially zero. . . . Thus, the subsequent transfer from the Debtor to the Defendant, although no consideration was exchanged, constituted for the Debtor an economic status quo. A valueless asset transferred for no consideration neither hurts nor benefits the estate. If no value was lost in the transfer between the

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT
-20-

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:56:30    Page 25 of
62

Debtor and the Defendant, it is inherently the case that the Debtor did not receive less than equivalent value."). Here, the commissions paid by clients under the Engagement Letters were for services rendered by Whelchel and Debtor as a result of successful private placement securities offerings. As discussed in the Engagement Letters and paragraph 32 of the Complaint, private placement securities offerings were required to be consummated by an SEC-registered broker dealer, in this case by Debtor, and the payment of commissions related to the offerings were thus required to be paid Debtor. Under the Subscription Agreement, the agreed upon shares of those commission payments were expressly set forth, with 90-96% going to Whelchel and 4-10% going to Debtor. Further, Debtor was required to pay Whelchel his share within 7 days of receipt of the commissions. Because the commission payments received by Debtor were for services rendered by Whelchel and were required to be paid to Whelchel, they were held constructively in trust by Debtor for Whelchel's benefit, the subsequent payments to Whelchel of his share of commissions were not transfers of Debtor's property, and Debtor's transfer of its bare legal title were not fraudulent transfers.

Third, where funds are earmarked for payment and creditors have no reasonable expectation to look to the transferred assets, there is no diminution in recovery on account of a transfer of the earmarked funds and there can be no avoidance. *See Cooper v. Centar Investments (Asia) Ltd. et al. (In re Trigem America Corp.)*, 431 B.R. 855, 864-65 (Bankr. C.D. Cal. 2010)(holding that earmarked funds were not subject to avoidance under 11 U.S.C. § 548). Here, under the Engagement Letters and Subscription Agreement, the commission payments by the clients following successful private placement offerings were earmarked for payment to Whelchel and Debtor, and only Debtor's share of the commissions were available to satisfy the claims of Debtor's creditors. Conversely, Debtor's payment of Whelchel's earmarked share of the commissions did not diminish the property of Debtor's bankruptcy estate and thus were not fraudulent transfers.

In sum, the Third Claim for Relief against Whelchel fails for several reasons and must be dismissed.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**
4856-7020-2734.1

Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 16:54:30    Page 26 of 62

Bankruptcy Case No. 23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

-21-

**E.  The Fourth Claim for Relief Against Whelchel for Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B) Should Be Dismissed**

The Fourth Claim for Relief of the Complaint seeks avoidance of Debtor's alleged payment of $1.9 million to Whelchel as constructively in fraud of creditors under 11 U.S.C. § 548(a)(1)(B). Like the Second Claim for Relief, the Fourth Claim for Relief merely restates the statutory elements, fails to allege supporting facts, is conclusory, fails to meet the *Twombly*/*Iqbal* pleading standards, and must be dismissed.

Payment of a preexisting debt is value and if the payment is dollar-for-dollar, full value is given.  Therefore, to the extent a transfer constitutes repayment of a debtor's antecedent or present debt, the transfer is not constructively fraudulent.  *Estate of Fitness Holdings International, Inc.*, 714 F.3d at 1145-46.  As discussed above, the facts alleged about the cash on hand and commissions receivable owed to Debtor five weeks before the $1.681 million commission payment to Whelchel on December 30, 2021, the terms of the Engagement Letters, the terms of the Subscription Agreement, and the commission payment documentation received from Debtor supporting the $1.681 million payment to Whelchel (i.e., Exhibit 2 hereto), make clear  the payment was in satisfaction of commissions earned by and owed to Whelchel in connection with successful private placement securities offerings.  The same holds true with respect to the alleged $225,000 in payments subsequently made to Whelchel.  Indeed, from the facts alleged, no other conclusion can be reached.  As such, Debtor's transfers in payment of the commissions owed to Whelchel - antecedent debts - are not constructively fraudulent.

The Fourth Claim for Relief fails for the additional reasons discussed above in connection with the Third Claim for Relief, specifically, the payments were not transfers of Debtor's property because the funds were held constructively in trust for Whelchel, and the funds were earmarked for payment to Whelchel and thus did not diminish Debtor's bankruptcy estate.

In sum, the Fourth Claim for Relief fails to state a claim of transfers of Debtor's property constructively in fraud of creditors in connection with the alleged $1.9 million in payments to Whelchel and thus the Fourth Claim for Relief must be dismissed.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

Bankruptcy Case No.  23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT
-22-

**F.     The Fifth Claim for Relief Against Whelchel For Recovery of Avoided**

**Transfers Should Be Dismissed Because There Are No Avoidable Transfers**

The Fifth Claim for Relief of the Complaint seeks recovery from Whelchel and Finalis of any avoided transfers under 11 U.S.C. §§ 550 and 551.  As discussed above, the assignment of the Engagement Letters and the payment of $1.9 million to Whelchel are not fraudulent transfers and the first four claims for relief against Whelchel should be dismissed.  As such, the Fifth Claim for Relief necessarily fails and should be dismissed.  Further, insofar as the Fifth Claim for Relief merely restates the statutory elements, it lacks specificity, is conclusory, fails to meet the *Twombly*/*Iqbal* pleading standards, and must be dismissed.

**V.     CONCLUSION**

Each of the five claims for relief against Whelchel must be dismissed.  The Engagement Letters were not transferred to Whelchel and the Complaint fails to allege facts sufficient to state a fraudulent transfer claim, either with actual intent or constructively in fraud of creditors against Whelchel.  Similarly, the $1.9 million paid to Whelchel were for services rendered by Whelchel and commissions owed to Whelchel by Debtor.  Like the Engagement Letters, the Complaint fails to allege facts sufficient to state a fraudulent transfer claim, either with actual intent or constructively in fraud of creditors, related to the $1.9 million payments to Whelchel.  As such, each of the fraudulent transfer claims against Whelchel fail.  Insofar as each of the fraudulent transfer claims against Whelchel must be dismissed, the Fifth Claim for Relief against Whelchel for recovery of avoidable transfers necessarily fails and must be dismissed.

Dated:  July 10, 2023                                   ALLEN MATKINS LECK GAMBLE
                                                                      MALLORY & NATSIS LLP


                                                                      By:  _/s/ WILLIAM W. HUCKINS_
                                                                             WILLIAM W. HUCKINS
                                                                             Attorneys for Defendant
                                                                             DAVID MICHAEL WHELCHEL

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4856-7020-2734.1

-23-

Bankruptcy Case No.  23-30218-HLB
DEFENDANT WHELCHEL'S MPA ISO
MOTION TO DISMISS COMPLAINT

Case: 23-03019     Doc# 15     Filed: 07/10/23     Entered: 07/10/23 16:46:39     Page 28 of
62

# EXHIBIT 1



**CONFIDENTIAL**

# Registered Representative

# Subscription Agreement including

# Master Terms & Conditions

**Effective March 28, 2018**

Growth Capital Services
Member FINRA, SIPC

582 Market Street, Suite 300
San Francisco, CA 94104

Tel : 415-692-0050
www.growthcapitalservices.com

14187445.6

# REGISTERED REPRESENTATIVE SUBSCRIPTION AGREEMENT

This Registered Representative Subscription Agreement (the "Agreement") is made between Michael Whelchel and Shawn Lesser (collectively, the "Primary Representative"), each additional representative who becomes a signatory of <u>Exhibit A</u> attached hereto (each an "Additional Representative" and together with the Primary Representative, the "Representatives"), and Growth Capital Services ("Broker Dealer" or "GCS") as of March 27, 2018 (the "Effective Date").

This Agreement is subject to the Master Registered Representative Terms and Conditions, attached hereto as <u>Exhibit B</u> (the "Master Terms and Conditions"). GCS shall provide Services to Representatives, and Representatives shall provide Services to GCS, pursuant to the terms herein and the Master Terms and Conditions. Capitalized terms not defined herein shall have the meanings given to such terms in the Master Terms and Conditions.

## 1. Compensation.

The payment obligations of Representatives and Broker Dealer hereunder, with respect to Commissions (as defined in Section 1.a. of the Master Terms and Conditions below), shall be as follows:

    **a. Commissions.** The following breakpoints are determined by aggregate Representative gross production over the previous 12 months.

        i. Of the first $500,000 in Commissions, 90% will be paid to Representatives and 10% will be paid to Broker Dealer.

        ii. Between $500,001 and $1 million in Commissions, 93% will be paid to Representative and 7% will be paid to Broker Dealer.

        iii. Above $1 million in Commissions, 96% will be paid to Representative and 4% will be paid to Broker Dealer.

    For purposes of calculating the foregoing, as each Commission is received by GCS, GCS will calculate Representative's activity over the trailing twelve month period. For example, if in the initial twelve months, the Representatives generate $2,000,000 in



Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 31 of 62

gross Success Fees, the total Commissions maintained by GCS would be $125,000 (10% * $500,000 + 7% * $500,000 + 4% * $1,000,000).

b. **Minimum Representative Production**. Representative is expected to generate the following minimum amount of Commissions ("Minimum Representative Production") in order to generate the following minimum agreed profits for Broker Dealer ("Minimum Broker Dealer Requirement") during each Commission Period.

    i. Based on this Agreement initially covering four (4) Representatives, the Minimum Representative Production is $200,000 in gross Commissions per Representative for each year, which shall yield a corresponding Aggregate Minimum Broker Dealer Requirement of $20,000 per Representative per year, to be paid to Broker Dealer for each Commission Period that this Agreement remains in effect; provided, however, that if any particular representative exceeds their Aggregate Minimum Broker Dealer Requirement during any Commission Period, the excess shall be credited towards the Aggregate Minimum Broker Dealer Requirement that is not satisfied by any other Representative(s) during the same Commission Period. For example, if two (2) Representatives generate $20,000 towards their Aggregate Minimum Broker Dealer Requirement in a Commission Period, and one Representative generates $30,000 towards their Aggregate Minimum Broker Dealer Requirement during the same Commission Period and one Representative generates $10,000 towards their Aggregate Minimum Broker Dealer Requirement, the Minimum Representative Production requirement and the Aggregate Minimum Broker Dealer Requirement for all Representatives shall be deemed to be satisfied. In addition, it is acknowledges and agreed that if this Agreement is terminated as to a Representative and there are then 3 Representatives remaining, the Aggregate Minimum Broker Dealer Requirement shall be adjusted to $60,000 for each Commission Period (with corresponding increases of $20,000 per Representative per year for any Representatives who are added to this Agreement in accordance with its terms). Any amount paid by Representatives to Broker Dealer in excess of the Minimum Broker Dealer Requirement for any Commission Period shall not be applied towards and credited against the Minimum Broker Dealer Requirement of succeeding years.



ii. Commencing on the 24-month anniversary of the Effective Date, if Representatives do not in the aggregate meet the Minimum Representative Production requirements and the Aggregate Minimum Broker Dealer Requirements set forth immediately above for the immediately preceding 12-month period, Broker Dealer shall invoice Primary Representative for any deficiency in the Aggregate Minimum Broker Dealer Requirement during such 12-month period.

c. **Non-Cash Commissions**. The portion of any Commission that consists of any property other than cash (e.g., warrants) will be 100% payable to Representative(s), without any Broker Dealer participation or sharing whatsoever. Representatives are solely responsible for arranging appropriate execution of such non-cash Commissions. Broker Dealer will not effect the transfer to Representatives of any non-cash Commission received by Broker Dealer on behalf of or with respect to any Representative, but instead will direct the issuer of such non-cash Commissions to the benefit of Representatives.

d. **Retainers.** Retainers (as defined in Section 1.b. of the Master Terms and Conditions) may be paid directly to Representative(s) or Representatives' company, without any Broker Dealer participation or sharing whatsoever. Notwithstanding the above, if any Retainer is received by Broker Dealer, the funds will be treated as Commissions, and Broker Dealer will retain the Broker Dealer Commission due from the Commission. In the event that retainers are netted out of eventual Commissions based on success fees, Broker Dealer Commission is based on the gross success fee, and not the net success fee paid at the time of the transaction. For example, the terms of a particular capital raise engagement states that the Retainers will be netted from the gross Success Fee. In this example, the total Retainers are $50,000 and the gross Success Fee is $300,000. The Success Fee paid to the Broker Dealer would be $250,000 by the company client ($300,000 - $50,000) but the Commissions paid to GCS would be calculated using the gross Success Fee of $300,000.

e. **Private Securities Transactions**. Each Representative acknowledges and agrees that Broker Dealer is obligated to supervise securities business conducted by each Representative, even if such business is not conducted through Broker Dealer's platform ("Private Securities Transactions" as defined in Section 1.d. of the Master Terms and Conditions below). Representative may not engage in Private Securities Transaction



without pre-approval by Broker Dealer (as specified in FINRA Rule 3280), such pre-approval not to be unreasonably withheld.  Pre-approval may entail an additional agreement reasonably acceptable to both Representative and Broker Dealer that delineates payments from Representative to Broker Dealer for compliance services relating to each specific Private Securities Transaction.

f. **Payment.** Payment of Commissions or other compensation owing to Representative(s) hereunder will be made by Broker Dealer within seven days after the later of (i) the receipt by Broker Dealer of Commissions or (ii) approval by Broker Dealer of the transaction.  Approval by Broker Dealer of any and all transactions subject to this Agreement shall not be unreasonably withheld, conditioned or delayed; provided, however, it is acknowledged and agreed that approval requires the delivery by Representative(s) to Broker Dealer of information reasonably necessary to allow Broker Dealer to perform its supervisory review.  All payments to be made by Broker Dealer hereunder shall be in cash, by wire transfer of immediately available funds to an account(s) designated in writing by Primary Representative, provided that such account(s) is (are) permitted to receive Commission payments according to FINRA rules.

## 2. Membership Fees.

a. Representatives shall pay Broker Dealer a quarterly membership fee which in the aggregate shall equal $10,000 per quarter, and shall cover all membership fee obligations hereunder for a total of four (4) Representatives (the "Membership Fee"). The Membership Fee for the first calendar quarter during which this Agreement is in effect shall be prorated based on the actual number of calendar days between the Effective Date and the end of the first calendar quarter of 2018.  New Representatives may take the place of Representatives by mutual consent of the Parties.  Additional Representatives beyond five may be added with the mutual consent of the Parties for an additional $2500 per quarter.   Broker Dealer is responsible for changing Exhibit A accordingly, and Primary Representative is responsible for obtaining the new or additional Representative's signature on Exhibit A.  .

b. Representative is obligated to an "Initial Term" of 12 months.  After the Initial Term, Representative may terminate this Agreement, with or without cause, on 30 days' advance written notice to Broker Dealer and as set forth in the Master Terms and



Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 34 of 62

Conditions. There is no pro rata reimbursement to Representative if a quarterly fee has been incurred.

c. The Membership Fee is payable in advance for each calendar quarter and shall be due no later than the third (3rd) business day of the calendar quarter to which it applies. Broker Dealer will issue invoices in respect of each Membership Fee at least 10 days prior to the commencement of the applicable calendar quarter.

d. Upon execution of this Agreement, Broker Dealer will issue an invoice for the initial Membership Fee.

e. Membership Fee payments will be subject to a late fee of 5% of the outstanding balance after they are 20 calendar days past due, and 10% of the outstanding balance after they are 50 calendar days past due. Broker Dealer shall have the right to terminate the Relationship for Material Breach if a Membership Fee balance is more than 60 days past due.

f. If Commissions are received at any time when Membership Fees are past due, Broker Dealer reserves the right to deduct such Membership Fees from the portion of Commission that would otherwise be payable to Representative.

3. **Expenses Assumed by Broker Dealer**. Broker Dealer will provide Representatives with the following benefits and assume all of the following expenses:

a. Fees for FINRA, SIPC, California and "home state" registrations. Additional state registrations will be charged to the Representative at the actual cost of registration in that state plus an administrative charge of $100.

b. Errors and Omissions insurance policy bearing commercially appropriate terms and conditions.

c. Data room service. Lightserve or a data room service bearing equivalent features and benefits.



Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 35 of 62

d. Fees for first attempt at FINRA exams. Broker Dealer will invoice Representative for subsequent attempts at the actual cost of each exam plus an administrative charge of $100.

4. **Counterparts.**  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument and is intended to be binding when all parties have delivered their signatures to the other Party. Signatures may be delivered by facsimile or electronic transmission. All counterparts shall be deemed an original of this Agreement.



**IN WITNESS, WHEREOF**, the parties have executed this Agreement as of the date first written above.


**PRIMARY REPRESENTATIVE**

By:  Michael Whelchel


Title:      3/28/2018

Affiliation: Big Path Capital

Date:

x _____


By:  Shawn Lesser


Title:

Affiliation: Big Path Capital

Date:

x _____


**GROWTH CAPITAL SERVICES**

By: Brian Dunn


CEO

Growth Capital Services

Date:
      March 28, 2018

x _____




14187445.6

**EXHIBIT A**

**Additional Representatives**

The signatures below indicates acknowledgement of the inclusion of the Additional Representative named below.

All parties understand and agree that the Additional Representative named below is entitled and subject to all of the benefits and burdens set forth this Agreement, and will abide by the same terms set out for the Representatives in this agreement.

ADDITIONAL REPRESENTATIVE:

_____          _____

Additional Representative Name          Date

ACCEPTANCE OF ADDITIONAL
REPRESENTATIVE:

Growth Capital Services, a _____

By: _____

Name: _____

Its: _____



Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 38 of 62

{this page has been intentionally left blank}



14187445.6 **10** of **23**

# MASTER REGISTERED REPRESENTATIVE TERMS AND CONDITIONS

These Master Registered Representative Terms and Conditions ("Master Terms and Conditions") govern the rights and obligations of Growth Capital Services ("Broker Dealer" or "GCS") and the representatives (each a "Representative" and collectively, the "Representatives") identified in the Registered Representative Subscription Agreement entered into between Broker Dealer and Representatives and incorporated herein (the "Agreement"). Broker Dealer and Representatives are each referred to individually in these Master Terms and Conditions as a "Party" and together as the "Parties." The relationship between Broker Dealer and Representatives created pursuant to the Agreement and these Master Terms and Conditions is referred to herein as the "Relationship."

## 1. Defined Terms

a. "Commissions" shall mean any and all cash compensation amounts actually paid to Representative(s) or Broker Dealer during the Term in connection with the performance of Services by Representative(s), including but not limited to finder fees, success fees, rights of participation in profits, and dissolution proceeds. Commissions shall specifically exclude Retainers, Event Fees, Sponsorship/Registration Fees, Excluded Service Fees, and any and all other amounts received by any Representative in connection with Outside Business Activities, which shall be paid directly to and retained by Representative(s).

b. "Event Fees" shall mean any and all fees and/or expense reimbursement amounts paid to Representative(s) in connection with events managed or sponsored by Representative(s) and/or Big Path Capital, including but not limited to The Five Fund Forums, Impact Capitalism Summits, the Mo Summit, and the Impact Across America events.

c. "Sponsorship/Registration Fees" shall mean fees paid by individuals and firm to attend or sponsor one of the events managed by Representative(s) and/or Big Path Capital, including but not limited to The Five Fund Forums, Impact Capitalism Summits, the Mo Summit, and the Impact Across America events.

d. "Outside Business Activities" shall mean Representatives' business activities outside the scope of the Relationship with Broker Dealer, as such conduct is described in FINRA rule 3270 (including but not limited to capital advisory services or other consulting services).

d. "Private Securities Transactions" shall have the meaning set forth in FINRA Rule 3280 and shall not be considered Services covered by or under this Agreement.



e. "Retainers" shall mean and refer to any and all amounts received by any Representative for Outside Business Activities.

f. "Services" means services provided by Representatives in connection securities transactions conducted on Broker's platform in accordance with these Master Terms and Conditions and the Agreement, .

g. "Sponsorships / Registration Fees" shall mean any and all admission, sponsorship and similar fees paid to Representative(s) in connection with events managed or sponsored by Representative(s) and/or Big Path Capital, including but not limited to The Five Fund Forums, Impact Capitalism Summits, the MO Summit, and the Impact Across America events.

**2. Services.**

Pursuant to the terms of these Master Terms and Conditions, Representatives will provide Services as a registered representative of Broker Dealer in connection with certain investment opportunities ("Opportunities").

b. Representatives will determine the method, timing, details and means of performing the Services, subject to Broker Dealer's supervisory controls, as discussed below.

c. Broker Dealer will supervise and oversee the means and methods for providing the Services to the extent required under federal and state securities laws and by the rules of the Financial Industry Regulatory Authority ("FINRA"). Supervisory oversight includes review of correspondence, clients, deals, transactions, outside activities, data security, brokerage account activity and other responsibilities set forth in FINRA regulations and in the Broker Dealer's manual of written supervisory procedures (the "WSP"). At all times during the Term, as defined below, Representatives shall comply with the WSP and cooperate with such supervision and control by Broker Dealer. Broker Dealer will provide Representatives with a version of the WSP that is current as of the Start Date, and will provide updated versions from time to time as they become applicable.

d. Representatives will comply with all terms and conditions of this Agreement, including terms and conditions regarding the receipt and disposition of Commissions.

**3. Independent Contractor Relationship.**

a. Representatives shall perform the Services and other obligations under these Master Terms and Conditions as an independent contractor of Broker Dealer. Nothing contained herein shall be



construed to create or establish the relationship of employer and employee, agent, joint venture, or partner between the Parties. Neither Party is authorized to make any representation, contract, or commitment on behalf of the other Party without prior written permission.

b. Representatives shall not be entitled to any benefits offered by Broker Dealer to its employees, including, without limitation, workers' compensation, medical insurance, disability insurance, vacation, or sick pay. Representatives shall not be entitled to any other benefits or remuneration except as expressly set forth herein.

 c. Certain expenses created by the association of Representatives and Broker Dealer will be assumed by Broker Dealer, as set forth in the Agreement. Representatives are responsible for all costs and expenses not listed in the Agreement, including costs of Representatives' legal counsel, travel, materials and additional costs of doing business.

d. Each Representative recognize that registered representative status can only be offered to an individual, and not a corporate entity. Representatives will therefore be issued a 1099 tax form naming each Representative as an individual, not as a corporate entity, for compensation received.

e. Representatives may enter into agreements in regard to Representatives' Outside Business Activities, subject to Representatives' compliance with the terms of Section 5 below and FINRA regulations.

**4. General Registered Representative Obligations.**

During the Term, Representatives shall:

a. comply with all FINRA, SEC, state and federal regulations;

b. take all actions reasonably required by Broker Dealer in its exercise of supervisory and regulatory responsibility over the Representatives, including compliance with all procedures set forth in the firm's Written Supervisory Procedures or formally communicated to Representatives by Broker Dealer;

c. obtain appropriate licensure in advance of conducting the Services, consult with Broker Dealer regarding any change in proposed Services that might require different licenses, and inform Broker Dealer promptly of any events that may require additional licensure;

d. keep such records as are required by Broker Dealer and FINRA regulations, including a current Form U4;



Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 42 of 62

e. obtain Broker Dealer's written pre-approval for clients, deals and transactions that are the subject of these Master Terms and Conditions and the Agreement, and to be supervised on the Broker Dealer's platform;

f. refrain from engaging in any transactions involving Commissions that are not run as deals through the Broker Dealer or pre-approved as Private Securities Transactions, pursuant to the terms set forth in Section 5 below;

g. communicate with relevant parties regarding Broker Dealer's customer identification program and assist in the collection of required data from relevant parties;

h. review progress with and permit the inspection of all work accomplished and/or in progress in connection with the Relationship as required by Broker Dealer;

i. immediately notify Broker Dealer upon the occurrence of any event or condition that would make a Representative ineligible to receive solicitation fees, and cease all activity under the Relationship until such time as both Parties mutually determine to be appropriate;

j. immediately inform Broker Dealer upon receipt of a written or oral complaint involving a Representative's activities in association with Broker Dealer and provide copies of such complaints; cooperate with any investigation Broker Dealer conducts; and

k. ensure that any indemnification it receives pursuant to any agreement relating to an Opportunity includes Broker Dealer as an indemnified party in no less than equal measure as Representatives.

**5. Representative Obligations Regarding Outside Business Activities and Private Securities Transactions.**

a. Representatives must submit a written notice describing all Outside Business Activities for Broker Dealer's assessment. Each such notice must comply with applicable FINRA regulations and the WSP. Representatives will not participate in any such Outside Business Activities, directly or indirectly, without first providing such notice to Broker Dealer. Retainers for Outside Business Activities shall be paid directly to Representatives or Representatives' company without Broker Dealer intervention. If such Retainers are agreed by Representatives and Broker Dealer to be netted out of future Commissions, the Commission shall be based on the gross success fee, and not the net success fee paid at the time of the transaction.

b. Representatives must submit a written notice describing all Private Securities Transactions for Broker Dealer's assessment. Each such notice must comply with applicable FINRA regulations and


Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:05:30   Page 43 of 62

the WSP. Representatives will not participate in any such Private Securities Transaction, directly or indirectly, without Broker Dealer's prior written approval which shall not be unreasonably withheld, conditioned or delayed. Representatives acknowledge and agrees that each Private Securities Transaction approved by Broker Dealer will be recorded on the books and records of Broker Dealer and Broker Dealer will supervise Representatives' participation in the transaction as if the transaction were executed on behalf of Broker Dealer.

## 6. Broker Dealer Obligations.

During the Term, Broker Dealer shall:

a. remain in good standing and maintain appropriate licensure as required by the applicable regulatory authorities, and inform Representatives immediately of any event that precludes Broker Dealer from fulfilling its obligations under these Master Terms and Conditions or the Agreement;

b. notify Representatives immediately of any order, enforcement action, or other formal notice that affects (or is reasonably likely to affect) Broker Dealer's ability to perform its obligations under these Master Terms and Conditions or the Agreement;

c. communicate relevant Broker Dealer policies and procedures, laws, regulations and other guidance to Representatives verbally and in writing;

d. provide compliance support and supervisory review, receipt and payment of Commissions, the benefits described in Section 6 of the Agreement, and any other support that is reasonably required by a Representative to provide the Services and by Broker Dealer to fulfill its obligations under this Agreement;

e. respond promptly to any reasonable requests by a Representative for information, review and/or approval of documentation related to transactions, or other actions;

f. act in accordance with Broker Dealer's representations and obligations in engagement letters; and

g. notify Representatives of amendments to these Master Terms and Conditions as provided in Section 13(b) below.

## 7. Confidentiality.

a. Representatives and Broker Dealer will maintain in confidence and will not, directly or indirectly, disclose or use, both during the Term and for a period of two years after the Term, any proprietary



Case: 23-03019   Doc# 15   Filed: 07/10/23   Entered: 07/10/23 17:05:30   Page 44 of 62

information, Confidential Information (as defined below), or know-how belonging to the other Party, whether or not it is in written or permanent form, except to the extent necessary to perform the Services.

b. "Confidential Information" shall include, but not be limited to, these Master Terms and Conditions; the terms of the Agreement; all agreements and contracts, including, without limitation, those in the form of a letter and all content and terms therein; the names of parties to any agreement with Broker Dealer or Representatives; the service needs and requirements of such parties; pricing, commission, or other related compensation agreements with such parties; information regarding the Additional Representatives; Broker Dealer's and Representative's documents, business plans and strategies; and any other information regarding Broker Dealer or Representative and its business plans and practices.

c. Notwithstanding the foregoing, Representatives and Broker Dealer shall not be subject to the restrictions on disclosure set forth herein where

(i) the Confidential Information is now or becomes public through no action of a Representative or Broker Dealer,

(ii) the Representative(s) or Broker Dealer already had the Confidential Information in his or her possession from his or her own work prior to the Effective Date set forth in the Agreement,

(iii) the Representative(s) or Broker Dealer received the Confidential Information from a third party on a non-confidential basis,

(iv) the Representative(s) or Broker Dealer receives permission in writing from the Broker Dealer or Representative(s) to disclose the Confidential Information, or

(v) the disclosure of the Confidential Information is required by law, FINRA rules or court order.

**8. Non-Solicitation.**

Representatives shall not, during the Term and for a period of two years immediately following the termination of this Agreement for any reason, whether with or without cause, either directly or indirectly solicit, induce, recruit or encourage any of Broker Dealer's affiliates, registered representatives, employees or consultants to terminate their relationship with Broker Dealer, either for Representatives or for any other person or entity. Further, during the term of this



Agreement and at any time following the termination of this Agreement for any reason, whether with or without cause, no Party hereto shall negatively influence any of clients or customers of any other Party from working with such Party or purchasing products or services from such Party.

## 9. Term of Agreement.

The initial term of the Relationship commences on the Effective Date and continues for 12 months thereafter (the "Initial Term"), unless earlier terminated as provided herein. If the Relationship is not terminated by the end of the Initial Term, the Relationship shall automatically renew for successive quarterly periods (the Initial Term and such renewal periods until termination of the Relationship are referred to collectively as the "Term").

## 10. Termination of the Relationship.

a. Termination.

i. Broker Dealer or Primary Representative may terminate this Agreement and the Relationship for any reason, or no reason, upon 30 days' written notice to the other Party.

ii. Broker Dealer may terminate the this Agreement and the Relationship immediately as to any Representative for Material Breach by such Representative, or terminate this Agreement and the Relationship in its entirety for any Material Breach by Primary Representative . Primary Representative may terminate this Agreement and the Relationship in its entirety for any Material Breach by Broker Dealer. As used herein, the term "Material Breach" means fraud; breach of any material term, covenant or representation in these Master Terms and Conditions or the Agreement; material violation of the WSP, FINRA regulations or applicable law; or any findings by Broker Dealer from background checks (e.g. liens, bankruptcies, civil judgments, criminal activities, questionable business practices, regulatory agency findings, etc.), occurrent civil judgments or criminal activity, action leading to a statutory disqualification, or any other event that Broker Dealer believes, in its sole discretion, to materially adversely affect its relationship with Representatives.

iv. The Relationship and this Agreement shall terminate automatically upon the institution by or against Broker Dealer of insolvency, receivership or bankruptcy proceedings.

v. The Relationship and this Agreement will terminate as to any Representative at such Representative's election after amendment of these Master Terms and Conditions under Section 13(b).



Case: 23-03019    Doc# 15    Filed: 07/10/23    Entered: 07/10/23 17:05:30    Page 46 of 62

vi. The Relationship and this Agreement shall terminate automatically as to a Representative upon such Representative's death, or termination or other cessation of such Representative's employment with Big Path Capital.

b. Effect of Termination.

i. Upon termination of the Relationship for any reason, other than termination as to a Representative upon such Representative's death, Representatives shall notify all clients with pending transactions that Representatives are no longer a registered representative of Broker Dealer and shall provide Broker Dealer with proof of such notice within two weeks after the termination of the Relationship. Notwithstanding the foregoing, Broker Dealer shall at all times after termination of the Relationship have the right to provide such notification to clients.

ii. Within five (5) business days following the termination of the Relationship and this Agreement as to any one or more of the Representatives, Broker Dealer shall prepare and submit to such Representative(s) a form U 5 Uniform Termination Notice for review and comment. The terminated Representative shall then have five (5) business days to review such form U 5 Uniform Termination Notice and provide any comments or questions to Broker Dealer relating to the same. Broker Dealer agrees to reasonably cooperate with the terminated Representative to reach an agreement as to any outstanding comments or questions in connection with the form U 5 Uniform Termination Notice, provided, however, it is acknowledged and agreed that the filing of such form shall be within the sole authority of Broker Dealer and if any dispute or controversy remains as to the form prior to filing, such dispute or controversy shall be subject to the provisions of Section 13(d), below.

iii. Any termination of the Relationship will not affect compensation relating to Services performed during the Term, except as provided for in connection with the Tail Period, as described below. Membership Fees, as defined and set forth in the Agreement, are payable in accordance with the terms set forth in the Agreement and shall be payable for all periods prior to termination of the Relationship. There will be no refund of part or all of the Membership Fee if Representatives terminates the Relationship prior to the end of the period for which the Membership Fee has been paid unless such termination is in connection with an amendment of these Master Terms and Conditions under Section 13(b), in which case Broker Dealer will refund to Representatives a prorated amount of the Membership Fee representing the period between the date of termination and the end of the period for which the Membership Fee has been paid. No additional Membership Fees shall be paid after termination.

**11. Tail Period.**



Following the termination date, there will be a period of 12 months (the "Tail Period") during which Commission payments relating to Opportunities approved in writing by Broker Dealer during the Term will continue to be paid to Representative(s) and Broker Dealer, respectively, according to the following terms:

a. Upon termination of the Relationship, it is solely the obligation of Representative to arrange for appropriate registration with a succeeding FINRA broker dealer.

**b.** Assuming such registration with succeeding FINRA broker-dealer is arranged, **Commissions received** during the Tail Period will be split between Broker Dealer and Representative(s) in accordance with Section 1.a. of the Agreement. Broker Dealer will send Representative's portion of Commissions to succeeding broker-dealer.

b. Assuming such registration with succeeding FINRA broker-dealer is arranged, all Commissions received by Broker Dealer after the expiration of the Tail Period shall be paid to succeeding broker-dealer.

c. If Representative is not appropriately registered, Broker Dealer will hold Commissions received after the Tail Period for a "Holding Period" of 12 months after receipt of funds. After the Holding Period, the funds are considered "abandoned" and shall become the property of Broker Dealer.

**12. Indemnification.**

a. Indemnification of Broker Dealer. Representatives shall indemnify and hold harmless Broker Dealer and its officers, directors, agents, employees and controlling persons (collectively, the "Broker Dealer Indemnified Persons" and each a "Broker Dealer Indemnified Person"), from and against all liabilities, claims, causes of action, penalties, interest, and expenses, including, fees and expenses of legal counsel (collectively, "Losses"), which a Broker Dealer Indemnified Person may incur that result from

(i) performance of, or failure to perform, the Services by Representatives;

(ii) any penalty or enforcement action taken by a regulatory authority against any Broker Dealer Indemnified Person in connection with Representative, the Services or the Relationship; or

(iii) the material breach of any of Representatives' representations and warranties in these Master Terms and Conditions or the Agreement, or any material breach by any Representative



in the performance of any of Representatives' obligations in these Master Terms and Conditions or the Agreement;

provided, however, that no Representative shall be liable under this Section 1.a. if the indemnification the Broker Dealer Indemnified Person seeks resulted from any action, conduct, communication, omission, negligence or fraud of a Broker Dealer Indemnified Person or failure of a Broker Dealer Indemnified Person to perform any of the Broker Dealer's obligations in these Master Terms and Conditions or the Agreement.

b. Indemnification of Representative. Broker Dealer shall indemnify and hold harmless each Representative and their respective members, officers, directors, agents, employees, controlling persons and affiliates (including Big Path Capital) (collectively, the "Representative Indemnified Persons" and each a "Representative Indemnified Person") from and against all Losses that a Representative Indemnified Person may incur or suffer under any federal or state securities laws that result from:

(i) Broker Dealer's performance of, or failure to perform, the obligations of Broker Dealer set forth in these Master Terms and Conditions or the Agreement,

(ii) any penalty or enforcement action taken by a regulatory authority against any Representative Indemnified Person in connection with Broker Dealer or such obligations; or

(iii) the material breach of any of Broker Dealer's representations and warranties in these Master Terms and Conditions or the Agreement; provided, however, that Broker Dealer shall not be liable under this paragraph if the indemnification the Representative Indemnified Person seeks resulted from any action, conduct, communication, omission, negligence, or fraud of a Representative Indemnified Person or failure of any Representative to perform any of such Representative's obligations in these Master Terms and Conditions or the Agreement.

**13. General Provisions**.

a. Entire Agreement; Severability. These Master Terms and Conditions, which incorporate the Agreement, together with all exhibits, represent the entire agreement between the parties and supersede all prior and contemporaneous agreements, communications and representations between the parties, either oral or in writing, relating to the subject matter herein. If the final judgment of any court or arbitrator of competent jurisdiction determines that any part of these Master Terms and Conditions or the Agreement is unenforceable or invalid, the remainder of these Master Terms and Conditions and the Agreement will continue to be valid and enforceable.



b. Amendments. Broker Dealer reserves the right to amend these Master Terms and Conditions from time to time. Broker Dealer shall send thirty days' advance written notice ("Advance Notice Period") by email to Representative of such amendments. If such amendment has or is reasonably likely to have an adverse effect on any Representative, Representatives shall be entitled to terminate the Master Terms and Conditions, the Agreement and the Relationship by written notice to GCS at any time during the Advance Notice Period. If the Relationship is not so terminated by the Representatives within such time, Representatives shall be deemed to have accepted the amendment and the Agreement, which shall be deemed to incorporate the Master Terms and Conditions as amended, shall continue in full force and effect.

c. Governing Law. These Master Terms and Conditions and the Agreement will be controlled by and construed under the laws of the State of California without giving effect to any principles of conflicts of law.

d. Arbitration. Any dispute, claim or controversy arising out of or relating to the Relationship that cannot be resolved directly between the Parties will be determined, upon the demand of either Party, by binding arbitration in San Francisco, California, before a sole arbitrator with appropriate experience in securities, mergers and acquisitions, and investment banking. Such arbitration will be administered by JAMS pursuant to its then-current Comprehensive Arbitration Rules and Procedures, provided any such rules are subject to the procedures set forth in this Section 12(d). The Parties shall be entitled to conduct discovery as provided in Sections 1283.05 and 1283.1 of the California Code of Civil Procedure. The decision of the arbitrator shall be final and binding. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

e. Attorneys' Fees. If any dispute between the Parties results in arbitration, the prevailing Party shall be entitled to all reasonable costs in connection with the arbitration and the enforcement of any award rendered by the arbitrator, including, but not limited to, reasonable attorneys' fees.

f. Transfer. These Master Terms and Conditions and the Agreement, and any rights granted herein or therein, are personal to Parties and shall not be assigned, delegated, sublicensed, subcontracted, encumbered, or otherwise transferred; provided, however, that Broker Dealer may assign the Agreement and all Broker Dealer's rights and obligations under these Master Terms and Conditions and the Agreement, subject to Representatives' prior written consent, to any corporation or other business entity that succeeds to all or substantially all of Broker Dealer's business through merger, consolidation, corporate reorganization or by acquisition of all or substantially all of Broker Dealer's assets ("Change in Control"), provided that the corporation or other business entity agrees to be bound by these Master Terms and Conditions and the



Agreement; provided, further, however, that such assignment shall not relieve Broker Dealer of any of its obligations hereunder. If Representative does not consent to the Change in Control, the Relationship and the Master Terms and Conditions and the Agreement will be terminated.

g. Survival.    Section 7 (Confidentiality), Section 8 (Non-Solicitation), Section 12 (Indemnification) and Section 13 (General Provisions) shall survive the termination of the Relationship, the Master Terms and Conditions and the Agreement, subject to the limitations set forth therein, if any.

h. Notice.    Any notice required under these Master Terms and Conditions shall be in writing and sent to the respective addresses provided by the Parties. All notices and copies thereof shall be either sent by first-class mail or its equivalent, return receipt requested, or sent by electronic mail with a confirmation of receipt requested and received. Time periods shall commence on the date that such notice is received, if delivered by hand or by courier service, one business day after mailing if mailed, and 24 hours after electronic mail is sent.



## Acknowledgement of Terms & Conditions

Primary Representative Name

X _____     Date:    3/28/2018


Primary Representative Name

X _____     Date:


Additional Representative Name

X _____     Date:


Additional Representative Name

X _____     Date:



14187445.6 **23** of **23**

# EXHIBIT 2

**Whelchel Commission 12/30/2021**

Link to Commission Payment to Rep:  https://olivia.growthcapitalservices.com/forms/193/entries/49210/

Commission Calculation Michael Whelchel

| Deal | Transaction Date | Invoice Date | Received by GCS | Payment type | Seller | Buyer | # of shares | Transaction Total | Partial payment | Commission Received | Commission after Co-marketing | Rep Payout Tier | Rep Share | Split | Payment | TR ID # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 Torani | 12/29/2021 | 12/29/2021 | 12/30/2021 | Wire | ▮ | ▮ | | ▮ | | $450,000.00 | $450,000.00 | 96.00% | $432,000.00 | 100.00% | $432,000.00 | TR49160 |
| 2021 Torani | 12/29/2021 | 12/29/2021 | 12/30/2021 | Wire | ▮ | ▮ | | ▮ | | $1,156,611.47 | $1,156,611.47 | 96.00% | $1,110,347.01 | 100.00% | $1,110,347.01 | TR49159 |
| 2021 Center Creek | 06/01/2021 | 06/22/2021 | 12/27/2021, 12/20/2021 | Wire, Wire | ▮ | ▮ | | ▮ | | $13,125.00 | $13,125.00 | 96.00% | $12,600.00 | 100.00% | $12,600.00 | TR48851 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48527 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48529 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48530 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $2,500.00 | $2,500.00 | 96.00% | $2,400.00 | 100.00% | $2,400.00 | TR48519 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48531 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48532 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48533 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48534 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48535 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48536 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48537 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $1,000.00 | $1,000.00 | 96.00% | $960.00 | 100.00% | $960.00 | TR48523 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $1,500.00 | $1,500.00 | 96.00% | $1,440.00 | 100.00% | $1,440.00 | TR48524 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $750.00 | $750.00 | 96.00% | $720.00 | 100.00% | $720.00 | TR48525 |
| 2020 Builders | 11/01/2021 | 12/01/2021 | 12/21/2021 | Wire | ▮ | ▮ | | ▮ | | $500.00 | $500.00 | 96.00% | $480.00 | 100.00% | $480.00 | TR48526 |
| 2021 Social Impact | 06/01/2021 | 12/01/2021 | 12/22/2021 | Wire | ▮ | ▮ | | ▮ | | $21,135.27 | $21,135.27 | 96.00% | $20,289.86 | 100.00% | $20,289.86 | TR49083 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $20,000.00 | $20,000.00 | 96.00% | $19,200.00 | 100.00% | $19,200.00 | TR49087 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $5,000.00 | $5,000.00 | 96.00% | $4,800.00 | 100.00% | $4,800.00 | TR49089 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $50,000.00 | $50,000.00 | 96.00% | $48,000.00 | 100.00% | $48,000.00 | TR49088 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $9,000.00 | $9,000.00 | 96.00% | $8,640.00 | 100.00% | $8,640.00 | TR49090 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $5,000.00 | $5,000.00 | 96.00% | $4,800.00 | 100.00% | $4,800.00 | TR49091 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $5,000.00 | $5,000.00 | 96.00% | $4,800.00 | 100.00% | $4,800.00 | TR49092 |
| 2020 Lime Rock | 11/15/2021 | 12/01/2021 | 12/08/2021 | Wire | ▮ | ▮ | | ▮ | | $5,000.00 | $5,000.00 | 96.00% | $4,800.00 | 100.00% | $4,800.00 | TR49093 |
| | | | | | | | | | | $1,751,121.74 | $1,751,121.74 | | $1,681,076.87 | | $1,681,076.87 | |

## Search Transaction History

Actions ⌄

| Transaction Date From | Transaction Date To | Start Amount | End Amount |
|---|---|---|---|
| 12/30/2021 | 12/30/2021 | $ Start | $ End |

| Check Number From | Check Number To | Transaction Type |
|---|---|---|
| Start Check Number | End Check Number | Select a Transaction Type ⌄ |

**Search**

| Date ↓ | | Description | Amount | |
|---|---|---|---|---|
| 12/30/2021 | 🔍 101104 | Miscellaneous Debit<br>INCOMING WIRE FEE | -$15.00 | › |
| 12/30/2021 | | Incoming Domestic Wire<br>WIRE FROM GROWTH CAPITAL SERVICES INC | $1,681,076.87 | › |

# EXHIBIT 3

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

<u>Claimant</u>
Intellivest Securities, Inc.

    vs.

<u>Respondent</u>
Growth Capital Services, Inc.

<u>Case Number</u>: 20-04057

<u>Hearing Site</u>: Atlanta, Georgia

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Member vs. Member

The evidentiary hearing was conducted by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Intellivest Securities, Inc. ("Claimant"): Daniel M. Kolber, Esq., Intellivest Securities, Inc., Riverdale, Georgia.

For Respondent Growth Capital Services, Inc. ("Respondent"): David Goldsmith, Growth Capital Services, Inc., San Francisco, California and Alvin L. Fishman, Esq., JRA Law Partners, LLP, San Francisco, California.

## CASE INFORMATION

Statement of Claim filed on or about: December 15, 2020.
Claimant signed the Submission Agreement: December 14, 2020.

Statement of Answer filed on or about: February 3, 2021.
Amended Statement of Answer filed on or about: August 16, 2021.
Respondent signed the Submission Agreement: February 3, 2021.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: raiding; misappropriation of trade secrets; inducement of breach of fiduciary duty and duty of loyalty; tortious interference with economic advantage and business relations; conspiracy; unfair competition; and unjust enrichment. The causes of action relate to Claimant's allegation that Respondent wrongfully raided Claimant, resulting in the abrupt resignation of all four of Claimant's registered representatives. Claimant further alleges that because of Respondent's

raid and subsequent interference with its clients, it was forced to cease virtually all its business operations.

Unless specifically admitted in the Statement of Answer, as amended, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested that the panel enter an award:

1. Granting Claimant compensatory damages of no less than $1,787,654.00;
2. Granting Claimant punitive damages of no less than $893,827.00, computed at no less than 50% of the compensatory damages to be awarded but in no event greater than two times the compensatory damages award;
3. Ordering Respondent to cease and desist interfering with Claimant's clients;
4. Ordering Respondent to return Claimant's client and other business information;
5. Ordering Respondent to cease and desist using Claimant's methods and techniques, including, without limitation, their form of client contracts and provisions;
6. Granting Claimant's its attorneys' fees in an amount no less than $32,275.00;
7. Granting Claimant its costs of no less than $11,488.00;
8. Granting Claimant statutory interest of 7%;
9. Ordering Respondent to disgorge to Claimant any payments paid to Respondent by Claimant's clients that should have been paid to Claimant;
10. Ordering Respondent to cease and desist defaming Claimant's reputations; and
11. Granting Claimant such other and further relief as the Panel deems just and appropriate.

In the Statement of Answer, as amended, Respondent requested that Claimant's claims be dismissed in their entirety, that judgment be entered in favor of Respondent and against Claimant, that all costs of this action be cast upon Claimant, and that Respondent be granted such other and further relief deemed just and proper.

At the hearing, Claimant's total request for relief was $12,516,856.00.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On August 16, 2021, Respondent filed a Motion to File Amended Statement of Answer ("Motion to Amend"). On August 22, 2021, Claimant filed an Opposition to the Motion to Amend. On August 25, 2021, Respondent filed a Reply to Claimant's Opposition to the Motion to Amend. In an Order dated September 2, 2021, the Panel granted the Motion to Amend.

On October 8, 2021, Claimant filed a Rule 13511 Motion for Discovery Sanctions combined with a Rule 13509 Motion to Compel ("Claimant's Motion for Sanctions"). The same day, Respondent filed a Motion for Discovery Sanctions combined with a Motion to Compel ("Respondent's Motion for Sanctions"). On October 15, 2021, Respondent filed an Opposition to Claimant's Motion for Sanctions. On October 16, 2021, Claimant filed an Opposition to Respondent's

Motion for Sanctions. In an Order dated October 25, 2021, the Panel denied Claimant's Motion for Sanctions and Respondent's Motion for Sanctions.

On November 15, 2021, Claimant filed a Rule 13511 Motion for Sanctions for Failing to Obey Panel's Order ("Claimant's Second Motion for Sanctions"). On November 19, 2021, Respondent filed an Opposition to Claimant's Second Motion for Sanctions. In an Order dated November 19, 2021, the Panel ordered Respondent to comply with Claimant's request for information immediately and indicated that sanctions and fees would be considered by the Panel if Respondent did not comply by the date the Order was published. On November 20, 2021, Claimant filed a Notice to Panel of Respondent's Contempt for Failing to Obey the Panel's Order of November 19, 2021. On November 22, 2021, Respondent filed a Motion for Reconsideration of Ruling to Panel's November 19, 2021 Order and Supplemental Reply in Opposition to Claimant's Second Motion for Sanctions. The Panel considered Claimant's Second Motion for Sanctions as part of the evidentiary hearing and herein denies the motion.

At the hearing, Respondent made an oral motion to dismiss. On the record, the Panel denied the oral motion to dismiss.

On January 3, 2022, Respondent filed an Expedited Motion to Strike Claimant's Post-Hearing Brief ("Motion to Strike"). The same day, Claimant filed a Response in Opposition to the Motion to Strike. Herein, the Panel denies the Motion to Strike.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $440,187.50 in compensatory damages.

2. Respondent is liable for and shall pay to Claimant the sum of $150,000.00 in punitive damages pursuant to O.C.G.A. Sections 51-12-5.1 and 10-1-763.

3. Respondent is liable for and shall pay to Claimant the sum of $21,742.00 in costs.

4. Respondent is liable for and shall pay to Claimant the sum of $295,000.00 in attorneys' fees pursuant to O.C.G.A. Section 10-1-764.

5. Respondent is liable for and shall pay to Claimant $2,000.00 to reimburse Claimant for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

6. Any and all claims for relief not specifically addressed herein are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

## Filing Fees

FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 3,400.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

## Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as parties, Claimant and Respondent are each assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 3,025.00 |
| Member Process Fee | =$ | 6,175.00 |

## Discovery-Related Motion Fees

Fees apply for each decision rendered on a discovery-related motion.

| | | |
|---|---|---|
| Two (2) decisions on discovery-related motions on the papers with the Panel @ $600.00/decision | =$ | 1,200.00 |

Claimant submitted one (1) discovery-related motion
Respondent submitted one (1) discovery-related motion

| | | |
|---|---|---|
| Total Discovery-Related Motion Fees | =$ | 1,200.00 |

The Panel has assessed the total discovery-related motion fees to Respondent.

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) pre-hearing sessions with a single Arbitrator @ $450.00/session | | =$ | 900.00 |
| Pre-Hearing Conferences: August 6, 2021 | 1 session | | |
| October 18, 2021 | 1 session | | |

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with the Panel @ $1,400.00/session | | =$ | 1,400.00 |
| Pre-Hearing Conference: April 7, 2021 | 1 session | | |

| | | | |
|---|---|---|---|
| Eighteen (18) hearing sessions @ $1,400.00/session | | =$ | 25,200.00 |
| Hearings: | November 30, 2021 | 2 sessions | |
| | December 1, 2021 | 2 sessions | |
| | December 2, 2021 | 2 sessions | |
| | December 3, 2021 | 2 sessions | |
| | December 6, 2021 | 2 sessions | |
| | December 7, 2021 | 2 sessions | |
| | December 8, 2021 | 3 sessions | |

|                | December 9, 2021  | 2 sessions |
|                | December 10, 2021 | 1 session  |

| Total Hearing Session Fees | =$ 27,500.00 |

The Panel has assessed the total hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Paul Joseph McIntyre | - | Non-Public Arbitrator, Presiding Chairperson |
| Brian Walsh Devlin | - | Non-Public Arbitrator |
| Richard Moore | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Paul Joseph McIntyre*
_____
Paul Joseph McIntyre
Non-Public Arbitrator, Presiding Chairperson

01/07/2022
_____
Signature Date

*Brian Walsh Devlin*
_____
Brian Walsh Devlin
Non-Public Arbitrator

01/07/2022
_____
Signature Date

*Richard Moore*
_____
Richard Moore
Non-Public Arbitrator

01/08/2022
_____
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

January 10, 2022
_____
Date of Service (For FINRA Dispute Resolution Services use only)