1  CHRISTOPHER D. SULLIVAN (148083)
2  STACEY L. PRATT (124892)
   ROXANNE BAHADURJI (290117)
3  **SULLIVAN BLACKBURN PRATT LLP**
   456 Montgomery Street, Suite 2200
4  San Francisco, CA 94104
   Phone: (415) 692-5218
5  Email: csullivan@sullivanblackburn.com
6          spratt@sullivanblackburn.com
           rbahadurji@sullivanblackburn.com
7
8  Special Litigation Counsel
   for the Chapter 7 Trustee Janina M. Hoskins

9

10              **UNITED STATES BANKRUPTCY COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                **SAN FRANCISCO DIVISION**

13

14  In re:
                                                    Bankruptcy. Case No. 22-30218-HLB
15  GROWTH CAPITAL SERVICES, INC., a
    Delaware corporation,
16                                                  Adversary No. 23-03019
                    Debtors.
17                                                  Chapter 7

18  ─────────────────────────────────
19  JANINA M. HOSKINS, in his capacity as           OPPOSITION TO DEFENDANT FINALIS
    Chapter 7 Trustee of Growth Capital Services,   SECURITIES, LLC'S MOTION TO DISMISS
20  Inc.,

21                  Plaintiff,

22           v.

23  DAVID MICHEAL WHELCHEL, an
    individual, and FINALIS SECURITIES, LLC,
24  a Delaware Limited Liability Company.

25                  Defendants.

26

27

28

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

FACTUAL BACKGROUND..............................................................................1

ARGUMENT.....................................................................................................4

    I.     **Legal Standard**..............................................................................**4**

    II.    **The Complaint Contains Ample Particularized Facts to Support the First Claim for Actual Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A)........5**

        A.    The Complaint Pleads a Confluence of Several Badges of Fraud.............5

        B.    Finalis may not introduce its own set of facts to contradict the facts well-pleaded in the Complaint because in considering the Motion, the Court is to accept all facts in the Complaint as true....................................8

        C.    Plaintiff's actual fraudulent transfer claim meets the Rule 9(b) standard...13

    III.    **The Complaint Contains Specific and Well Plead Facts that the Transfers of Engagement Letters were Constructively Fraudulent.............................14**

    IV.    **The Complaint Pleads Entitlement to Recovery and Relief Under Sections 550 and 551...............................................................................21**

CONCLUSION............................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Aceituno v. Vowell et. al. (In re Intelligent Direct Marketing)*, 518 B.R. 579 (E.D. Cal. 2014).................................................................................................................................12

*Acequia Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800 (9th Cir. 1994) ................................. 10

*Akhtar v. Mesa,* 698 F.3d 1202 (9th Cir. 2012) ............................................................................9

*al-Kidd v. Ashcroft,* 580 F.3d 949 (9th Cir. 2009) ........................................................................9

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79 (S.D.N.Y 2004) .................................................................................................................................20

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................................................9

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) .........................................................................9

*Citicorp North America Inc., v. Official Cmmt. Of Unsecured Creditors (In re Tousa, Inc.)*, 680 F.3d 1298 (11th Cir. 2012)......................................................................................................20

*EBC I, Inc. v. America Online, Inc. (In re EBC I)*, 380 B.R. 348 (Bankr. D. Del. 2008)............21

*Everett v. Thomas Capital Invest. (In re Pacific Thomas Corp.)*, 543 B.R. 7 (Bankr. N. D. Cal. 2015).................................................................................................................................20

*Foman v. Davis*, 371 U.S. 178 (1962)........................................................................................27

*GGW Brands, LLC v. Nielson (In re GGW Brands, LLC)*, 504 B.R. 577 (Bankr. C.D. Cal. 2013)12

*Gill v. Maddalena*, 176 B.R. 551, 555 (Bankr. C. D. Cal. 1995)................................................14

*Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776 (S.D. N.Y Aug. 3, 2006)21

*Husted v. Taggart (In re ECS Refining, Inc.)*, 625 B.R. 425 ......................................................17

*In re Adeeb*, 787 F.2d 1339 (9th Cir. 1986) ..............................................................................10

*In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 539 (9th Cir. 1990) ..................................... 13, 14

*In re Altier*, 2017 WL 1011416 (Bankr. M. D. Fl. March 15, 2017) ...........................................21

*In re Opus East, LLC*, 528 B.R. 30 (Bankr. D. Del. 2015) .........................................................21

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) .........................................................18

*Kupetz v. Wolf*, 845 F.2d 842 (9th Cir. 1988) ...........................................................................10

*Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir. 2001) ............................................................9

*Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207 (Bankr. D. Nev. 2007).................................................................................................................................13

Case: 23-03019   Doc# 22   Filed: 08/18/23   Entered: 08/18/23 18:21:18   Page 3 of 26

*Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, 2020 WL 374357  (Bankr. W. D. Okla Jan. 17, 2020)................................................................................................. 20

*Max Sugarman Funeral Home, Inc. v. A.D.B Investors*, 926 F.2d 1248 (1st Cir. 1991) ............. 10

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109 (2nd Cir. 2013) ................................................................................................... 20, 24

*OSU Student Alliance v. Ray,* 699 F.3d 1053 (9th Cir. 2012)...................................................... 9

*Sarachek v. The Right Place, Inc. (In re Agriprocessors*, Inc.), 2011 WL 4621741  (Bankr. N.D. Iowa Sept. 30, 2011) ...................................................................................... 22

*Screen Capital Intern Corp. v. Liberty Asset Acquisition Co., Ltd.*, 510 B.R 248 (C. D. Cal. 2014) ................................................................................................................... 20

*Shauer v. Alterton*, 151 U.S. 607 (1894) ................................................................................. 13

*U.S. Bank N.A. v. Verizon Commc'ns Inc.*, No. 3:10-cv-1842-G  (N.D. Tex. July 31, 2012) ...... 26

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................................... 10

*Weisbuch v. County of Los Angeles*, 119 F.3d 783 (9th Cir. 1997) ........................................... 13

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) ................................. 13

**Statutes**

11 U.S.C. § 544 ....................................................................................................................... 21

11 U.S.C. § 548(a)(1)(A) ......................................................................................................... 10

11 U.S.C. § 548(a)(1)(B).................................................................................................... 20, 22

11 U.S.C. § 548(a)(1)(B)(II) .................................................................................................... 25

11 U.S.C. § 548(c) .................................................................................................................. 13

11 U.S.C. § 550 ....................................................................................................................... 26

11 U.S.C. § 727(a)(2)(A) ......................................................................................................... 10

**Rules**

17 CFR § 240.17a-11 ............................................................................................................... 15

Case: 23-03019    Doc# 22    Filed: 08/18/23    Entered: 08/18/23 18:21:18    Page 4 of 26

## INTRODUCTION

Defendant Finalis Securities, LLC's ("Finalis") Motion to Dismiss ("Motion") seeks to dismiss Plaintiff's claims for relief based on conclusory statements and unexamined defenses. For instance, despite the Complaint containing well-pleaded facts of several badges of fraud, Finalis attempts to contradict Plaintiff's facts with its own set of facts asserting that GCS's conduct was righteous and harmless and that Finalis acted in good faith. Plaintiff states well-pled facts that the Engagement Letters and the tail fees in them were lucrative and that GCS transferred them to Finalis for free, Finalis argues, no, the Engagement Letters were valueless. On a motion to dismiss, a court is not to weigh competing evidence. To the extent there are competing allegations, the court must resolve the conflict in a light most favorable to the Plaintiff. It is premature for the Court to decide competing facts that turn on evidence yet to be presented fully to the Court. Plaintiff's first and second claims include sufficient facts to indicate the plausibility of the claims asserted. The Motion should be denied.

## FACTUAL BACKGROUND

Growth Capital Services, Inc. ("GCS" or "Debtor") was a broker dealer in the business of buying and selling securities. GCS was previously registered as an investment advisor firm. Its primary business was private placement offerings of securities. (Complaint "Compl." ¶ 16.) GCS had a history of FINRA regulatory actions stemming from violations of private placement offerings. (Compl. ¶¶ 18-20.)

Prior to March 2018, Michael David Whelchel ("Whelchel") was a registered representative at Intellivest. Intellivest is a boutique banking investment firm dedicated to raising capital for issuers/clients seeking to attract investors interested in achieving positive social impact along with a competitive rate of return. (Comp. ¶ 23.) On or about December 14, 2020, Intellivest filed a claim with FINRA Dispute Resolution Services, initiating arbitration proceedings against GCS. (Compl. ¶ 23.) Intellivest brought claims including but not limited to raiding, misappropriation of trade secrets, inducement of breach of fiduciary duty and duty of loyalty, tortious interference with economic advantage and business relationships, conspiracy, unfair

competition, and unjust enrichment. (Whelchel Motion to Dismiss ("Whelchel MTD"), Exh. 3.) Intellivest argued that its business was destroyed when GCS "raided" Intellivest, resulting in the resignation of Whelchel among three other registered representatives. (Compl. ¶ 22.)

Whelchel was at the center of the Intellivest action. (Compl. ¶ 24.) Intellivest argued successfully that Whelchel, with GCS's knowledge, solicited Intellivest's clients that had agreements with Intellivest and got them to terminate their engagement agreements in favor GCS. Additionally, Whelchel and GCS steered fees owed to Intellivest under the engagement agreements to themselves. (*Id.*) These claims were heavily contested. The FINRA proceeding lasted more than a year and involved motions for sanctions, a motion to compel, a notice of contempt, a motion for reconsideration, an oral motion to dismiss, post hearing briefs, and a motion to strike a post-hearing brief. (Compl. ¶ 25.) The arbitration hearings took place over eighteen sessions. (*Id.*) At the hearing held on December 9, 2021, the panel signaled that it would issue an award for damages to Intellivest of $458,000 with the arbitration fees being split evenly. (*Id.*) The final arbitration session was held on December 10, 2021. (*Id.*)

As the arbitration proceedings were coming to an end, GCS sought ways to transfer assets away from the Debtor so that Intellivest could not recover on any award. (Compl. ¶ 26.) Despite Whelchel's conduct being at the forefront of the Intellivest action and the reason that Intellivest initiated arbitration against GCS, GCS and Whelchel once again took actions to hinder Intellivest's ability to collect. For instance, on December 30, 2021, after the panel stated that they would decide in Intellivest's favor and for a substantial amount, Whelchel received a transfer of $1.7 million (Compl. ¶ 26, 51, 64.) Moreover, by January 4, 2022, GCS and Whelchel had already started drafting at the very least, the Amendments to Letter Agreements. (*See* ADA-SCA Grace Holdings, LLC, and Traditional Medicinals, Inc. Amendments to Letter Agreements attached as Exh. B to Complaint bearing January 4, 2022 dates). Through these Amendments to Letter Agreements, which Whelchel was a signatory to as a registered representative of Finalis, GCS waived all rights to receive any fees under the Engagement Letters (Compl. ¶¶ 36-40.) The fees in the Engagement Letters were lucrative and a significant source of the Debtor's income. (Compl.

¶¶ 4, 27, 34-35, 36, 51.) The Debtor received zero compensation for the transfers. (Compl. ¶¶ 46, 52.)

In early January 2022, the panel issued its award. (Compl. ¶ 24.) They found in favor of Intellivest and awarded it: compensatory damages of $440,187.50; $150,000 in punitive damages; $21,742 in costs; $295,000 in attorneys fees; $2,000 filing fees; and additional FINRA fees of $41,300. (Compl. ¶ 26.) Swiftly thereafter, by January 14, 2022, the Debtor terminated all its employees (Compl. ¶ 51) and continued its efforts to execute Amendments to Letter Agreements. (Compl. ¶ 27.) By January 18, 2022, Whelchel was registered formally with Finalis (Compl. ¶ 41). One day later, Whelchel and GCS allegedly executed a letter whereby GCS waived and disclaimed its negotiated to rights to broker dealer fees arising out of the Engagement Letters. (Finalis Motion to Dismiss "MTD," Exh. 2.) The Debtor assigned all rights to the broker-dealer fees for free.

The short period, as asserted in the Complaint, between when the arbitration award was issued and when Whelchel formally registered with Finalis, indicates that Whelchel was working towards moving to Finalis and taking the valuable contracts with him before GCS closed. Moreover, per Finalis, Whelchel independently chose Finalis as his broker-dealer (Finalis MTD 14:9-10), indicating that Whelchel was once again complicit with GCS in transferring clients and contingent fees which would be owed to a broker-dealer (this time around GCS) to another firm.

From January 2022 through May 2022, the Debtor entered into the Amendments to Engagement Letters, transferring away all of its negotiated rights to receive tail fees. (Compl. ¶¶ 27, 33-39.) As asserted in the Complaint, the short time between the arbitration award and the transfer of the Engagement Letters, indicates that GCS made no effort to receive any benefit from the tail fees. Additionally, from January 14, 2022 to February 7, 2022, Whelchel received a further $225,000. (Compl. ¶ 26.) GCS's transfers of the Engagement Letters and the $225,000 were made after GCS owed more than $900,000 to Intellivest. With respect to insolvency or the Debtor's capital, Finalis and Whelchel acknowledge that at least by the date of the arbitration award, GCS had insufficient capital under FINRA requirements. (MTD ¶ 2; Whelchel MTD at 14:27-15:8.)

Rather than negotiating in good faith with Intellivest or working within the FINRA processes for an orderly winddown, GCS rapidly dissipated its assets and weakened an already frail corporation, acting contrary to the Debtor's best interests, all to hinder Intellivest's ability to collect on its award. (Compl. ¶¶ 4, 44, 51, 60, 65, 71.)

## ARGUMENT

### I.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Akhtar v. Mesa,* 698 F.3d 1202, 1212 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Plausibility" does not require "probability." *See Starr v. Baca,* 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable.").  It remains the law that a court reviewing a motion to Rule 12(b)(6) motion is to "accept the well-pleaded factual allegations of the complaint as true and construe them in the light most favorable to plaintiffs." *OSU Student Alliance v. Ray,* 699 F.3d 1053, 1061 (9th Cir. 2012). Therefore, no matter how improbable the facts alleged are, they must be accepted as true for purposes of the motion and construed in a light most favorable to the plaintiff. *Bell Atl. Corp* v. *Twombly,* 550 U.S. 544, 556 (2007); *Lee v. City of Los Angeles,* 250 F.3d 668,688 (9th Cir. 2001). "Factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee,* 250 F.3d at 668. The Court is not to weigh the evidence. *al-Kidd v. Ashcroft,* 580 F.3d 949 (9th Cir. 2009). Motive, intent, and state of mind may be alleged generally, even under Rule 9(b). *In re Glenfed, Inc. Sec. Litig.,* 422 F.3d 1541, 1546 (9th Cir. 1994) *(en banc).* To the extent there are competing allegations in a complaint, courts must resolve the conflict by construing the complaint in a light most favorable to the Plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501 (1975).

///

///

## II. The Complaint Contains Ample Particularized Facts to Support the First Claim for Actual Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A).

### A. The Complaint Pleads a Confluence of Several Badges of Fraud.

Contrary to Finalis's assertion, the Complaint contains several facts giving rise to a reasonable inference that the transfers were made with actual intent to hinder, delay, or defraud a creditor of the Debtor – Intellivest -- from collecting on its arbitration award. (Compl. ¶¶ 25-27, 44, 51-52.) The transfer of any interest in the debtor's property within one year of the bankruptcy petition, is voidable by the trustee if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing the property from their reach. *Max Sugarman Funeral Home, Inc. v. A.D.B Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991); *cf In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986) (inquiry under § 727(a)(2)(A) is whether debtor intended to hinder or delay a creditor by placing property beyond the creditor's reach, and if he did, he had the intent penalized by statute). The Complaint clearly and sufficiently pleads that the Debtor disposed of the valuable Engagement Agreements and the rights to receive broker dealer fees and tail fees, terminated all its employees, and stopped doing business, all so Intellivest could not recover on the arbitration award. This is exactly the type of conduct that § 548(a)(1)(A) seeks to curtail.

Because it is often impracticable on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors, courts infer fraudulent intent from circumstances surrounding the transfer. *Acequia Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994). The most common indicia of fraud is when an insolvent debtor makes a transfer and gets nothing or very little in return. *Kupetz v. Wolf*, 845 F.2d 842, 846 (9th Cir. 1988). That is exactly what happened here. The Complaint amply pleads the more common circumstantial indicia of fraudulent intent: (1) an adverse arbitration award following heavily contested litigation for more than a year (Compl. ¶¶ 25-26); (2) the cessation of all business and the transfer of the Engagement Agreements and the rights to the fees therein for free - no consideration whatsoever (Compl. ¶¶ 27, 34-39, 44, 46, 51-52, 58); and (3) Debtor's insolvency (Comp. ¶¶ 4, 59-60).

Finalis first argues that the complaint does not allege actual or threated litigation, implying for an unknown reason that litigation pending against a debtor is a badge of fraud but an award against a debtor is not. (MTD ¶ 31a.) A debtor transferring assets in the face of a judgment or an award against it for a definitive sum out of the reach of that creditor is more of an indicia of fraud than when the debtor faces litigation, but the exposure is unknown. Additionally, Finalis puts words into the Complaint by arguing that the Complaint alleges that the Debtor had sufficient assets to pay the arbitration award. (MTD ¶ 31a.) This is incorrect; the Complaint states that rather than considering potential ways that GCS could pay the award, GCS acted quickly to cease business and transfer all rights to receive the broker dealer fees and tail fees thereby hindering creditor efforts to recover. (Compl. ¶ 4.)

Finalis incorrectly argues that Plaintiff has not alleged that the Engagement Letters made up substantially all of the Debtor's assets or that the Debtor was insolvent or had unmanageable indebtedness. (MTD ¶ 31b-c.) The Complaint clearly states that the Engagement Letters were "a significant source of the Debtor's income" (Compl. ¶ 28); from January 2022 through March 2022, the Debtor transferred the "existing lucrative contracts effectively leaving the company penniless" (Compl. ¶¶ 4, 27); "[w]ithin days after the arbitration award, the Debtor acted swiftly to transfer its assets and its source of income, namely any rights to receive fees from the Engagement Letters, rendering it insolvent" (Compl. ¶ 60). Furthermore, the Complaint provides that the Debtor transferred its "source of income" and "dissipate[ed] its assets such that it could file for bankruptcy." (Compl. ¶ 44.) The Debtor's schedule lists the Debtor's only property as $43,024.70 (Compl. ¶ 45) and other than the transfer of the Engagement Letters attached as Exhibit C to the Complaint (Compl. ¶ 39), the Debtor has not listed any other transfers of property outside the ordinary course of business – thereby indicating that the Engagement Letters was a significant source of the Debtor's income. Moreover, Finalis is being disingenuous when it argues on the one hand that after receiving the $900,000 unfavorable arbitration award, the Debtor was unable to remain licensed by FINRA (MTD ¶ 2), but at the same time arguing that the facts do not show that the Debtor had insolvency issues or unmanageable indebtedness (MTD

¶ 31c). By citing to FINRA requirements, Finalis is referring to the net capital rule that requires that a firm like the Debtor maintain net capital at specific levels, thereby indicating that the Debtor indeed did have at the very least solvency issues at the time of the transfers. (*See* Whelchel Motion to Dismiss at 14:27-15:6).

Finalis ignores the fact that Plaintiff amply pleads that the transfers of the Engagement Letters and the right to the fees from them were made for no consideration – valuable assets belonging to the Debtor were given for free. (Compl. ¶¶ 46, 52, 58.) When a debtor assigns assets away for free and closes in the face of litigation, like here, courts find that the assignment was made with actual intent to hinder, delay or defraud creditors. *See Aceituno v. Vowell et. al. (In re Intelligent Direct Marketing)*, 518 B.R. 579, 591-92 (E.D. Cal. 2014); *GGW Brands, LLC v. Nielson (In re GGW Brands, LLC)*, 504 B.R. 577, 627-28 (Bankr. C.D. Cal. 2013).

For example, in *GGW Brands, LLC*, the Bankruptcy Court granted summary judgment for the trustee, finding that the debtors' assignment of trademarks to another entity for no consideration after two lawsuits had been filed and two were being threatened against the debtors, and when the certification of formation for the debtor was cancelled, were actual fraudulent transfers. *In re GGW Brands, LLC*, 504 B.R. at 627. The Court further reasoned that while there was insufficient direct evidence that the debtors were insolvent or became insolvent from the assignments, it was reasonable to assume this was true because the trademarks were the debtors' most valuable asset. *Id.* at 628. From these facts, the Court concluded that the purpose of the assignments "was to make it much more difficult, costly, and time consuming for creditors to reach the Trademarks." *Id.* Similarly, in *Intelligent Direct Marketing*, following a bench trial, the Court found that the debtor's transfer of its goodwill, income stream, and assets after the debtor ceased operations and performing on its contracts, was fraudulent because the transfer was intended to prevent creditors from collecting the debtor's debts. *In re Intelligent Direct Marketing*, 518 B.R. at 584-85, 91-92. The Complaint contains ample facts similar to *GGW Brands, LLC* and *Intelligent Direct Marketing* – the ceasing of business, the assignment of valuable rights for free, and insolvency in the face of a substantial debt owed to Intellivest.

**B.** <u>Finalis may not introduce its own set of facts to contradict the facts well-pleaded in the Complaint because in considering the Motion, the Court is to accept all facts in the Complaint as true.</u>

In its effort to have the Court dismiss the Complaint, Finalis attempts to present its own set of facts. However, it is premature for the Court to decide contested actual issues on a Rule 12(b)(6) motion. The Court cannot weigh the evidence at this time. Finalis asserts that it accepted the transfer of the Engagement Letters in good faith. A good faith defense under § 548(c) is an affirmative defense, which cannot be raised by a Rule 12(b)(6) motion unless the allegations of the complaint plead facts that establish the affirmative defense. *Weisbuch v. County of Los Angeles*, 119 F.3d 783, fn 1 (9th Cir. 1997); *Xechem, Inc. v. Bristol-Meyers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). At no point does the Complaint allege that Finalis acted in good faith by accepting assignments for free from the Debtor.

As to good faith and knowledge, in *In re Agric. Rsch. & Tech. Grp., Inc. (In re Agritech)*, 916 F.2d 528, 539 (9th Cir. 1990), the Ninth Circuit indicated that the issue of good faith involved what the transferee "knew or should have known" in an objective rather than subjective sense, and concluded that, if the circumstances would have put a reasonable person on inquiry of the debtor's fraud and a diligent inquiry would have discovered the same, good faith is lacking. 916 F.2d at 535–36. The court in *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207 (Bankr. D. Nev. 2007), agreed with *Agritech* and quoted *Shauer v. Alterton*, 151 U.S. 607, 621 (1894), regarding a lack of good faith:

> [W]hile the plaintiff was not bound to act upon mere suspicion as to the intent with which [the transferor] made the sale in question, if he had knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether [the transferor] intended to delay or defraud his creditors, and he omitted to make such inquiry with reasonable diligence, he should have been deemed to have notice of such fact, and therefore such notice as would invalidate the sale to him, if such sale was in fact made with the intent upon the part of the [transferor] to delay or defraud other creditors.

367 B.R. at 223–24. One who knowingly or recklessly participates in a fraudulent scheme designed to injure or obstruct the transferor's creditors will not be protected even if value is

given in exchange for that transfer. *Gill v. Maddalena*, 176 B.R. 551, 555 (Bankr. C. D. Cal. 1995).

The point is that Finalis does not have an automatic successful affirmative defense that would support dismissal. The resolution of the issue depends on facts elicited in discovery. Plaintiff contends that discovery will reveal that Finalis knew or at the very least was on inquiry notice that the Engagement Letters that it was assigned for free involved Whelchel, the very party that was at the center of the arbitration award. (Compl. ¶¶ 22-24.) In the arbitration, Intellivest asserted that GCS "raided" the firm, resulting in Whelchel's resignation and move to the Debtor, and that with GCS's knowledge, Whelchel encouraged Intellivest's clients to breach their engagement letters with Intellivest in favor of the Debtor. Moreover, Whelchel and GCS diverted fees owed from Intellivest clients to themselves. (Compl. ¶ 24.) Discovery will reveal that the clients listed on the fee waiver agreement that Finalis relies upon (MTD, Exh. 2) are the very same clients that Intellivest asserted in its arbitration were its clients that Whelchel and the Debtor diverted. Finalis had notice of GCS's history of playing fast and loose with FINRA's regulations. (Compl. ¶¶ 18-20.) The Debtor had a track record of FINRA regulatory actions stemming from violations. (*Id.*) Finalis's unexamined defense that it received the transfers in good faith cannot be conclusive.

Finalis also attempts to paint an innocent picture that the Debtor had no choice but to assign the Engagement Letters because it ceased its operations and could no longer provide services (MTD ¶¶ 31d, 35.) The timeline does not support such a righteous story. While the arbitration award was handed down in early January, the panel had already signaled by December 9, 2021, that it would issue an award to Intellivest in a sum of at least $458,000. (Compl. ¶¶ 25-26.) So by early December at the latest, GCS and Whelchel were aware that GCS would face significant liability (*Id.*) Two of the Amendments to the Letter Agreements (ADA-SCA Grace Holdings, LLC, and Traditional Medicinals, Inc.) bare a date of January 4, 2022 (even if potentially completed at a later date) indicating that GCS and Whelchel had begun efforts to transfer assets to Finalis even before the Debtor ceased operations (Compl. Exh. B.)

Contrary to Finalis's assertions, under FINRA Rule 2010's "high standards of commercial honor" GCS had an obligation to not abruptly shut down in the face of an award. There were several options available to it. At the outset, SEC Exchange Act Rule 15c3-1 requires that every broker or dealer maintain net capital of a certain ratio and not be insolvent. The failure to meet those ratios does not require nor encourage a firm to shut down. Rather FINRA Rule 4110(b)(1) provides that "unless otherwise permitted by FINRA, a member shall *suspend* all business operations during any period in which it is not in compliance with applicable net capital requirements set forth in SEA Rule 15c3-1." (Emphasis added). The rule provides for *suspension* for a period to give an opportunity to the broker-dealer to get in compliance. Where the firm (like GCS) did not hold in its custody client's assets, the correct procedure is to file a 17a-11 notification giving notice of the deficiency and promptly discuss with the broker-dealer's FINRA coordinator how to fix the problem to resume operations. *See* 17 CFR § 240.17a-11 (does not require broker-dealer to cease business altogether but to notify the SEC within 24 hours); *SEC Charges Broker-Dealer CEO With Net Capital Rule Violations, Administrative Proceeding*, File No. 3-18409, March 27, 2018, http:sec.gov/enforce/34-82951-s (stating the net capital rule is "designed to protect customer assets held in brokerage accounts"). The net capital rule is not designed to shut down broker-dealer firms.

Typically, if the SEC finds out from its own investigation (rather than the broker-dealer coming forward) that the broker-dealer is in violation of the net capital rule, the SEC does not require an immediate shut down (especially when no client funds are held) but imposes a penalty. FINRA's Sanction Guidelines state that the principal consideration in determining sanctions include whether the firm continued in business while knowing of the deficiencies and whether the firm attempted to conceal the deficiencies. *See* FINRA Sanction Guidelines, September 2022 at p. 27, https://www.finra.org/rules-guidance/oversight-enforcement/sanction-

guidelines; *see also Broker Check Report for Third Seven Capital LLC*[1] (imposing $10,000 fine and censure for firm conducting business while failing to maintain the minimum net capital); *Broker Check Report for Arque Capital, Ltd* (Disclosure 1 of 4) (imposing $50,000 fine and censure for failure to maintaining minimum required capital, failing to notify FINRA and SEC of deficiencies, failure to remit payroll taxes among other findings); Order Instituting Administrative and Cease and Desist Proceedings* ("Darbie Order") (imposing $50,000 fine and censure where firm "willfully violated" the net capital requirements and firm held customer accounts subjecting it to the heightened minimum net capital requirement).

To require a business to quickly shut down once in violation of the net capital requirements runs counter to the purpose of the net capital rule, which is to ensure broker dealers maintain enough liquid assets to meet all obligations to customers and have additional resources to winddown a business in an orderly manner if the firm fails financially. *See Darbie Order* at p. 2; 2021 Report on FINRA's Examination and Risk Monitoring Program, https://www.finra.org/rules-guidance/guidance/reports/2021-finras-examination-and-risk-monitoring-program/net-capital (the net capital rule "requires that firms must at all times have and maintain capital at specific levels to protect customers and creditors from monetary losses that can occur when firms fail"). Thus, GCS did not need to abruptly shut down when confronted with a creditor claim and this conduct was contrary to Rule 15c3-1's purpose of protecting creditors when broker-dealers are insolvent or have small capital.

After notifying and working with the regulatory bodies on any net capital violation, rather than immediately closing shop and hurting its creditors, the Debtor could have stayed alive or wound down in an orderly fashion. An acceptable alternative to abruptly closing would have been if the claimant – in this case Intellivest – subordinated the amount of its arbitration award

---

[1] Plaintiff requests the Court take judicial notice of the broker check reports and Darbie order attached as Exhibit A to this opposition. These documents are matters of public record and their existence and what they state are not subject to reasonable dispute. *See Intri-Plex Tech., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).

pursuant to an approved sub-loan meeting all the conditions of the net capital rule. *See* NASD Notice to Members 00-63 "NASD Regulation Provides Guidance on The Use of Installment Payments To Satisfy Arbitration Award" (Sept. 11, 2000), https://www.finra.org/rules-guidance/notices/00-63. FINRA rules provided Debtor with the viable option to request Intellivest to subordinate the arbitration award through an approved sub-loan. (*Id.*) Alternatively, the Debtor could have in good faith assigned the tail fees to Intellivest to satisfy the arbitration award, and the net capital violation would have been solved.

If the Debtor no longer wished to stay in business, it could have acted in a manner that did not make the company's financial situation more dire or weakened the ability of GCS deliberately to force concessions from Intellivest and harm other unsecured creditors as well. *See Husted v. Taggart (In re ECS Refining, Inc.)*, 625 B.R. 425, 448-49 (Bankr. E.D. Cal. 2020). FINRA Rule 2010 dictates that GCS should not have given away the Engagement Letters. The fees that Plaintiff pleaded were valuable and a substantial source of the Debtor's income for free in the face of a successful creditor action. The Debtor could and should have negotiated with other broker-dealers to get the assignments for some price other than zero. Finalis states that "Whelchel had to identify a replacement licensed broker-dealer…and Whelchel independently chose Finalis as his licensed broker-dealer." (MTD ¶ 31(d) at 14:8-10.) Finalis therefore acknowledges that GCS did not make any attempt to shop around the Engagement Letters to other broker dealers to receive payment for the right to receive fees. Alternatively, the Debtor could have sought consideration from the clients to be released from the tail Fees and any deferred fees. There was no valid purpose for relinquishing the Tail Fees, other than hindering Intellivest and acting with reckless disregard to its creditors.

In any event, Finalis's presentation of the facts is a strawman argument because on a motion under Rule 12(b)(6), the Court is required to accept Plaintiff's allegations as true. Here Plaintiff has pleaded several badges of fraud: adverse arbitration award (Compl. ¶¶ 25-26); transfer for free of the Engagement Agreements and the lucrative rights to fees, which were a substantial source of Debtor's income despite many options available to it (Compl. ¶¶ 4, 27-28,

34-39, 44, 46, 51-52, 58); and Debtor's insolvency (Comp. ¶¶ 4, 44-45, 59-60). Plaintiff is not required to plead facts giving rise to every single badge of fraud. The presence of a single badge of fraud may spur mere suspicion but the confluence of several can constitute conclusive evidence of actual intent to defraud. *In re Acequia, Inc.*, 34 F.3d at 806; *see In re ECS Refining, Inc.*, 625 B.R. at 459 (finding that the trustee's claim for actual fraudulent transfer survived a motion to dismiss because the trustee plead facts giving rise to at least two indicia of fraud). Thus, the Complaint contains ample facts showing multiple badges of fraud.

C. Plaintiff's actual fraudulent transfer claim meets the Rule 9(b) standard.

Plaintiff has averred substantial and specific details to support its actual fraudulent transfer claim. That Finalis does not like the level of specificity and wishes for Plaintiff to prove up its case now, does not make the Complaint deficient. Rule 9(b) requires that the circumstances constituting the alleged fraud "be specific enough to give notice of the particular misconduct…so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks and citation omitted). Rule 9(b) serves three purposes: (1) to provide defendants with notice and to deter the filing of a complaint as a pretext for the discovery of unknown wrongs; (2) to protect those whose reputation would be harmed as a result of fraud charges; (3) to prohibit a plaintiff from imposing costs absent some factual basis. *Id.* at 1125. Here, the Complaint (as laid out in Section IIA above) contains ample circumstantial indicia of fraudulent intent thereby providing Finalis with fair notice of the grounds upon which the actual fraudulent transfer claim rests.

Finalis is not defending itself in the dark as it would have the Court and the parties believe. Finalis has been provided notice that this lawsuit seeks to avoid and recover all the Engagement Letters that the Debtor transferred to it and the applicable tail fees. The Complaint describes the nature and substance of the Engagement Letters (Compl. ¶¶ 28-29, 33-35) and that "GCS assigned these Engagement Letters and GCS's valuable rights to the "Tail Fees" to Whelchel as a broker-dealer and to Finalis." (Compl. ¶¶ 36-37.) The Complaint also attaches

fourteen Amendments to Letter Agreements executed by Finalis and GCS transferring Engagement Letters to Finalis. Plaintiff notes that there are additional Engagement Letters that GCS transferred that the Debtor identified in its Statement of Financial Affairs. (Compl. ¶ 39.) As an assignee to the Engagement Letters, Finalis knows which Engagement Agreements referenced in Exhibit C it is party to. If Finalis is in any doubt, Whelchel has identified for Finalis that 29 of the contracts listed on Exhibit C were assigned to Finalis (Whelchel MTD at 7 fn. 7.) Finalis feigns ignorance that it does not know the "true nature of the claim against it" but in the very next sentence it correctly identifies that the Trustee seeks to "avoid the assignment of the Engagement Letters to Finalis" (MTD ¶ 35) and to recover for the benefit of the estate the avoided transfers (Compl. ¶ 73.)

### III. The Complaint Contains Specific and Well Plead Facts that the Transfers of Engagement Letters were Constructively Fraudulent.

#### A. Plaintiff pleads facts giving rise to the reasonable inference that the Debtor did not receive reasonably equivalent value in exchange for the transfers of the Engagement Letters to Finalis.

Plaintiff pleads repeatedly that the Debtor transferred valuable and lucrative contracts away for free – no consideration. Specifically, the "Debtor transferred away any and all rights to be paid broker-dealer fees and tail fees from existing lucrative contracts effectively leaving the company penniless and hindering creditor efforts to recover" (Compl. ¶ 4); "The Debtor did not receive any consideration for the Transfers. The Debtor gave away assets for free and by the petition date, the Debtor had disposed of any valuable assets and hindered Intellivest's ability to collect its award" (Compl. ¶ 52); "Defendants received transfers from the Debtor and the Defendants did not provide any value" (Compl. ¶ 46); "GCS transferred valuable contracts and its rights to receive significant fees from those contracts (Compl. ¶ 27); the Engagement Letters was "a significant source of the Debtor's income." (Compl. ¶ 28). The Complaint also provides details on the specific fees that GCS was entitled to – the "Broker Dealer Fee" and the "Tail Fee" (Compl. ¶¶ 34-36, Exh. A.)

Rule 9(b)'s heightened pleadings standard is not applicable to a claim for constructive fraudulent transfer. *Screen Capital Intern Corp. v. Liberty Asset Acquisition Co., Ltd*., 510 B.R 248, 257 (C. D. Cal. 2014). Plaintiff's claim for constructive fraud is subject to the "ordinary notice pleading" standard and only to the "short and plain statement requirements of Federal Rule of Civil Procedure 8(a)." *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 120 (2nd Cir. 2013). Although Plaintiff contends that the Complaint contains detailed factual allegations, Rule 8 does not require more than sufficient facts that raise the right to relief above the speculative level and give the defendant fair notice of the grounds upon which the claim rests. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Plaintiff's constructive fraudulent claim is supported by well plead facts and gives Finalis fair notice of the grounds upon which it rests.

Whether the Debtor received reasonably equivalent value for the transfers is a question of fact inappropriate for a motion to dismiss. "It has long been established that whether fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Citicorp North America Inc., v. Official Cmmt. Of Unsecured Creditors (In re Tousa, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012); *Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, 2020 WL 374357, at *11 (Bankr. W. D. Okla Jan. 17, 2020) (same); *Everett v. Thomas Capital Invest. (In re Pacific Thomas Corp.)*, 543 B.R. 7, 11 (Bankr. N. D. Cal. 2015) (whether the value is reasonably equivalent requires a comparison of the value of what was transferred and received. The determination of reasonably equivalent value is a question of fact). Because reasonably equivalent value is a question of fact, "[i]t would therefore be premature to dismiss the § 548(a)(1)(B) claim on the ground that the value transferred …appears, in simple mathematical terms, to exceed that of the allegedly fraudulent transfers. The totality of the circumstances must be examined, and [plaintiff] has the right to offer evidence in an effort to show that, contrary to appearances, it did not receive reasonably equivalent value in exchange for the transfer." *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79, 106 (S.D.N.Y 2004) (denying dismissal of constructive

fraudulent transfer claims on a 12(b)(6) motion); *see also Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776, at * 9 (S.D. N.Y Aug. 3, 2006) (denying dismissal of claims for avoidance of transfers under § 544 because whether the debtor received "fair consideration" could not be decided as a matter of law, rather it is a factual question and even if it appears that "fair consideration" was received, it would be premature to dismiss the claims).

The cases relied upon by Finalis undermine its argument that whether the Debtor received reasonably equivalent value can be decided on a motion to dismiss. For instance, in *Pacific Thomas Corp.*, the Court decided only after trial and after considering testimony and evidence, that a creditor failed to demonstrate that the debtor received reasonably equivalent value in exchange for payments made for work performed. *In re Pacific Thomas Corp.*, 43 B.R. at 12. Similarly, in *All Phase Roofing & Constr., LLC*, the Court ruled in favor of the defendant after trial. *See* 2020 WL 374357, at *12-13. Additionally, the facts of *All Phase Roofing & Constr., LLC*, are not relevant because there the court considered whether the debtor transferred anything of value when the assets were fully encumbered and thus had no value to the estate. Here, the complaint pleads that the engagement letters were valuable, the fees in them were a significant source of the debtor's income, and the transfer of them hindered creditor's ability to recover from them. (Compl. ¶¶ 4, 27-28, 52.). In *Goshen Mortgage, LLC v. Altier (In re Altier)*, too, the Court only after considering all the evidence on a summary judgment motion ruled that the debtor transferred "valuable" real property for "no consideration" when the debtor was not paying debts due. *In re Altier*, 2017 WL 1011416, at * 2-4 (Bankr. M. D. Fl. March 15, 2017); *see also In re Opus East, LLC*, 528 B.R. 30, 88-89 (Bankr. D. Del. 2015) (finding after trial that reasonably equivalent value was given for management contracts and physical assets after considering the evidence, including that the contracts had previously never realized a profit); *EBC I, Inc. v. America Online, Inc. (In re EBC I)*, 380 B.R. 348, 362 (Bankr. D. Del. 2008) (decided after evidence presented on summary judgment). Thus, the cases Finalis cites to actually support denial of the motion and undercut its arguments.

Moreover, the Complaint clearly asserts that the Debtor received no money – zero – in exchange for the Engagement Letters. (Compl. ¶¶ 52, 58.) Contrary to Finalis's assertion, this is not a conclusory statement. Courts accept the allegation that the debtor received no consideration in exchange for transfers as sufficient factual support for a lack of reasonably equivalent value. For example, the Court *in Sarachek v. The Right Place, Inc.* (*In re Agriprocessors*, Inc.), 2011 WL 4621741, at 9 (Bankr. N.D. Iowa Sept. 30, 2011) explained that: "when the Trustee alleges Debtor received nothing from the defendant in exchange for an alleged fraudulent transfer, it is entirely plausible that Debtor received less than reasonably equivalent value in exchange for that alleged transfer." That is why, in *ECS Refining, Inc.*, the Court dismissed the constructive fraudulent transfer claim because the complaint made "no effort to describe the consideration (*or in the alternative, state that no consideration was received*)[.]" *ECS Refining, Inc.*, 625 B.R. at 461 (emphasis added). Plaintiff clearly pleads that the Engagement Agreements were transferred for free, thereby satisfying this element of § 548(a)(1)(B).

Finalis attempts to negate Plaintiff's facts with its own set of facts. Contradicting Plaintiff's allegations, Finalis argues again that the Engagement Letters had no value because they were assigned to Finalis after the Debtor shut down and therefore the Debtor could no longer provide any services as consideration for the fees. (MTD ¶¶ 42, 44.) This is misleading because, as Plaintiff elaborated above (Section IIB) and in the Complaint, the Debtor did not need to abruptly cease its business and it could have realized value from the Engagement Letters and the fees. The only reason the Debtor immediately shut down was to hinder Intellivest's ability to collect the arbitration award. *See ECS Refining, Inc.*, 625 B.R. at 448-49 (finding on a Rule 12(b)(6) motion that business judgment rule did not bar the Trustee's claims because she plead bad faith acts that deepened the debtor's insolvency, including weakening the debtor's financial condition intentionally to force concessions from largest creditor). Even if the Debtor wished to stop conducting business, it could have retained its value from the Engagement Letters by negotiating with other broker dealers to obtain payment for the assignments or sought consideration from the clients to release the tail fees.

Finalis next argues that the Debtor received a benefit from the transfer of the Engagement Letters because had GCS retained the Engagement Letters after it shut down, it "*could* have been exposed to breach of contracts claims …not to mention *possible* claims and enforcement actions by regulatory agencies for *possible* violations of applicable law, rules, and regulations." (MTD ¶ 46 [emphasis added.]) Tellingly, the Motion to Dismiss is silent on the basis for breach of contract claims or what regulatory agency rules and regulations GCS would be in violation of if it retained rights to receive tail fees from the Engagement Letters. Simply because GCS closed, does not mean that it was not entitled to compensation for services performed.

The Engagement Letters and Whelchel's registered representative agreement specifically contemplate GCS receiving fees after the agreements are terminated and GCS no longer performing services. The Engagement Letters provide that if a client receives an indication of interest from a prospective investor within 2 years of the termination of the Engagement Letter, even if the closing occurs after the 2 years, GCS is still entitled to the tail tees. (Compl. Exh. A, § 3.2.2.) This provision specifically states that if the relationship is terminated, and GCS is no longer performing services, it is entitled to fees. This is completely different from the facts in *EBC I, Inc.*, 380 B.R. at 362-63. In that case, on summary judgment, the Court determined that the agreement which required AOL to deliver impressions and other ads for the debtor's website had no value because the debtor was no longer operating, and the contracts were not assignable by the debtor to another. Here, the Engagement Letters were assignable, and they were assigned. Additionally, the Engagement Letters have a clear contractual provision that entitles GCS to fees once the agreement is terminated and GCS is no longer performing services for the client.

Additionally, Whelchel's registered representative agreement also provides for payment of fees to the Debtor even after the relationship is terminated. Specifically, once the relationship is terminated, for a period of one year, GCS is entitled to its portion of the commission payments received relating to opportunities approved in writing prior to the termination. (MTD Exh. 1, § 11.) And if Whelchel has moved on to another broker dealer firm, then GCS is still entitled to its portion of the commission payments and GCS will send Whelchel's portion to the succeeding

broker-dealer. (*Id.*) Thus, the agreement specifically contemplates GCS's right to fees even if GCS is not performing anymore services because the Debtor performed by approving the opportunity in writing allowing the capital to be raised. (*Id.*) Moreover, put simply, just because GCS closed does not mean that it should not be compensated for the services performed. Depending on what stage of completion a deal under an Engagement Letter was, the issuers could have completed the deals themselves or had another broker-dealer complete the deal and then deduct the costs from any tail otherwise owed to GCS.

With respect to Finalis's claim of "*possible* violations" of rules and regulations and "*possible* claims and enforcement actions[,]" (MTD ¶ 46 [emphasis added]), the nature of which is unknown, GCS's actions in transferring assets in the face of a FINRA award and fees owed to FINRA, runs counter to FINRA's "high standard of commercial honor[.]" *See* FINRA Rule 2010. Moreover, transferring assets for free runs counter to the principle behind the net capital rule of protecting creditors from losses when a broker-dealer fails.

Finalis's efforts to raise issues of disputed facts is not appropriate on a motion to dismiss. As the Second Circuit stated on appeal to a Rule 12(b)(6) motion: "Discovery may reveal that the actual facts support the inference drawn by Defendants…, rather than those drawn by the [Plaintiff]. But that has no bearing on the question before us." *New Jersey Carpenters Health Fund*, 709 F.3d at 125. "A well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbably, and that recovery is very remote or unlikely." *Id.* The applicable question is whether the facts alleged in the Complaint, as taken as true, allow the Court to draw the reasonable inference that the Engagement Letters and the fees therein were given away for less than reasonably equivalent value. Plaintiff has met its pleading burden.

///

///

///

///

///

**B.** <u>The Complaint contains sufficient facts on the Debtor's insolvency and this fact is validated by Defendants' motions to dismiss.</u>

Plaintiff has plead sufficient facts above the speculative level that the transfers rendered the Debtor insolvent or were made at a time when the Debtor had unreasonably small capital. In early January 2022, the GCS was faced with a debt of $908,000 (Compl. ¶ 26.) Nevertheless, "[w]ithin days after the arbitration award, the Debtor acted swiftly to transfer its assets and its source of income, namely any rights to receive fees from the Engagement Letters, rendering it insolvent." (Compl. ¶ 60.) The Engagement Letters were "a significant source of the Debtor's income" and from January 2022 through March 2022, the Debtor transferred the "existing lucrative contracts effectively leaving the company penniless." (Compl. ¶¶ 4, 27.) The Debtor transferred its "source of income" and "dissipate[ed] its assets such that it could file for bankruptcy." (Compl. ¶ 44.) And by the petition date of May 3, 2022, the Debtor only had personal property of $43,024.70 and liabilities in excess of $2.4 million. (Compl. ¶ 45.) Moreover, the Debtor's schedule lists its only asset as property of $43,024.70 and its Statement of Financial Affairs does not list any transfers of property outside the ordinary course of business other than the transfers attached as Exhibit C, thereby showing that the Engagement Letters was a significant source of the Debtor's income and the transfer of them and the right to the fees in them left the Debtor penniless. (Compl. ¶ 45, Exh. C.)

As the Court in *Winnick* explained, "[i]n the end, while it may turn out that the Estate Representative will be unable to prove this element [insolvency] as to some or all of its claims, it has satisfied the minimal burden it faces at this early stage of the proceeding." 2006 WL 2212776, at * 11. Unlike *Winnick*, Finalis and Whelchel acknowledge that the Debtor had liquidity issues due to the net capital requirements. (MTD ¶ 2; Whelchel MTD at 14:27-15:8.) Whelchel states that because GCS could not "satisfy its net capital requirements" it was "forced to shut down its operations[,]" (Whelchel MTD at 14:27-15:8) thereby indicating that by the time of the arbitration award, the Debtor had unreasonably small capital under the FINRA requirements. *See* 11 U.S.C. § 548(a)(1)(B)(II) (the debtor "was engaged in business or a

transaction, or was about to engage in business or transaction, for which any property remaining with the debtor was an unreasonably small capital."). Thus, the Complaint contains sufficient facts that the transfers rendered the Debtor insolvent and Defendants' themselves assert that by January 2022, GCS had unreasonably small capital.

## IV. The Complaint Pleads Entitlement to Recovery and Relief Under Sections 550 and 551

Plaintiff correctly asserts that the proper focus in § 550 actions is on what the bankruptcy estate loss because of the transfer. (MTD ¶ 54.) Here, in the face of an arbitration award for $908,000 and an action by an investor for $1.5 million, the Debtor lost its right to tail fees or the right to realize any value from the Engagement Letters.

First the Engagement Letters do not require GCS to perform services for the client at the time that the tail fees come into play, which is after termination of the agreement. (Compl. Exh. A, § 3.2.2.). Just because GCS closed does not mean that it is not entitled to compensation for the services that it did perform that allowed for the raising of the capital down the line. Second, the transfer of benefits in the Engagement Letter namely the right to tail fees for no consideration hurt the bankruptcy estate. The estate is damaged by the failure to assign the Engagement Letters and the fees in them for fair consideration.

The facts here are different from those in *U.S. Bank N.A. v. Verizon Commc'ns Inc., No.* 3:10-cv-1842-G, at * 25-26 (N.D. Tex. July 31, 2012) or *Winnick*, 2006 WL 2212776, at *9. In these two cases, the plaintiffs sought to recover as fraudulent transfers stocks transferred to defendants. The Courts held for the defendants, explaining that the plaintiffs could not argue on one hand that the corporations were insolvent and had no value and on the other hand seek to recover money from stock transfers. Unlike *Winnick* or *U.S. Bank N.A.*, Plaintiff is not arguing that the Debtor was insolvent on one hand and on the other hand asserting that the Debtor's shares had value. Rather, Plaintiff seeks to recover Debtor's right to tail fees in contracts that

were transferred for no consideration. What the value of the tail fees were, is a question of fact that Finalis debates, and which cannot be decided on Rule 12(b) motion.

## CONCLUSION

The motion should be denied. To the extent the Court is inclined to dismiss any particular claim for relief, Plaintiff requests that it be permitted to amend its Complaint. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). A plaintiff should be afforded an opportunity to test his claim on the merits. *Id.* In the absence of any "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given.'" *Id.* At this early stage where neither defendant has answered the Complaint, discovery has not even begun, and there have been no previous amendments, allowing an amendment will not prejudice defendants.