CHRISTOPHER D. SULLIVAN (148083)
STACEY L. PRATT (124892)
ROXANNE BAHADURJI (290117)
**SULLIVAN BLACKBURN PRATT LLP**
456 Montgomery Street, Suite 2200
San Francisco, CA 94104
Phone: (415) 692-5218
Email: csullivan@sullivanblackburn.com
        spratt@sullivanblackburn.com
        rbahadurji@sullivanblackburn.com

Special Litigation Counsel
for the Chapter 7 Trustee Janina M. Hoskins

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>GROWTH CAPITAL SERVICES, INC., a Delaware corporation,<br><br>          Debtors. | Bankruptcy. Case No. 22-30218-HLB<br><br>Adversary No. 23-03019<br><br>Chapter 7 |
| JANINA M. HOSKINS, in his capacity as Chapter 7 Trustee of Growth Capital Services, Inc.,<br><br>          Plaintiff,<br><br>          v.<br><br>DAVID MICHAEL WHELCHEL, an individual, and FINALIS SECURITIES, LLC, a Delaware Limited Liability Company.<br><br>          Defendants. | OPPOSITION TO DEFENDANT DAVID MICHAEL WHELCHEL'S MOTION TO DISMISS |

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………..1

ARGUMENT …………………………………………………………………………………2

I.   Legal Standard…………………………………………………….2

II.  **The Complaint Contains Ample Particularized Facts to Support the First Claim for Actual Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A)**……...2

    A.   The complaint pleads a confluence of several badges of fraud……………..2

    B.   The business judgment rule does not bar the actual fraudulent transfer claim because the Complaint contains sufficient facts asserting a lack of good faith and due care……………………………………………………………..3

III. **The Complaint Contains Sufficient Facts Giving Rise To The Reasonable Inference that the Debtor Did Not Receive Reasonably Equivalent Value In Exchange For The Transfer of Engagement Letters**…………………………..11

IV.  **Plaintiff's Third Claim Against Whelchel for the Avoidance of $1.9 Million in Actual Fraudulent Transfers Amply Pleads Fraud and Whelchel Cannot Introduce New Allegations to Contradict Plaintiff's Facts**……………………15

    A.   The circumstances surrounding the transfers totaling $1.9 million to Whelchel demonstrate an intent to dissipate the Debtor's assets and to hinder Intellivest's ability to recover………………………………………...15

    B.   On a Rule 12(b)(6) motion, Whelchel is not permitted to add new facts to contradict Plaintiff's contentions and thus the Court may not consider Whelchel's Exhibit 2…………….……………………………………………...17

    C.   Even if the Court were to incorporate Exhibit 2 into the Complaint and accept that the payments were for commissions, the payments remained property of the estate……………………………………………………19

    D.   Whether Whelchel received the transfers in good faith is an affirmative defense that cannot be decided on a motion to dismiss…………….………...23

V.   **Plaintiff's Fourth Claim for Avoidance of the $1.9 million as Constructive Fraudulent Transfers as Plead Defeats Whelchel's Efforts to Dismiss the Claim**…………………………………………………………………24

VI.  **Plaintiff is Entitled to Recovery and Relief Under Sections 550 and 551**…….25

CONCLUSION………………………………………………………………………………25

# TABLE OF AUTHORITIES

**Cases**

*Aceituno v. Vowell et. al. (In re Intelligent Direct Marketing)*, 518 B.R. 579, 591-92 (E.D. Cal. 2014)...................................................................................................................... 3

*Acequia Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994) .................. 3

*Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012)...................................................... 2

*al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009) .......................................................... 2

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79, 106 (S.D.N.Y 2004).................................................................................................................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................. 2

*Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)........................................................... 7

*Citicorp North America Inc., v. Official Cmmt. Of Unsecured Creditors (In re Tousa, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012)............................................................................ 12

*Davis v. Pham et. al. (In re Tung Thanh Nguyen)*, 783 F.3d 769 (10th Cir. 2015) ...................... 21

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ...... 6

*Everett v. Thomas Capital Invest. (In re Pacific Thomas Corp.)*, 543 B.R. 7, 11 (Bankr. N. D. Cal. 2015).................................................................................................................... 12

*FDIC v. Faigin*, 2013 WL 3389490, at * 6 (C.D. Cal. July 8, 2013)............................................. 5

*Foman v. Davis*, 371 U.S. 178 (1962)........................................................................... 25

*GGW Brands, LLC v. Nielson (In re GGW Brands, LLC)*, 504 B.R. 577, 627-28 (Bankr. C.D. Cal. 2013).................................................................................................................... 3

*Gill v. Maddalena*, 176 B.R. 551, 555 (Bankr. C. D. Cal. 1995)........................................ 24

*Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776, at * 9 (S.D. N.Y 2006) .. 13

*In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986) .......................................................... 3

*In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 539 (9th Cir. 1990) ...................................... 23, 24

*In re Fitness Holdings Intern., Inc.,* 714 F.3d 1141, 1148-49 (9th Circ. 2013)............................ 13

*In re Glenfed, Inc. Sec. Litig.,* 422 F.3d 1541, 1546 (9th Cir. 1994) *(en banc)* ............................. 2

*In re Gomez*, 560 B.R. 866, 868-71 (Bankr. S. D. Fl. 2016)............................................... 13

*In re Immune Response Sec. Litg.,* 375 F.Supp.2d 983, 995-96 (S.D. Cal. 2005) .................... 17, 19

*In re Jacks*, 266 B.R. 728, 737 (9th Cir. BAP 2000) ......................................................... 5

*In re Walt Disney Co. Derivative Litg.*, 906 A.2d 27, 74 (Del. 2006) .................................. 7

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ................................... 18

*Kupetz v. Wolf*, 845 F.2d 842, 846 (9th Cir. 1988) ......................................................... 3

*Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ......................................... 16

*Lee v. City of Los Angeles,* 250 F.3d 668,688 (9th Cir. 2001) ........................................... 2

*Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207 (Bankr. D. Nev. 2007) ....... 23

*Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Circ. 1998) ............................................. 17

*Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, 2020 WL 374357, at *11 (Bankr. W. D. Okla Jan. 17, 2020) .............................................................. 12

*Max Sugarman Funeral Home, Inc. v. A.D.B Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991)........ 3

*McCafferty v. McCafferty (In re McCafferty)*, 96 F.3d 192, 198-99 (6th Circ. 1996) .................... 21

*Mills Acquisition Co. v. Macmillan, Inc.*, 559 A2d 1261, 1280 (Del. 1989) ................................. 5

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A. 2d 92, 98 (Del. 2007) .... 5

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 120 (2nd Cir. 2013) .................................................................................. 11

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 125 (2nd Cir. 2013) .................................................................................. 13

*Nielson v. Union Bank of Cal., N.A.*, 290 Fl.Supp.2d 1101, 1115 (C.D. Cal. 2003) ...................... 19

*Prof'l Hockey Corp. v. World Hockey Ass'n*, 191 Cal. Rptr. 773, 776 (Cal. Ct. App. 1983) ........... 5

*Quadrant Structured Products Co., Ltd. v. Vertin*, 115 A. 3d 535, 546-47 (Del. Ch. 2015)............ 5

*Sarachek v. The Right Place, Inc.* (*In re Agriprocessors*, Inc.), 2011 WL 4621741, at *9 (Bankr. N.D. Iowa Sept. 30, 2011).......................................................................... 14

*Screen Capital Intern Corp. v. Liberty Asset Acquisition Co., Ltd.*, 510 B.R 248, 257 (C. D. Cal. 2014).............................................................................................. 11

*See Berg & Berg Enters., LLC v. Boyle*, 100 Cal. Rptr. 3d 875, 890-91 (Cal. Ct. App. 2009) ....... 5

*Shauer v. Alterton*, 151 U.S. 607 (1894) ........................................................................ 23

*Starr v. Baca,* 652 F.3d 1202, 1216-17 (9th Cir. 2011) ...................................................... 2

*Stockman's Bank v. Capital Title (In re Pauley & McDonald, Inc.)*, 215 B.R. 37 (Bankr. D. Ariz. 1996).............................................................................................. 20

*Tolz v. Miller (In re Todd)*, 391 B.R. 504, 509 (Bankr. S. D. Fl. 2008) ..................................... 13

*Torres v. Eastlick (In re North Am. Coin & Currency, Ltd.)*, 767 F.2d 1573. 1575 (9th Cir. 1985) .................................................................................................. 21

*Trigem America Corporation*, 431 B.R. 855, 864 (Bankr. C. D. Cal. 2010) ................................. 22

*U.S. Bank N.A. v. Verizon Commc'ns Inc., No.* 3:10-cv-1842-G, at * 25-26 (N.D. Tex. July 31, 2012)..................................................................................................................................... 23

*U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (2011) .................................................................. 18

*U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)........................................................................... 19

*Warth v. Seldin,* 422 U.S. 490, 501 (1975) ......................................................................................... 2

*Weisbuch v. County of Los Angeles*, 119 F.3d 783, fn 1 (9th Cir. 1997) ......................................... 23

*Xechem, Inc. v. Bristol-Meyers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ............................ 23

*XLDatacomp, Inc. v. Wilson (In re Omega Group, Inc.)*, 16 F.3d 1443, 1449-51 (6th Cir. 1994). 21

**Statutes**

11 U.S.C. § 541(d) .......................................................................................................................... 20

11 U.S.C. § 548(a)(1)(A) ............................................................................................................... 2, 3

11 U.S.C. § 548(a)(1)(B) ........................................................................................................... 12, 14

11 U.S.C. § 548(c) ........................................................................................................................... 21

11 U.S.C. § 550 ............................................................................................................................... 25

11 U.S.C. § 551 ............................................................................................................................... 25

11 U.S.C. § 727(a)(2)(A) .................................................................................................................. 3

**Regulations**

17 CFR § 240.17a-11 ........................................................................................................................ 8

# INTRODUCTION

Defendant Michael David Whelchel ("Whelchel") moves to dismiss Plaintiff's claims for relief based on unexamined defenses and competing facts that turn on evidence yet to be presented fully to the Court. On a motion to dismiss, a court must not weigh competing evidence. Nevertheless, that is exactly what Whelchel looks to the Court to do. For example, despite the Complaint pleading several badges of fraud with respect to both the transfer of the Engagement Letters and the transfer of $1.9 million to Whelchel, Whelchel, like Finalis, attempts to contradict well-pleaded facts with his own set of facts. Namely, that GCS's conduct in transferring assets away from the Debtor for no consideration in the face of a sizeable unfavorable award was righteous and harmless. Despite the Complaint pleading that Whelchel was at the forefront of Intellivest's litigation in which Whelchel was accused of soliciting Intellivest's clients and fees away from Intellivest when he moved to GCS, Whelchel seeks to have the Court find that he acted in good faith this time around. Moreover, even though the Complaint amply pleads that the Debtor did not receive reasonably equivalent value for the Engagement Letters because they were transferred away for free, Whelchel makes the factual argument that, no, the Engagement Letters were valueless.

Next, Whelchel relies on a snapshot from Whelchel's bank account and an alleged commission spreadsheet to assert that the $1.9 million in payments were commissions owed to Whelchel. Submitting documents that are in no way referred to in the Complaint, here is nothing more than disputing factual allegations. Additionally, even if the Court were to find that the transfers made to Whelchel were commission payments, whether the funds were held in constructive trust, earmarked, or even earned by Whelchel, involve contested issues of fact that cannot be decided on a motion to dismiss. None of the cases relied upon by Whelchel for his earmarking or trust argument were decided on a motion to dismiss. On a motion to dismiss, to the extent there are competing allegations, the court must resolve the conflict in a light most favorable to the Plaintiff. It is premature for the Court to decide competing facts. Plaintiff's first through fifth

claims include sufficient facts to indicate the plausibility of the claims asserted. The motion should be denied.

<b>ARGUMENT</b>

**I.      Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Akhtar v. Mesa,* 698 F.3d 1202, 1212 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Plausibility" does not require "probability." *See Starr v. Baca,* 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable.

A court reviewing a motion to Rule 12(b)(6) motion is to "accept the well-pleaded factual allegations of the complaint as true and construe them in the light most favorable to plaintiffs." No matter how improbable the facts alleged are, they must be accepted as true for purposes of the motion and construed in a light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007); *Lee v. City of Los Angeles,* 250 F.3d 668,688 (9th Cir. 2001). "Factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee,* 250 F.3d at 668. The Court is not to weigh the evidence. *al-Kidd v. Ashcroft,* 580 F.3d 949 (9th Cir. 2009). Motive, intent, and state of mind may be alleged generally, even under Rule 9(b). *In re Glenfed, Inc. Sec. Litig.,* 422 F.3d 1541, 1546 (9th Cir. 1994) *(en banc).* To the extent there are competing allegations in a complaint, courts must resolve the conflict by construing the complaint in a light most favorable to the Plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501 (1975).

**II.      The Complaint Contains Ample Particularized Facts to Support the First Claim for Actual Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A).**

A. <u>The complaint pleads a confluence of several badges of fraud</u>.

The Complaint contains several facts giving rise to the reasonable inference that the transfer of the Engagement Letters and the right to commissions in them were made with actual

intent to hinder, delay, or defraud the Debtor's creditor – Intellivest from collecting on its arbitration award. (Compl. ¶¶ 25-27, 44, 51-52.) The transfer of any interest in the debtor's property within one year of the bankruptcy petition, is voidable by the trustee if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing the property from their reach. *Max Sugarman Funeral Home, Inc. v. A.D.B Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991); *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986) (inquiry under § 727(a)(2)(A) is whether debtor intended to hinder or delay a creditor by placing property beyond its reach, and if he did, he had the intent penalized by statute). The Complaint clearly and sufficiently pleads that the Debtor disposed of the valuable Engagement Letters and the rights to receive broker dealer fees and tail fees, terminated all its employees, and stopped doing business, all so Intellivest could not recover on the arbitration award. This is exactly the type of conduct that § 548(a)(1)(A) seeks to curtail.

Because it is often impracticable on direct evidence to demonstrate an actual intent to hinder, delay or defraud creditors, courts infer fraudulent intent from circumstances surrounding the transfer. *Acequia Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994). The most common indicia of fraud is when an insolvent debtor makes a transfer and gets nothing or very little in return. *Kupetz v. Wolf*, 845 F.2d 842, 846 (9th Cir. 1988). That is exactly what happened here. The Complaint amply pleads the more common circumstantial indicia of fraudulent intent: (1) an adverse arbitration award following heavily contested litigation for more than a year (Compl. ¶¶ 25-26); (2) ceasing of all business and the transfer of the Engagement Letters and the rights to the fees in them for free - no consideration whatsoever (Compl. ¶¶ 27-28, 34-39, 46, 51-52, 58) and; (3) Debtor's insolvency/unreasonably small capital (Comp. ¶¶ 4, 44-45, 59-60).

When a debtor assigns assets away for free and shuts down when facing litigation, like here, courts generally find that the assignment was made with actual intent to hinder, delay or defraud creditors. *See Aceituno v. Vowell et. al. (In re Intelligent Direct Marketing)*, 518 B.R. 579, 591-92 (E.D. Cal. 2014); *GGW Brands, LLC v. Nielson (In re GGW Brands, LLC)*, 504 B.R. 577, 627-28 (Bankr. C.D. Cal. 2013). For example, in *GGW Brands, LLC*, the Bankruptcy Court

granted summary judgment for the trustee finding that the debtors' assignment of trademarks to another entity for no consideration when two lawsuits had been filed and two were being threatened against the debtors, and when the certification of formation for the debtor was cancelled, were actual fraudulent transfers. *In re GGW Brands, LLC* 504 B.R. at 627. From these facts, the Court concluded that the purpose of the assignments "was to make it much more difficult, costly, and time consuming for creditors to reach the Trademarks." *Id.* Similarly, in *Intelligent Direct Marketing*, after a bench trial, the Court found that the debtor's transfer of goodwill, income stream, and assets after the debtor ceased operations and performing on its contracts, was fraudulent because the transfer was intended to prevent creditors from collecting the debtor's debts. *In re Intelligent Direct Marketing* 518 B.R. at 584-85, 91-92. Plaintiff pleads ample facts similar to *GGW Brands, LLC* and *Intelligent Direct Marketing*. Namely, the ceasing of business, the assignment of valuable rights for free, and insolvency in the face of a substantial debt owed to Intellivest. Thus, the Complaint defeats the motion to dismiss the first claim for actual fraudulent transfers.

Finally, Whelchel is a transferee of the Engagement Letters. He was not a party to the Engagement Letters, Big Path, LLC was. There is no mention of Whelchel in the Engagement Letters other than him being a signatory on behalf of Big Path, LLC. Under the Amendment to Letter Agreements, he is not only a signatory for Big Path, LLC, but also a registered representative of Finalis obtaining the benefits of the potential commissions that arise out of the Engagement Letters. Moreover, Whelchel should not be entitled to retain the benefits of the fraud that surrounded the transfer of the Engagement Letters.

B. <u>The business judgment rule does not bar the actual fraudulent transfer claim because the Complaint contains sufficient facts asserting a lack of good faith and due care.</u>

In his effort to have the Court dismiss the Complaint, Whelchel presents his own set of facts and argues that the decision to shut down, terminate all employees, and transfer the Engagement Letters and the fees in them for no consideration is protected by the business judgement rule. Whelchel's argument is unavailing. First, factual challenges to the Complaint have no bearing on the legal sufficiency of the allegations. The Court is not to weigh the evidence.

Second, the Complaint contains facts showing lack of good faith and due care, thereby rebutting the business judgment rule.

Under California and Delaware law[1], corporate directors owe fiduciary duties. Under California law, directors owe the duty of care, loyalty, and good faith. *See Berg & Berg Enters., LLC v. Boyle*, 100 Cal. Rptr. 3d 875, 890-91 (Cal. Ct. App. 2009). The duty of care requires directors to exercise "such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances." Cal. Corp. § 309(a). The duty of loyalty requires them to act "in the best interests of the corporation," and "not to act in their own self-interest." *Id.*; *Prof'l Hockey Corp. v. World Hockey Ass'n*, 191 Cal. Rptr. 773, 776 (Cal. Ct. App. 1983). And the duty of good faith requires reasonable oversight. *FDIC v. Faigin*, 2013 WL 3389490, at * 6 (C.D. Cal. July 8, 2013). Directors of an insolvent corporation owe a fiduciary duty to creditors to protect the assets available to satisfy their claims. *Berg*, 100 Cal. Rptr. 3d at 890. All the assets of the corporation, immediately upon becoming insolvent, become a trust fund for the benefit of the corporation's creditors. *In re Jacks*, 266 B.R. 728, 737 (9th Cir. BAP 2000). This duty is breached by any actions that "divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditor's claims." *Berg*, 100 Cal. Rptr. 3d at 894.

Similarly, under Delaware law, directors are required to exercise due care and loyalty. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A2d 1261, 1280 (Del. 1989). Directors must exercise due care both in decision making by acting on an informed basis and in other aspects of their responsibilities. *Husted v. Taggart (In re ECS Refining, Inc.)*, 625 B.R. 425, 444 (Bankr. E.D. Cal. 2020). A corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A. 2d 92, 98 (Del. 2007); *Quadrant Structured Products Co., Ltd. v. Vertin*, 115 A. 3d 535, 546-47 (Del. Ch. 2015).

---

[1] Plaintiff provides both California and Delaware law because prior to September 2021, Debtor was incorporated in California, and after that, in Delaware. Whelchel does not argue which state law applies. It does not matter here. The business judgment rule does not protect the Debtor's directors under either Delaware or California law.

Under California law, the business judgment rule "refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions" *Gaillard v. Natomas Co.* 208 Cal.App.3d 1250, 1263 (1989), unless those decisions are made "without reasonable inquiry, with improper motives, or as a result of a conflict of interest." *Lee v. Interinsurance Exchange* 50 Cal.App.4th 694, 715 (1996). Fraud and breach of trust will also prevent application of the business judgment rule. *Desaigoudar v. Meyercord*, 133 Cal.Rptr.2d 408, 415 (2003).

Similarly, the business judgment rule under Delaware law is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company." *In re ECS Refining, Inc.*, 625 B.R. at 445-46. A proponent of a claim can rebut the business judgment rule by introducing evidence that the directors lacked good faith or failed to exercise due care. *Id.* at 446. Whelchel argues that the decision to shut down, terminate employees, and transfer assets for zero consideration is protected by the business judgment rule and reflects prudent business decisions. (Whelchel Motion to Dismiss ("MTD") at 15:14:20-26, 16:20-22.) Whelchel cannot hide behind the business judgment rule because Plaintiff has alleged ample facts showing a lack of good faith and failure to exercise due care.

The facts in the Complaint are like the facts in *ECS Refining, Inc.*, where the Bankruptcy Court ruled that the trustee had stated a plausible claim for breach of fiduciary and waste despite the business judgment rule. *Id.* at 448-49. The Court held that the trustee had pled adequate and strong facts sufficient to state a plausible claim despite the business judgment rule by asserting that the directors engaged in bad faith acts that deepened the debtor's insolvency and made the corporation's situation more dire to force concessions from the debtor's largest secured creditor. *Id.* at 448. The defendants argued that the debtor's actions were designed to "tame" an unruly secured creditor and were in the best interests of the unsecured creditors. *Id.* However, the Court held that in deciding a Rule 12(b)(6) motion, a court should not weigh competing inferences on deciding the plausibility of well-plead facts, unless one inference is so strong as to constitute an obvious alternative explanation. *Id.* at 449 (citing *Eclectic Properties East, LLC v. Marcus &*

*Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). In light of the deliberate weakening of the corporation without due consideration on its impact on unsecured creditors – the Court declined to find the existence of an obvious alternative explanation. *Id.* Here, like in *ECS Refining, Inc.*, the Debtor's director took actions to deliberately weaken the Debtor in order to tame Intellivest – dissipating the Debtor's assets (Compl. ¶¶ 4, 26-27, 4-45), transferring Engagement Letters and the right to fees in them for no consideration (Compl. ¶¶ 28, 35-36, 52, 60), transferring $1.9 million to Whelchel, who was an active participant in the Intellivest litigation (Compl. ¶¶ 22-24, 64-65, 69), and shutting down hastily after the arbitration award (Compl. ¶ 4, 27.)

Delaware law also recognizes a claim for waste. An action for waste lies where the plaintiff proves that the exchange was so one-sided that no businessperson of ordinary sound judgment could conclude that the corporation had received adequate consideration. *In re Walt Disney Co. Derivative Litg.*, 906 A.2d 27, 74 (Del. 2006). It is a transfer of corporate assets "that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). In *ECS Refining, Inc.*, the Court also declined to dismiss the trustee's waste claim because substantial consideration and good faith must each exist to bring a director's actions within the business judgment rule and bar an action for waste. *Id.* at 453. Here, the fact that the Engagement Letters and the right to bargained for fees were transferred away for free and effectively gifted to Finalis and Whelchel, supports an action for waste.

Whelchel attempts to paint an innocent story that the "Debtor could no longer conduct business in light of the award" (MTD at 14:22) and that the "Debtor could not satisfy its net capital requirements and was forced to shut down its operations." (MTD at 15:7-8). The timeline does not support such a righteous story. While the arbitration award was handed down in early January 2022, the panel had already signaled by December 9, 2021, that it would issue an award to Intellivest in a sum of at least $458,000. (Compl. ¶¶ 25-26.) So by early December at the latest, GCS and Whelchel were aware that GCS would face significant liability (*Id.*) Two of the Amendments to the Letter Agreements (ADA-SCA Grace Holdings, LLC and Traditional Medicinals, Inc.) bear a date of January 4, 2022 (even if potentially completed at a later date)

indicating that GCS and Whelchel had begun efforts to transfer assets to Finalis even before the Debtor ceased operations (Compl. Exh. B.)

With respect to the net capital rule, under FINRA Rule 2010's "high standards of commercial honor," GCS had an obligation to not abruptly shut down in the face of an award when there were several viable options available to it. At the outset, SEC Exchange Act Rule 15c3-1 requires that every broker or dealer maintain net capital of a certain ratio and not be insolvent. The failure to meet those ratios does not require nor encourage a firm to shut down. Rather FINRA Rule 4110(b)(1) provides that "unless otherwise permitted by FINRA, a member shall suspend all business operations during any period in which it is not in compliance with applicable net capital requirements set forth in SEA Rule 15c3-1." The rule provides for suspension for a period to give an opportunity to the broker-dealer to get in compliance. Where a firm (like GCS) does hold client's assets, the correct procedure is to file a 17a-11 notification giving notice of the deficiency and promptly discuss with the broker-dealer's FINRA coordinator how to fix the problem to resume operations. *See* 17 CFR § 240.17a-11 (does not require broker-dealer to cease business altogether but to notify the SEC within 24 hours); *SEC Charges Broker-Dealer CEO With Net Capital Rule Violations, Administrative Proceeding*, File No. 3-18409, March 27, 2018, http:sec.gov/enforce/34-82951-s (stating the net capital rule is "designed to protect customer assets held in brokerage accounts"). The net capital rule is not designed to shut down broker-dealer firms.

Typically, if the SEC finds out from its own investigation (rather than the broker-dealer coming forward) that the broker-dealer is in violation of the net capital rule, the SEC does not require an immediate shut down (especially when no client funds are held) but imposes a penalty. FINRA's Sanction Guidelines state that the principal considerations in determining sanctions include whether the firm continued in business while knowing of deficiencies and whether the firm attempted to conceal the deficiencies. *See* FINRA Sanction Guidelines, September 2022 at p. 27 <https://www.finra.org/rules-guidance/oversight-enforcement/sanction-guidelines>; *see also Broker Check Report for Third Seven Capital LLC* (imposing $10,000 fine and censure for firm conducting business while failing to maintain the minimum net capital); *Broker Check Report for*

*Arque Capital, Ltd* (Disclosure 1 of 4) (imposing $50,000 fine and censure for failure to maintaining minimum required capital, failing to notify FINRA and SEC of deficiencies, failure to remit payroll taxes among other findings*); Order Instituting Administrative and Cease and Desist Proceedings* ("Darbie Order") (imposing $50,000 fine and censure where firm "willfully violated" the net capital requirements and firm held customer accounts subjecting it to the heightened minimum net capital requirement).[2]

To require a business to quickly shut down once in violation of the net capital requirements runs counter to the net-capital rule's purpose, which is to ensure broker dealers maintain enough liquid assets to meet all obligations to customers and have additional resources to winddown a business in an orderly manner if the firm fails financially. *See Darbie Order* at p. 2; 2021 Report on FINRA's Examination and Risk Monitoring Program, https://www.finra.org/rules-guidance/guidance/reports/2021-finras-examination-and-risk-monitoring-program/net-capital (the net capital rule "requires that firms must at all times have and maintain capital at specific levels to protect customers and creditors from monetary losses that can occur when firms fail"). Thus, contrary to Whelchel's assertion, GCS did not need to abruptly shut down when confronted with a creditor claim and this conduct was contrary to Rule 15c3-1's purpose to protect creditors when broker-dealers are insolvent or have small capital.

After notifying and working with the regulatory bodies on any net capital violation, rather than immediately shuttering and hurting its creditors, the Debtor should have wound down in an orderly fashion. An acceptable alternative to abruptly closing would have been if the claimant – in this case Intellivest – subordinated the amount of its arbitration award pursuant to an approved sub-loan meeting all the conditions of the net capital rule. *See* NASD Notice to Members 00-63 "NASD Regulation Provides Guidance on The Use of Installment Payments To Satisfy Arbitration Award" (Sept. 11, 2000), https://www.finra.org/rules-guidance/notices/00-63. FINRA rules

---

[2] Plaintiff requests the Court take judicial notice of the broker check reports and Darbie Order attached as Exhibit A to this opposition. These documents are matters of public record and their existence and what they state are not subject to reasonable dispute. *See Intri-Plex Tech., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).

provided the Debtor with the viable option to request Intellivest to subordinate the arbitration award through an approved sub-loan. (*Id.*) Alternatively, the Debtor could have in good faith assigned tail fees in the Engagement Letters to Intellivest to satisfy the arbitration award, and the net capital violation would have been solved.

If the Debtor no longer wished to stay in business, it could have acted in a manner that did not make the company's financial situation more dire or weakened GCS deliberately to force concessions from Intellivest, an unsecured creditor. *See ECS Refining, Inc.*, 625 B.R. at 448-49. FINRA Rule 2010 dictates that GCS should not have given away the Engagement Letters and the fees that the Complaint asserts were valuable and a substantial source of the Debtor's income for free in the face of a successful creditor action. The Debtor could and should have negotiated with other broker dealers to get the assignments for some price other than zero. Finalis states that "Whelchel had to identify a replacement licensed broker-dealer…and Whelchel independently chose Finalis as his licensed broker-dealer." (MTD ¶ 31(d) at 14:8-10.) Finalis therefore acknowledges that GCS did not make any attempt to shop around the Engagement Letters to other broker dealers to receive payment for the right to receive fees. Whelchel was free to go to Finalis or any other broker-dealer firm without the tails being transferred. Alternatively, GCS could have sought consideration from the clients/issuers to be released from the tail fees and any deferred fees. There was no valid purpose for relinquishing the tail fees, other than hindering Intellivest and acting with reckless disregard to its creditors.

Whelchel next appears to argue that the Debtor shutting down was a material breach that excused clients' obligations to pay the Debtor any tail fees. And that by transferring the Engagement Letters, the Debtor mitigated damages. At the outset, whether there was a material breach is a question of fact, which cannot be decided on a motion to dismiss. Tellingly, the motion is sparse on details of how the Debtor materially breached. This is because the Engagement Letters and Whelchel's registered representative agreement specifically contemplate GCS receiving fees after the agreements are terminated and at a time when GCS no longer performs any further services. The Engagement Letters provide that if a client receives an indication of interest from a prospective investor within 2 years of the termination of the Engagement Letter, even if the

closing occurs after the 2 years, GCS is still entitled to the tail fees. (Compl. Exh. A, § 3.2.2.)

Additionally, Whelchel's registered representative agreement provides for payment of fees to the Debtor even after the relationship is terminated and GCS is not performing any services for Whelchel. Specifically, once the relationship is terminated, for a period of one year, GCS is entitled to its portion of the commission payments received relating to opportunities approved in writing prior to the termination. (MTD Exh. 1, § 11.) And if Whelchel has moved on to another broker dealer firm, then GCS is still entitled to its portion of the commission payments, and GCS is to send Whelchel's portion to the succeeding broker-dealer. (*Id.*) Put simply, just because GCS closed does not mean that it should not be compensated for the services performed up to that point that lead to the raising of capital down the line. Depending on what stage of completion a deal under an Engagement Letter was, the issuers could have completed the deals themselves or had another broker-dealer complete the deal and then deduct the costs from any tail otherwise owed to GCS.

Plaintiff has averred substantial and specific details to support its actual fraudulent transfer claim. The Complaint asserts several badges of fraud: adverse arbitration award with Whelchel at the center of it (Compl. ¶¶ 25-26); transfer of the Engagement Agreements and the lucrative rights to fees for free (Compl. ¶¶ 4, 27-28, 34-39, 44, 46, 51-52, 58); and Debtor's insolvency (Comp. ¶¶ 4, 44-45, 59-60). The business judgment rule does not protect Whelchel as the transferee of an actual fraudulent transfer where Plaintiff has plead a lack of good faith and deliberate actions to harm and hinder Intellivest – an unsecured creditor.

III. **The Complaint Contains Sufficient Facts Giving Rise To The Reasonable Inference that the Debtor Did Not Receive Reasonably Equivalent Value In Exchange For The Transfer of Engagement Letters**.

Rule 9(b)'s heightened pleadings standard is inapplicable to a claim for constructive fraudulent transfer. *Screen Capital Intern Corp. v. Liberty Asset Acquisition Co., Ltd*., 510 B.R 248, 257 (C. D. Cal. 2014). Plaintiff's claim for constructive fraud is subject to the "ordinary notice pleading" standard and only to the "short and plain statement requirements of Federal Rule of Civil Procedure 8(a)." *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland*

*Group, PLC*, 709 F.3d 109, 120 (2nd Cir. 2013). Although Plaintiff contends that the Complaint contains detailed factual allegations, Rule 8 does not require more than sufficient facts that raise the right to relief above the speculative level and give the defendant fair notice of the grounds upon which the claim rests. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Plaintiff's constructive fraudulent claim is supported by well pleaded facts and gives Whelchel fair notice of the grounds upon which it rests.

Whelchel asserts that the Engagement Letters had no value because the Debtor shut down and could not perform under the Engagement Letters. (MTD at 18:1-4.) This is misleading because as Plaintiff elaborated above the Debtor did not need to abruptly cease its business and it could have realized value from the Engagement Letters and the fees. The only reason the Debtor immediately shut down was to hinder Intellivest's ability to collect the arbitration award. As elaborated above, even if the Debtor wished to stop conducting business, it could have retained its value from the Engagement Letters by negotiating with other broker dealers to obtain payment for the assignments or sought consideration from the clients/issuers to release the tail fees. The short time frame as plead in the Complaint between the arbitration award and the transfer of Engagement Letters indicates that no efforts were made to recover the benefits that the tail fee provision provided. As the Complaint pleads repeatedly, these Engagement Letters were valuable because of the right to receive the tail fees, and the assignment of that right was made for no money. Thus, the Debtor received less than reasonably equivalent value.

Moreover, whether the Debtor received reasonably equivalent value is a question of fact inappropriate for a motion to dismiss. "It has long been established that whether fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Citicorp North America Inc., v. Official Cmmt. Of Unsecured Creditors (In re Tousa, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012); *Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, 2020 WL 374357, at *11 (Bankr. W. D. Okla Jan. 17, 2020) (same); *Everett v. Thomas Capital Invest. (In re Pacific Thomas Corp.)*, 543 B.R. 7, 11 (Bankr. N. D. Cal. 2015) (whether the value is reasonably equivalent requires a comparison of the value of what was transferred and received. The determination of reasonably equivalent value is a question

of fact). Because reasonably equivalent value is a question of fact, "[i]t would therefore be premature to dismiss the § 548(a)(1)(B) claim on the ground that the value transferred …appears, in simple mathematical terms, to exceed that of the allegedly fraudulent transfers. The totality of the circumstances must be examined, and [plaintiff] has the right to offer evidence in an effort to show that, contrary to appearances, it did not receive reasonably equivalent value in exchange for the transfer." *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79, 106 (S.D.N.Y 2004) (denying dismissal of constructive fraudulent transfer claims on a 12(b)(6) motion); *see also Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776, at * 9 (S.D. N.Y 2006) (denying dismissal of claims for avoidance of transfers under § 544 because whether the debtor received "fair consideration" could not be decided as a matter of law, rather it is a factual question and even if it appears that "fair consideration" was received, it would be premature to dismiss the claims).

The cases relied upon by Whelchel undermine his assertion that the resolution of the reasonably equivalent value question can be decided on a motion to dismiss. For instance, in *In re Gomez*, 560 B.R. 866, 868-71 (Bankr. S. D. Fl. 2016), the Court determined that stock had no value only after a trial during which the trustee was cross examined on the value of the stock. In *Tousa, Inc.*, the Sixth Circuit affirmed a bankruptcy court's ruling that the debtor-subsidiaries did not receive reasonably equivalent value only after a 13-day trial, during which the bankruptcy court heard extensive fact and expert testimony and admitted over 1,800 exhibits. *In re Tousa, Inc.*, 680 F.3d at 1303, 1311. *Tolz v. Miller (In re Todd)*, 391 B.R. 504, 509 (Bankr. S. D. Fl. 2008) was also not decided on a Rule 12(b)(6) motion, but on summary judgment. *In re Fitness Holdings Intern., Inc.*, 714 F.3d 1141, 1148-49 (9th Circ. 2013) is inapplicable. In that case, the panel considered whether the Bankruptcy Code gives courts the authority to recharacterize claims in bankruptcy proceedings, and remanded the matter back to the bankruptcy court to determine if the complaint plausibly alleged that promissory notes could be recharacterized as equity rather than debt.

Whelchel's efforts to raise issues of disputed facts is not appropriate on a motion to dismiss. In considering an appeal to a Rule 12(b)(6) motion, the Second Circuit stated: "Discovery

may reveal that the actual facts support the inference drawn by Defendants…, rather than those drawn by the [Plaintiff]. But that has no bearing on the question before us." *New Jersey Carpenters Health Fund*, 709 F.3d at 125. "A well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote or unlikely." *Id.* The applicable question is whether the facts alleged in the Complaint, taken as true, allow the Court to draw the reasonable inference that the Engagement Letters and the fees therein were given away for less than reasonable equivalent value. Plaintiff has met its pleading burden.

Here, the Complaint repeatedly asserts that the Debtor's "valuable" and "lucrative contracts" that were a "significant source of the Debtor's income" were given away for free. Specifically: the "Debtor transferred away any and all rights to be paid broker-dealer fees and tail fees from existing lucrative contracts effectively leaving the company penniless and hindering creditor efforts to recover" (Compl. ¶ 4); "The Debtor did not receive any consideration for the Transfers. The Debtor gave away assets for free and by the petition date, the Debtor had disposed of any valuable assets and hindered Intellivest's ability to collect its award" (Compl. ¶ 52); "Defendants received transfers from the Debtor and the Defendants did not provide any value" (Compl. ¶ 46); "GCS transferred valuable contracts and its rights to receive significant fees from those contracts (Compl. ¶ 27.) The Complaint also provides details on the specific fees that GCS was entitled to – the "Broker Dealer Fee" and the "Tail Fee" and attaches an Engagement Letter (Compl. ¶¶ 34-36, Exh. A.)

Courts accept the allegation that a debtor received no consideration in exchange for a transfer as sufficient factual support for the reasonably equivalent value element. For example, the Court in *Sarachek v. The Right Place, Inc.* (*In re Agriprocessors*, Inc.), 2011 WL 4621741, at *9 (Bankr. N.D. Iowa Sept. 30, 2011), stated that "when the Trustee alleges Debtor received nothing from the defendant in exchange for an alleged fraudulent transfer, it is entirely plausible that Debtor received less than reasonably equivalent value in exchange for that alleged transfer." In *ECS Refining, Inc.*, the Court dismissed the constructive fraudulent transfer claim only because the complaint made "no effort to describe the consideration (*or in the alternative, state that no*

*consideration was received*) [.]" *In re ECS Refining, Inc.*, 625 B.R. at 461 (emphasis added). Plaintiff pleads that the Engagement Agreements were transferred for free, thereby satisfying this element of § 548(a)(1)(B).

IV. **Plaintiff's Third Claim Against Whelchel for the Avoidance of $1.9 Million in Actual Fraudulent Transfers Amply Pleads Fraud and Whelchel Cannot Introduce New Allegations to Contradict Plaintiff's Facts**.

A. The circumstances surrounding the transfers totaling $1.9 million to Whelchel demonstrate an intent to dissipate the Debtor's assets and to hinder Intellivest's ability to recover.

The timeline laid out in the Complaint demonstrates an intent to transfer the Debtor's assets far from Intellivest's reach. The arbitration proceeding by Intellivest against GCS was initiated on or about December 14, 2020, and lasted for more than a year. (Compl. ¶ 21.) The FINRA proceeding was heavily contested by the Debtor, and involved discovery sanctions, contempt proceedings, a motion to dismiss, and 18 hearing sessions from November 30, 2021 to December 10, 2021. (Compl. ¶ 25.) At a hearing session held on December 9, 2021, the panel signaled that it would issue a damages award to Intellivest of $458,000. (*Id.*) Thus, by December 9, 2021, the Debtor and Whelchel knew GCS was facing significant liability. (Compl. ¶¶ 26, 51, 64.) Nevertheless, on December 30, 2021, just a few days prior to the arbitration's final decision, Whelchel received $1.7 million from the Debtor. (*Id.*)

Moreover, two of the Amendments to the Letter Agreements (ADA-SCA Grace Holdings, LLC, and Traditional Medicinals, Inc.) bear a date of January 4, 2022 (even if potentially completed at a later date) indicating that GCS and Whelchel had begun efforts to transfer assets away from the Debtor on the heels of the arbitration panel signaling an award in Intellivest's favor. (Compl. Exh. B.) In early January, the FINRA panel awarded Intellivest $908,000 (Compl. ¶ 26.) Rather than in good faith working with the regulatory bodies for Intellivest to stay alive or wind down in an orderly fashion (as is the purpose of the net capital rule), GCS abruptly shut down its operations by January 14, 2022. (Compl. ¶ 27.) From January 14, 2022 through February 7, 2022, Whelchel received further payments totaling $225,000. (Compl. ¶ 26.) Whelchel registered as a representative with Finalis on January 18, 2022 (Compl. ¶ 41) and around January

1   19, 2022, GCS allegedly executed a fee waiver agreement with Whelchel, waiving all rights and

2   any interest in the Engagement Letters. (Finalis MTD, Exh. 2.) Finalis asserts in its motion to

3   dismiss that Whelchel independently chose Finalis as his licensed broker-dealer." (Finalis MTD ¶

4   31(d) at 14:8-10.) As Whelchel registered with Finalis roughly only four days after the Debtor

5   ceased business, Whelchel had to have been discussing transferring the Debtor's assets to Finalis

6   for no consideration prior to the Debtor shutting down and at least around the same time that

7   Whelchel received $1.7 million from GCS. Whelchel was free to move to Finalis without taking

8   the Engagement Letters with him. The totality of the circumstances plead shows that Whelchel

9   received transfers of significant sums while GCS was certain to owe a substantial amount to

10  Intellivest and at the same time as the Engagement Letters were being transferred away for free by

11  Whelchel and the Debtor. The Debtor's assets were being transferred specifically beyond

12  Intellivest's reach. This is the conduct that § 548(a)(1)(A) addresses.

13          Whelchel argues incorrectly that there was no special relationship between the Debtor and

14  Whelchel. (MTD at 19:4-5.) First, on a motion to dismiss, Whelchel cannot add facts to contradict

15  Plaintiff's facts – Plaintiff's contentions must be accepted as true. Second, the Complaint alleges a

16  special relationship between GCS and the Debtor because the conduct that was at the heart of the

17  arbitration proceedings which ultimately led to Intellivest's arbitration award and which Whelchel

18  was at the center of, is the same conduct that Whelchel, the Debtor, and Finalis are accused of

19  now. Intellivest successfully argued that with GCS's knowledge, Whelchel solicited Intellivest's

20  client into breaching their engagement agreements with Intellivest in favor of GCS. Whelchel then

21  diverted to GCS contingent broker dealer commissions and fees that were owed to Intellivest.

22  (Compl. ¶¶ 22-24.) The same conduct that the arbitrators found GCS liable for, the "raiding" of

23  Intellivest's clients and contracts, has happened once again, with Whelchel diverting GCS's

24  clients, the Engagement Letters, and the broker dealer fees to Finalis and himself for no

25  consideration. The Complaint pleads circumstantial evidence of GCS and Whelchel moving the

26  Debtor's assets even further beyond Intellivest's reach.

27          Next, Whelchel argues that Plaintiff has not plead insolvency or unmanageable debt.

28  (MTD 19 at 15-16.) Plaintiff does not need to plead every circumstantial indicia that courts use to

find fraud, insolvency or unmanageable debt, which is one of them. The Complaint alleges that at the time that the $1.7 million payment was made to Whelchel on December 30, 2021 (just a few days prior to the arbitration decision) the FINRA panel had already notified GCS that it would be liable to Intellivest. (Compl. ¶ 25.) Moreover, by Whelchel asserting that at the time the arbitration award was granted in Intellivest's favor, the Debtor could not "satisfy its net capital requirements" and was "forced to shut down its operations" (MTD at 14:27-15:8.), Whelchel is acknowledging that the Debtor had unreasonably small capital under the FINRA requirements. It is beyond dispute that the transfers amounting to $225,000 made between January 14 and February 7, 2022 were after the arbitration decision and after the Debtor had insolvency issues (Compl. ¶ 26.). Thus, the Complaint pleads circumstantial evidence of fraud, including actual litigation against the Debtor and an award against it, a special relationship between the Debtor and Whelchel, and insolvency/small capital. See *Max Sugarman Funeral Home, Inc*, 926 F.2d at 1255 (finding two badges of fraud sufficient to conclude that transfers were fraudulent and void: special relationship and desperate financial condition)[3].

B. On a Rule 12(b)(6) motion, Whelchel is not permitted to add new facts to contradict Plaintiff's contentions and thus the Court may not consider Whelchel's Exhibit 2.

In an effort to have the Court dismiss the Complaint, Whelchel presents its own set of facts, which he is not permitted to do on a motion to dismiss. The sole issue raised by a Rule 12(b)(6) motion is whether the facts plead would, if established, support a plausible claim for relief. Therefore, no matter how improbable the facts alleged are, they must be accepted as true for the purposes of the motion and construed in a light most favorable to Plaintiff. *Twombly*, 550 U.S. at 556; *Lee*, 250 F.3d at 688. The incorporation by reference doctrine is a "narrow exception…It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *In re Immune Response Sec. Litg.,* 375 F.Supp.2d 983, 995-96 (S.D. Cal. 2005) (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Circ. 1998)). The overuse

---

[3] It is also "curious" that despite GCS shutting down in January 2022, it filed its bankruptcy petition four months later, presumably to prevent a trustee from filing preference actions against the transferees that received transfers within ninety days in Debtor's efforts to dissipate its assets. *See* (Compl. ¶¶ 44, 45.)

and improper application of incorporation by reference can lead to unintended and harmful results because defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Whelchel improperly requests the Court to take notice of a copy of an alleged spreadsheet and a screen shot of Whelchel's bank account to discredit the well-plead facts in the Complaint and to re-write the Complaint.

Whelchel insists that the challenged $1.9 million in transfers to him were commission payments for services rendered and earned. (MTD at 19:20-24.) To support his contentions, Whelchel asks the Court to consider Exhibit 2. Whelchel describes Exhibit 2 as "copy of the spreadsheet Debtor [allegedly] provided to Whelchel in support of the December 30, 2021 commission payment" and "a screenshot of Whelchel's bank records showing Whelchel's receipt of Debtor's wire transfer payment[.]" (MTD at 11:14-15, 11:19-20.) Whelchel seeks to contradict the Complaint with contentions and assertions that are subject to reasonable dispute. It is improper to assume the truth of an incorporated document if such assumption only serves to dispute well pleaded facts in the complaint. *Khoja*, 899 F.3d at 1003. "This admonition is of course, consistent with the prohibition against resolving factual disputes at the pleading stage." *Id.; see U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (2011) (holding that the complaint expressly referred to and relied on the existence of the reports but the court could not take draw inferences or take notice of facts that might be reasonably disputed); *Lee*, 250 F.3d at 688 (reversing district court's decision to dismiss plaintiff's claims because district court assumed the existence of facts that favor defendants based on evidence outside of plaintiff's pleadings, took notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in light most favorable to plaintiffs).

Courts "may not consider any material beyond the pleadings in ruling on a 12(b)(6) motion." *Corinthian Colleges*, 655 F.3d at 998 (quoting *Lee*, 250 F.3d at 688). A court may consider unattached evidence on which the complaint "necessarily relies" only if: (1) the complaint refers to the documents; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document. *Id.* at 999. Here, the Complaint does not

necessarily rely on an alleged commission spreadsheet or a snapshot of Whelchel's bank records to support the third and fourth causes of action against Whelchel. The Complaint does not "refer[,]" quote, or even mention the spreadsheet or snapshot and these two documents are not central to plaintiff's claim. "The mere mention of the existence of a document is insufficient to incorporate the contents of a document by reference." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citation omitted). Moreover, Plaintiff questions and challenges the authenticity of a snapshot purportedly taken from Whelchel's bank records and an unclear spreadsheet.

As the Court in *Khoja* explained: "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Khoja*, 899 F.3d at 1002. "Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint[,]" which is exactly Whelchel's purpose in requesting the Court to incorporate Exhibit 2 and dismiss claims three and four. *Id.* at 1003; *see In re Immune Response Sec. Litg.*, 375 F.Supp.2d 983, 995-96 (S.D. Cal. 2005) (declining to incorporate by reference documents because none of the opposed documents were central to or form the basis of plaintiff's claims and the complaint did not "extensively refer to them" or "necessarily rely on them" and defendants offered the documents as evidence that defendants did not commit securities violations); *Nielson v. Union Bank of Cal., N.A.*, 290 Fl.Supp.2d 1101, 1115 (C.D. Cal. 2003) (declining to take notice of a letter because its contents were not alleged in the complaint and its authenticity is disputed). The Court should not consider the documents attached to Exhibit 2 because the documents are not referred to or mentioned in the Complaint, the documents are not central to Plaintiff's fraudulent transfer claims against Whelchel, and moreover, Plaintiff disputes their authenticity.

C. Even if the Court were to incorporate Exhibit 2 into the Complaint and accept that the payments were for commissions, the payments remained property of the estate.

Whelchel argues that because the $1.9 million, in his view, were commission payments (Plaintiff disputes the assertion) it was for services rendered and earned and thus Debtor did not

retain any interest in the money. This is incorrect because FINRA Rule 2040(a)(2) provides that no member shall directly or indirectly pay any compensation, fees, commissions, or other allowances to any appropriately registered associated person unless such payment complies with all applicable federal securities laws, FINRA rules and SEA rules and regulations. FINRA Rule 2040(a)(2). For Whelchel to receive any commission payments, he had to comply with federal securities laws, rules, and regulations, and this determination is a question of fact that cannot be decided on Rule 12(b)(6) motion. Whelchel's conduct that gave rise to the Intellivest award (Compl. ¶¶ 22-26), the transfer of the Engagement Letters to Whelchel and Finalis for free (Compl. ¶¶ 27, 36-37, 40), and Whelchel's role in obtaining GCS's waiver of any rights to the Engagement Letters and the fees therein (Finalis MTD ¶ 31(d) at 14:8-10, Exh. 2) in the face of Intellivest's award (Compl. ¶¶ 51-52, 64-65) all show that Whelchel was not in compliance with the required law, rules, and regulations. Another wrinkle is that the Engagement Letters define the "Advisor" as Big Path, LLC and state that "Advisor is a registered representative pursuant to an independent contractor agreement" …between Advisor and GCS" and the Engagement Letters go on to describe the advisory services that the Advisor must perform (Compl. Exh. A beginning paragraph and §§1.3, 2.1). However, contrary to the Engagement Letters, Big Path cannot be a registered representative, only an individual can.

Whelchel next argues that because the $1.9 million were allegedly commission payments, they were held by the Debtor for Whelchel in constructive trust – and did not become property of the estate. (MTD at 20:13-21-14.) However, commissions held by a debtor for another remain property of the estate. In the case of *Stockman's Bank v. Capital Title (In re Pauley & McDonald, Inc.)*, 215 B.R. 37 (Bankr. D. Ariz. 1996), on cross motions for summary judgment, the Court held that no trust relationship existed under contract or state law between the debtor, in its capacity as real estate brokerage firm and independent contractor sales agents, with respect to the commissions which the debtor was obligated to pay the agents. The chapter 7 trustee brought an adversary proceeding against a title company for turnover of commissions associated with the sale of real properties. The agents' independent contractor agreements with the debtor provided that all the fees earned by the agents were to be collected by the debtor and transmitted to the agent. *Id.* at

40.

Like Whelchel, the agents argued that a pre-petition trust was created between the debtor and the agents, and the commissions were not property of the estate under § 541(d). *Id.* at 42. The Court found that no provision of the agreement created a trust relationship. *Id.* Rather, the debtor received a gross commission from the sale of property, of which a portion or percentage was payable to the debtor, and a separate percentage payable to the agent. *Id.* These facts are like the facts here. No provision of the registered representative agreement created a trust. GCS was to receive commissions from clients and the agreement does no more than spell out the split between Whelchel and the Debtor. The Court in *Pauley & McDonald* explained that the debtor and the agents established a debtor/creditor relationship, and nothing more. *Id.* at 43, 50. The Ninth Circuit in *Torres v. Eastlick (In re North Am. Coin & Currency, Ltd.)*, 767 F.2d 1573. 1575 (9th Cir. 1985), amended by 774 F.2d 1390 (9th Cir. 1985) held that funds subject to a constructive trust still become property of the estate. Thus, the Court should act cautiously before determining that the Debtor held the $1.9 million in constructive trust for Whelchel and that these payments were not property of the estate.

Moreover, the cases cited by Whelchel do not establish that the alleged commissions were held in constructive trust for him. In *McCafferty v. McCafferty (In re McCafferty)*, 96 F.3d 192, 198-99 (6th Circ. 1996), decided on summary judgment, the Sixth Circuit reversed and remanded holding that a pre-petition state court divorce decree that determined that the debtor's spouse had a separate interest in the debtor's pension plan created a constructive trust. Thus, when the debtor filed for bankruptcy, he only retained bare legal title in the designated portion of his wife's portion of the pension plan. *Id.*; *see also XLDatacomp, Inc. v. Wilson (In re Omega Group, Inc.)*, 16 F.3d 1443, 1449-51 (6th Cir. 1994) (stating that a constructive trust is fundamentally at odds with the goals of the bankruptcy code and thwarts the policy of ratable distribution among competing creditors). In contrast with *In re McCafferty*, here there is no pre-petition judicial order declaring that $1.9 million was held in constructive trust for Whelchel. Next Whelchel relies on *Davis v. Pham et. al. (In re Tung Thanh Nguyen)*, 783 F.3d 769 (10th Cir. 2015). In that case, the Circuit affirmed a bankruptcy court's decision after an evidentiary hearing that the debtor only possessed

bare legal title to real property under a provision of Kansas law that allows a resulting trust to form when the payor provides consideration for a piece of property but enters into an agreement with another party without fraudulent intent for the other party to hold the property in trust for the payor. *Id.* at 772. *In re Tung Thanh Nguyen* is inapplicable because first Whelchel is requesting the Court to impress a trust on the $1.9 million transfers that Whelchel received on a 12(b)(6) motion as opposed to at trial or on summary judgment. Second, Whelchel has not pointed to any state law that allows for the imposition of a trust under the facts here. Thus, *In re Tung Thanh Nguyen* is inapplicable.

Whelchel also relies on *In re Todd*, 391 B.R. 504. In that case, a resulting trust arose not under contract but by implication of Florida law that it is the presumed intention of the parties that the one furnishing the money should have the beneficial interest while the other party holds title for the benefit of the purchaser. *Id.* at 508. Again, whether or not a trust existed was not based on the pleadings but on summary judgment and facts stipulated by the parties. Additionally, unlike *In re Todd*, Whelchel does not argue for a resulting trust based on state law but rather a constructive trust because of a contractual provision on the percentage split of commissions and facts that are subject to dispute. None of the cases cited by Whelchel support Whelchel's assertion that the alleged commissions were not property of the estate and that such a determination should be made on a Rule 12(b)(6) motion.

Whelchel's earmarking argument also falls flat. In *Trigem America Corporation*, 431 B.R. 855, 864 (Bankr. C. D. Cal. 2010), decided on summary judgment, a California corporation wholly owned by a Korean corporation transferred $17.85 million to the parent corporation's bond-holders pre-petition on the instructions of the parent. Upon making such a factual determination, the Court held that the funds transferred from the California corporation that subsequently filed for bankruptcy was not the subsidiary's property because it was the parent corporation who designated who would be paid. Here, assuming even that the $1.9 million was a payment on account of commissions, and Plaintiff contends otherwise, that payment would have been made to the Debtor by a client under an engagement letter. The Engagement Letters do not dictate the commissions be paid to Whelchel. Thus, this case does not support Whelchel's

earmarking argument.

Additionally, *U.S. Bank N.A. v. Verizon Commc'ns Inc., No.* 3:10-cv-1842-G, at * 25-26 (N.D. Tex. July 31, 2012) cited by Finalis contradicts Whelchel's argument. There, pre-petition the debtor received $1.9 billion through a loan from third party lenders under an agreement requiring the debtor to use the loans to make a cash distribution to Verizon, which the debtor did. *Id.* at * 20. On a motion to dismiss a complaint to avoid the distribution as a fraudulent transfer, the defendants asserted the earmarking doctrine citing *Trigem America Corporation. Id.* at *22. The Court denied the motion to dismiss and explained that "even if only briefly, this money was an interest of the debtor in property, and therefore is within the purview of the fraudulent transfer statutes. *Id.* Moreover, the $1.9 billion transfer clearly did have the effect of diminishing [the debtor's assets]." *Id.* Therefore, the plaintiff successfully pled a claim for fraudulent transfer. Here too, the Trustee successfully pleads a claim for fraudulent transfers of $1.9 million to Whelchel.

D. <u>Whether Whelchel received the transfers in good faith is an affirmative defense that cannot be decided on a motion to dismiss.</u>

Whelchel asserts that it accepted the transfers in good faith. A good faith defense under § 548(c) is an affirmative defense, which cannot be raised by a Rule 12(b)(6) motion unless the allegations of the complaint plead facts that establish the affirmative defense. *Weisbuch v. County of Los Angeles*, 119 F.3d 783, fn 1 (9th Cir. 1997); *Xechem, Inc. v. Bristol-Meyers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). At no point does the Complaint allege that Whelchel acted in good faith by accepting $1.9 million in transfers.

As to good faith and knowledge, in *In re Agric. Rsch. & Tech. Grp., Inc.(In re Agritech)*, 916 F.2d 528, 539 (9th Cir. 1990), the Ninth Circuit indicated that the issue of good faith involved what the transferee "knew or should have known" in an objective rather than subjective sense, and concluded that, if the circumstances would have put a reasonable person on inquiry of the debtor's fraud and a diligent inquiry would have discovered the same, good faith is lacking. 916 F.2d at 535–36. The court in *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207 (Bankr. D. Nev. 2007), agreed with *Agritech* and quoted *Shauer v. Alterton*, 151 U.S. 607, 621 (1894), regarding a lack of good faith:

> [W]hile the plaintiff was not bound to act upon mere suspicion as to the intent with which [the transferor] made the sale in question, if he had knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether [the transferor] intended to delay or defraud his creditors, and he omitted to make such inquiry with reasonable diligence, he should have been deemed to have notice of such fact, and therefore such notice as would invalidate the sale to him, if such sale was in fact made with the intent upon the part of the [transferor] to delay or defraud other creditors.

367 B.R. at 223–24. One who knowingly or recklessly participates in a fraudulent scheme designed to injure or obstruct the transferor's creditors will not be protected even if value is given in exchange for that transfer. *Gill v. Maddalena*, 176 B.R. 551, 555 (Bankr. C. D. Cal. 1995).

The point is that Whelchel does not have an automatic successful affirmative defense that would support dismissal. The same pattern that the arbitrators found GCS liable for, the "raiding" of Intellivest's clients, contracts, and commissions, has happened again and Whelchel is again at the center of it. Discovery will show that the clients, engagement letters and fees that Whelchel took with him to Finalis are the very same clients that Intellivest asserted in its successful arbitration were Intellivest's. Whelchel "independently chose Finalis as his licensed broker-dealer" (Finalis MTD ¶ 31(d) at 14:9-10) and took the Engagement Letters for free without any consideration of GCS's debt. (Compl. ¶¶ 27, 40, 44, 51-53, 60, 64-65.) Whelchel did not need to take the Engagement Letters with him to Finalis. Moreover, during the same period, Whelchel received $1.9 million in transfers. How complicit and involved Whelchel was in hindering, delaying, and defrauding Intellivest will depend on the facts elicited in discovery. Whelchel's unexamined defense that it received the transfers in good faith cannot be conclusive at this time.

## V.   Plaintiff's Fourth Claim for Avoidance of the $1.9 million as Constructive Fraudulent Transfers as Plead Defeats Whelchel's Efforts to Dismiss the Claim.

In arguing for dismissal of the fourth claim for avoidance of constructive fraudulent transfers of the $1.9 million in payments that he received, Whelchel merely repeats the arguments he makes in support of dismissal of the third claim for avoidance of actual fraudulent transfers. He argues first that the $1.9 million transfers were commissions for services performed and next he argues that the payments were not Debtor's property because they were held in constructive trust and earmarked for Whelchel. With respect to his first argument, Plaintiff has not pled that the $1.9 million was for commissions and the Court may not consider Exhibit 2 because

under Ninth Circuit authority, the documents are not relied upon at all in the Complaint. *See* Section IVB above. With respect to Whelchel's constructive trust and earmarking assertions, the arguments are unavailing for the reasons set forth above in Section IVC.

### VI. Plaintiff is Entitled to Recovery and Relief Under Sections 550 and 551

The estate is damaged from the transfer of the Engagement Letters and right to receive tail fees for no consideration. The estate is also damaged from the transfer of $1.9 million to Whelchel. After the conduct alleged in detail in the Complaint, the estate was left with personal property of around $40,000 and liabilities of $2,472,881. (Compl. ¶ 45.) The Complaint contains ample facts in support of the four claims for avoidance of fraudulent transfers and Plaintiff is thus entitled to recover under §§ 550 and 551 of the Bankruptcy Code.

### CONCLUSION

The Motion should be denied. To the extent the Court is inclined to dismiss any particular claim for relief, Plaintiff requests that it be permitted to amend its Complaint. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). A plaintiff should be afforded an opportunity to test his claim on the merits. *Id.* In the absence of any "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given.'" *Id.* At this early stage where neither defendant has answered the Complaint, discovery has not even begun, and there have been no previous amendments, allowing an amendment will not prejudice defendants.